# EXHIBIT E

LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:   +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice* forthcoming)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:   +1 202.853.3491

HOLLAND & KNIGHT LLP
  James W. Noe (*pro hac vice* forthcoming)
  *jim.noe@hklaw.com*
  Ashley Akers (*pro hac vice* forthcoming)
  *ashley.akers@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

Attorneys for Plaintiffs Sable Offshore Corp. and
Pacific Pipeline Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABLE OFFSHORE CORP., and PACIFIC PIPELINE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ARMANDO QUINTERO, in his official capacity as Director of the California Department of Parks and Recreation, <br><br> Defendant. | **CASE NO.** 2:26-cv-02739 <br><br> **COMPLAINT FOR DECLARATORY RELIEF** <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Sable Offshore Corp. ("Sable Offshore") and Pacific Pipeline Company ("PPC") (collectively, "Sable") bring this action for declaratory relief against Defendant Armando Quintero, in his official capacity as Director of the California Department of Parks and Recreation ("CDPR"), and allege as follows:

## INTRODUCTION

1.      This case arises from the collision of federal and state law.  Sable faces two directly contradictory demands: on one hand, the United States Government's recently issued "Pipeline Capacity Prioritization and Allocation Order," Ex. A (the "DPA Order"), commanding Sable to immediately *begin* flowing oil through the entire Santa Ynez Pipeline System pursuant to the Defense Production Act, and on the other hand, the State of California's insistence that Sable *desist* from flowing oil until the state agrees to renew an easement that was in place for 30 years covering a small segment of CDPR land.  Sable must choose between compliance with federal law, risking a state action, and compliance with California's demands, risking the DPA's civil and criminal penalties.  *See* 50 U.S.C. § 4513.  But like all direct conflicts between federal and state law, the Supremacy Clause compels a straightforward conclusion: federal law controls.  And that is particularly true here in the field of interstate pipelines, where Congress has entirely displaced state regulation.

2.      Sable owns the Santa Ynez Pipeline System, a single integrated pipeline system for moving crude oil and natural gas from offshore waters containing the largest known offshore oilfield in the United States to and throughout central California.  This case concerns one onshore section of that pipeline system: a four-mile stretch of the approximately 113.5-mile pipe termed "Segment CA-325."  This four-mile portion of Segment CA-325 runs through Gaviota State Park, pursuant to a time-limited easement granted in 1987.

3.      In 2015, under different ownership, a spill occurred along a different segment of the pipeline system.  Pursuant to a directive from the federal Pipeline and

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E
98

Hazardous Materials Safety Administration ("PHMSA"), oil was removed from Segment CA-325 and replaced with inert gas in the wake of that spill. Federal regulators, along with the pipeline system's then-owners and multiple state entities—including CDPR—entered into a Consent Decree, Ex. B, to resolve claims related to the spill and to agree on a specific set of steps required to restart the flow of oil through certain onshore portions of the Santa Ynez Pipeline System, including Segment CA-325.

4.     Sable purchased the Santa Ynez Pipeline System in February 2024 and contractually agreed to be bound by certain Consent Decree provisions relating to the pipeline. Sable has since complied with each requirement for restart of the flow of oil through Segment CA-325 as outlined in the Consent Decree.

5.     To comply with the relevant Consent Decree provisions, Sable required continual access to Gaviota State Park for repair and maintenance of the pipeline, which CDPR continually allowed, even though the easement's initial term had run. CDPR knew and understood that Sable was undertaking these repair and maintenance activities in preparation for the restart of CA-325—repair and maintenance activities that cost more than $7 million in Gaviota State Park alone—based on its reliance on the segment restart process agreed to by CDPR in the Consent Decree.

6.     CDPR now demands, as a condition of renewing the long-held easement, that Sable conduct extensive additional environmental testing and review and acquire new permits above and beyond the Consent Decree's requirements, effectively attempting to force Sable to submit to California's preferred regulatory regime. But since the Santa Ynez Pipeline System is designated as an "interstate" pipeline exclusively regulated by PHMSA, California's regulatory demands run headlong into governing—and exclusive—federal pipeline regulations.

7.     On March 13, 2026, the Secretary of Energy issued the DPA Order pursuant to authority delegated by the President under the Defense

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E

99

Production Act, directing Sable to immediately begin to flow oil through the entirety of the Santa Ynez Pipeline System.  As stated in that order, the Secretary has determined that the Santa Ynez Pipeline System is "a critical energy resource on the West Coast," necessary to address identified "shortages" and "energy vulnerabilities on the West Coast" that are causing "adversarial dependence" on hostile foreign actors.  Ex. A at 19.  The DPA Order accordingly orders Sable to "immediately commence" services which will require flowing oil throughout the Santa Ynez Pipeline System, by "prioritiz[ing] and allocat[ing] pipeline transportation services for hydrocarbons from the SYU through the SYPS."  *Id.* at 20.  But because the Santa Ynez Pipeline System is an integrated network, Sable must necessarily flow oil through the pipeline segment in Gaviota State Park, as has occurred since the pipeline first entered service in 1992.

8.    An active and present controversy thus exists between Sable and Defendant concerning their respective rights and duties regarding Segment CA-325, namely California's attempt to assert control over the pipeline in opposition to federal law.  Sable seeks a judicial declaration from this Court that (1) federal law and Defendant's conduct in the Consent Decree litigation bar Defendant's attempt to condition an extension, renewal, or regrant of the easement on compliance with Defendant's preferred state regulatory regime—including heightened environmental testing and permitting requirements; and (2) the Defense Production Act of 1950 preempts any state-law action by Defendant seeking to prevent Sable from complying with its duties under the DPA Order, whether sounding in trespass, breach of contract, or otherwise.

## JURISDICTION AND VENUE

9.    This action arises under the laws of the United States and the State of California.  This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1337, because this action arises under an act of Congress regulating commerce,

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

specifically, the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq*.

10. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11. Venue in the Central District of California is proper pursuant to 28 U.S.C. § 1391(b). Upon information and belief, Defendant maintains offices and/or resides within the Central District. Moreover, a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and the property that is the subject of the action is likewise situated in this district.

12. This Court has personal jurisdiction over Defendant as he is a citizen of, and resides in, the State.[1]

## THE PARTIES

13. Plaintiff Sable Offshore Corp. is a Delaware corporation, registered to do business in California, with its principal place of business in Texas.

14. Plaintiff Pacific Pipeline Company is a Delaware corporation, registered to do business in California.

15. Defendant Armando Quintero is the Director of the California Department of Parks and Recreation. He is sued in his official capacity only.

## GENERAL ALLEGATIONS

**A.     The National Energy Emergency**

16. On January 20, 2025, the President issued Executive Order 14156 (the "National Energy Emergency Order"), finding that "our Nation's inadequate energy supply and infrastructure causes and makes worse the high energy prices that devastate Americans, particularly those living on low- and fixed-incomes," a harm that "is exacerbated by our Nation's diminished capacity to insulate itself from hostile foreign actors." 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025).

---

[1] The filing of this complaint and Plaintiffs' participation in this lawsuit shall not be construed as a waiver of personal jurisdiction defenses in any other matter. Plaintiffs do not consent to personal jurisdiction in California in connection with any other matter.

5

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

17. Accordingly, the President determined that "[t]he United States' insufficient energy production, transportation, refining, and generation, . . . constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy," a threat that is "most pronounced in our Nation's . . . West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population." *Id.* at 8434.

18. The National Energy Emergency Order, among other directives, requires federal agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States" so as "to protect the collective national and economic security of the United States." *Id.*

**B.     The Santa Ynez Pipeline System and Segment CA-325**

19. The Santa Ynez Pipeline System consists of an integrated pipeline system for transporting crude oil and natural gas from offshore wells—the single largest known offshore oilfield in the United States—into and across southern California. It transports hydrocarbons from sixteen federal leases—comprising approximately 76,000 acres of the Outer Continental Shelf in the federal waters of the Santa Barbara Channel that are held by Sable—to intermediate onshore processing facilities at Las Flores Canyon. This case concerns Segment CA-325, a part of the Santa Ynez Pipeline System, connecting Gaviota Pump Station in Santa Barbara County to the Pentland Delivery Point in Kern County.

20. Prior to construction, a comprehensive environmental impacts analysis was performed on Segments CA-324 and CA-325, which included an assessment of the long-term operation (including repairs and maintenance) of Segment CA-325.

21. In the mid-1980s, a group of federal and state agencies—the California State Lands Commission, the federal Bureau of Land Management, and the U.S. Department of the Interior—prepared a joint Environmental Impact Report and

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E

102

Environmental Impact Statement that identified a right-of-way through Gaviota State Park as an environmentally superior route based in part on an assessment of the long-term operation of Segment CA-325. The State Lands Commission certified the report in January 1985, and the Santa Barbara County Planning Commission approved the pipeline in February 1986.

22.   On November 23, 1987, CDPR granted an easement allowing construction, maintenance, and operation of Segment CA-325 through the Gaviota State Park right-of-way. Since 1987, Sable and its predecessors-in-interest have maintained and operated the pipeline along that right-of-way.

**C.     The Refugio Oil Spill and the Consent Decree**

23.   On May 19, 2015, a leak along Segment CA-324—a different segment from Segment CA-325—while the pipeline segment was owned and operated by a predecessor to PPC, resulted in the Refugio oil spill. PHMSA, the federal authority that regulates oil pipelines, ordered that oil temporarily stop flowing through Segments CA-324 and CA-325 while pipeline conditions were evaluated.

24.   The then-owners of Segments CA-324 and CA-325, the United States, and various other federal and California agencies—including CDPR—entered into the Consent Decree to "resolve[] the civil claims of the United States and the State Agencies" relating to the Refugio spill.[2] Ex. B at 72.

25.   In exchange for civil penalties, damages payments, and required compensation in the settlement—of which the Consent Decree earmarked $2 million for CDPR—the parties agreed on three alternative paths forward for Segment CA-325, two of which explicitly contemplated flowing oil through Gaviota State Park once again.

26.   The Consent Decree provided three options for compliance. The

---

[2] Plains All American Pipeline, L.P. and Plains Pipeline, L.P., entered into the Consent Decree. Sable purchased the Santa Ynez Pipeline System in February 2024 and has assumed the relevant obligations under the Consent Decree. For ease of reference, this complaint refers to the pipeline owner as "Sable."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E

103

pipeline owner/operator could (1) "replace the existing" pipeline segments with new pipe, (2) "[a]s an alternative to replacement[,] . . . restart the existing pipelines in accordance with the [Consent Decree]," or (3) "[a]s an alternative to replacement or restart[,] . . . abandon all or any segments." *Id.* 105-06.[3]

27.    The Consent Decree imposed different conditions on the three options. For the replacement option, it explicitly noted that new construction would be viable only "if [the pipeline owner] is able to timely obtain . . . whatever *additional* rights are needed, including rights-of-way that may be needed from landowners." *Id.* at 105 (emphasis added).

28.    By contrast, the "restart" option did not contemplate a requirement to obtain rights-of-way.  Instead, the only condition for restart was to do so "in accordance with the [Consent Decree]" and its "Appendix D," *id.* at 106, a document listing the "outstanding corrective actions" required by PHMSA, *id.* at 121.  Those actions comprised the "Restart Plan" and described operating rules for when Sable "may return that segment [CA-325] to service" as well as what it could do "[a]fter a return to service." *Id.* at 124-25.  The Consent Decree's "Restart Plan" did not include any provisions or requirements for further state-law environmental review, nor for further securing of easement rights from CDPR. *See id.* at 121-27.  That was true even though the 30-year term initially outlined in the easement had run at the time CDPR entered the Consent Decree and agreed to the "Restart Plan" obligations.

29.    Sable has complied with all relevant terms of the Consent Decree and completed all necessary steps for restart.

**D.    Federal Regulation of Interstate Pipeline Facilities**

30.    Under federal law, interstate pipelines are subject to the exclusive regulatory oversight of PHMSA. *See* 49 U.S.C. §60104(c).  Segment CA-325 was regulated by PHMSA as an interstate pipeline prior to the 2015 spill.  However, after

---

[3] Segment CA-325 was previously known as Line 903, and the Consent Decree references it as such.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

the spill, with the prior owner only owning the onshore Segments CA-324 and CA-325 and cancelling federal tariffs with the Federal Energy Regulatory Commission in light of the cessation of oil flows, California's Office of the State Fire Marshal ("OSFM") assumed regulation of Segment CA-325 as an intrastate pipeline.

31.   Sable, directly and through its subsidiary PPC, purchased all segments of the Santa Ynez Pipeline System in February 2024.  Because that purchase united the onshore and offshore segments under common ownership, on December 17, 2025, PHMSA redesignated the entire Santa Ynez Pipeline System (including Segment CA-325) as an interstate pipeline.  PHMSA determined that the Santa Ynez Pipeline System is "subject to the regulatory oversight of PHMSA," and it confirmed that the Santa Ynez Pipeline System is considered an "active" pipeline under federal regulations.  *See* Ex. C at 131 & n.8.  In light of PHMSA's exclusive jurisdiction, OSFM no longer retains any regulatory role with respect to the Santa Ynez Pipeline System.

32.   On December 22, 2025, PHMSA approved Sable's Restart Plan for Segment CA-325.  *See* Ex. D.

33.   The next day, on December 23, 2025, PHMSA granted Sable an emergency "Special Permit" for Segment CA-325.  On January 22, 2026, Sable submitted a request for a non-emergency Special Permit.  The Special Permit waives a single regulatory requirement and imposes additional safety measures to ensure pipeline integrity.  On February 23, 2026, PHMSA "preliminarily determined that the issuance of the special permit would not be inconsistent with pipeline safety" and noticed the Special Permit application for public comment.  *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026).  The Consent Decree required Sable to seek and obtain this Special Permit.

34.   No other PHMSA approvals are necessary to flow oil through Segment CA-325.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E
105

**E. Sable's Recent Efforts to Repair and Restart the Santa Ynez Pipeline System**

35. Sable chose to pursue the second option under the Consent Decree—restarting the flow of oil through Segments CA-324 and CA-325 in accordance with the relevant requirements of the Consent Decree. Following that roadmap, Sable has invested over $150 million in repairs and upgrades to the Santa Ynez Pipeline System, including Segment CA-325. Sable has since installed automated safety valves, conducted in-line inspections, implemented a new pipeline control system with real-time leak detection and automatic shutdown capability, and performed other ongoing maintenance pursuant to the Consent Decree.

36. As part of this work, CDPR has entered into a series of "Right of Entry Permit[s]" with Sable (and its predecessor) allowing Sable to enter Gaviota State Park for maintenance and repairs on Segment CA-325. Sable has entered Gaviota State Park numerous times to conduct this maintenance and make these repairs. CDPR understood that the purpose of these maintenance and repair activities was to comply with the Consent Decree requirements and restart the flow of oil through Segment CA-325. Some of these permits explicitly contemplated a restart of Segment CA-325.

**F. The Defense Production Act Order**

37. On March 13, 2026, on behalf of and under authority delegated by the President of the United States, the Secretary of Energy issued the DPA Order, "direct[ing]" Sable to "immediately commence" services which will require flowing oil throughout the entirety of the Santa Ynez Pipeline System. Ex. A at 20. In the DPA Order, the Secretary found that the immediate resumption of petroleum transportation throughout the Santa Ynez Pipeline System, including Segment CA-325, is "necessary or appropriate to promote the national defense." *Id.* The Secretary also found, in accordance with the President's determination in the National Energy Emergency Order, that it is critical to alleviate "our Nation's

10

EXHIBIT E
106

diminished capacity to insulate itself from hostile foreign actors," and to address the national energy emergency that is "devastat[ing] Americans, particularly those living on low- and fixed-incomes." 90 Fed. Reg. at 8433. And because West Coast energy shortages "'jeopardize our Nation's core national defense and security needs,'" both consumers and the military require Sable's "continuous production to address energy vulnerabilities on the West Coast." Ex. A at 18 (quoting 90 Fed. Reg. at 8433).

### G.     California's Improper Attempts To Regulate The Pipeline Through Easement Conditions

38.    At all times since Sable acquired the Santa Ynez Pipeline System, it has intended to resume petroleum transportation throughout the Santa Ynez Pipeline System. CDPR understood that this is Sable's purpose and has knowingly encouraged and authorized Sable to invest its resources in carrying out the required activities under the Consent Decree to resume the transportation of petroleum through Segment CA-325.

39.    Despite (1) the original Environmental Impact Report and Environmental Impact Statement already assessing the long-term operation of Segment CA-325, including regular required maintenance and repair activity, (2) Sable's compliance with the terms of the Consent Decree, (3) PHMSA's approval for Sable to flow oil through Segment CA-325, and (4) the United States' direction that Sable resume the flow of oil immediately, CDPR now asserts that Sable may not flow oil unless it complies with additional environmental analysis and review far beyond the scope of what it agreed to in the Consent Decree.

40.    A comprehensive environmental impacts analysis, including an assessment of long-term operations, was already conducted prior to CA-325's construction in the 1980s. Sable does not expect that restart will result in any new construction activity other than the general repair and maintenance activities already contemplated by the original environmental impacts analysis and previously

11

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

authorized by CDPR in the original easement and subsequent Right of Entry permits. CDPR expressly agreed, in the Consent Decree, to the contemplated resumption of oil flow through the existing pipeline.  And Sable has already completed the new construction work and additional testing required to comply with the Consent Decree.

41.    However, CDPR has refused to extend the longstanding easement and instead granted only one-year Right of Entry permits (for which Sable pays tens of thousands of dollars each year).

42.    CDPR has not offered any non-regulatory reasons for refusing to renew or extend the long-held easement.  Instead, by requiring extensive additional environmental analysis and review, CDPR is effectively treating the easement as an entirely new project.

43.    On information and belief, CDPR's reasons for refusing to renew the easement are pretextual.  California has no continuing role in regulating the Santa Ynez Pipeline System given the exclusive jurisdiction of PHMSA.  However, it seeks to regulate the Santa Ynez Pipeline System indirectly by refusing to renew the easement and instead conditioning its extension on compliance with directives not contemplated by the Consent Decree and inconsistent with PHMSA's exclusive jurisdiction.

### FIRST CAUSE OF ACTION

### Declaratory Judgment – Unlawful State Regulation

44.    Plaintiffs allege and incorporate by reference each and every of the above allegations.

45.    Defendant is seeking to regulate in an area reserved solely to the federal government under the federal Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, and its accompanying federal regulations, demanding compliance with its preferred state regulatory regime as a condition of clarifying the status of and/or renewing Sable's easement in Gaviota State Park.  Defendant's conduct thus requires Sable to

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

either submit to an unlawful and unauthorized state regulatory regime or risk the permanent shutdown of the Santa Ynez Pipeline System, a critical piece of national energy infrastructure that Sable is under a federal order to operate as a matter of national security.

46. Moreover, the DPA Order—issued by the United States of America, one of the signatories to the Consent Decree—poses a direct potential conflict with Defendant's interpretation of state law. Sable has been ordered to immediately begin flowing oil through the entirety of the Santa Ynez Pipeline System, which the President has declared a critical need to provide for national security and defense. Yet, Defendant's intransigence in clarifying the Gaviota State Park easement (or, as necessary, negotiating an extension of the easement) means that Sable's compliance with the DPA Order may require exceeding its current agreements with CDPR. But just as with the Pipeline Safety Act, a conflict between the Defense Production Act and state law must be resolved in favor of federal law.

47. CDPR is also barred and estopped from demanding any regulatory or environmental conditions to resume the flow of petroleum through Segment CA-325 beyond those contained in the Consent Decree, to which CDPR is a party and for which it received significant compensation. The Consent Decree offered a path forward for restart of Segment CA-325, and it made clear that additional rights-of-way would only be necessary for construction of a new pipeline, not a restart of the existing CA-325 segment. Having agreed to these representations and commitments, Defendant may not now seek to retroactively modify the Consent Decree through the coercive application of state property law.[4]

48. Plaintiffs therefore seek a declaration from this Court that federal law and Defendant's representations in the Consent Decree litigation preempt and bar

---

[4] Sable does not object to compensating Defendant for the fair market value of the easement or agreeing to appropriate indemnities, consistent with its historic practice under the easement.

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E

any attempts by Defendant to regulate, direct, oversee, inspect, control, or otherwise interfere with the operation, maintenance, construction, restart, staffing, or testing of Sable's pipeline, including the CA-325 segment, by any means—including, but not limited to, attaching regulatory conditions in negotiations over easements or rights-of-way through Gaviota State Park.

## SECOND CAUSE OF ACTION

### Declaratory Judgment – Liability Under Defense Production Act

49.   Plaintiffs allege and incorporate by reference each and every of the above allegations.

50.   Under the Defense Production Act, "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or [DPA] order." 50 U.S.C. § 4557. The DPA Order requires Sable to utilize the entirety of the Santa Ynez Pipeline System, including Segment CA-325, to assist in providing oil for refineries to promote the national defense and alleviate the national energy shortage. Sable's compliance with the DPA Order may require exceeding Defendant's interpretation of Sable's current Right of Entry Permits.

51.   Along with the DPA's prioritization and allocation authorities, *see* 50 U.S.C. § 4511(a), (c), Section 4557's limitations on liability bars any state-law legal or equitable action by Defendant seeking to prevent Sable from complying with the terms of the DPA Order.

52.   Plaintiffs therefore seek a declaration from this Court that the Defense Production Act bars any legal or equitable action by Defendant seeking to prevent Sable from complying with the terms of the DPA Order, whether sounding in trespass, breach of contract, or any other legal theory.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. A judicial declaration that federal law and Defendant's agreement to the

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

Consent Decree preempt and bar any attempts by Defendant to regulate, direct, oversee, inspect, control, or otherwise interfere with the operation, maintenance, construction, restart, staffing, or testing of Sable's pipeline, including Segment CA-325, by any means—including, but not limited to, attaching regulatory conditions in negotiations over easements or rights-of-way through Gaviota State Park;

2. A judicial declaration that the Defense Production Act bars any legal or equitable action by Defendant seeking to prevent Sable from complying with the terms of the DPA Order, whether sounding in trespass, breach of contract, or any other legal theory; and

3. Any other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R. 38-1, Plaintiffs demand a jury trial for all issues so triable.

Dated:  March 13, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Jessica Stebbins Bina*
Jessica Stebbins Bina
jessica.stebbinsbina@lw.com
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
nmcdaniel@babstcalland.com
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:  +1 202.853.3491

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice* forthcoming)
jim.noe@hklaw.com

15

EXHIBIT E
111



Ashley Akers (*pro hac vice* forthcoming)
*ashley.akers@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

Attorneys for Plaintiffs Sable Offshore Corp. and Pacific Pipeline Company

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT E

112