ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
*Jessica.tuckermohl@doj.ca.gov*
Supervising Deputy Attorney General
ALICE M SEGAL (SBN 288108)
*alice.segal@doj.ca.gov*
MATTHEW T. STRUHAR (SBN 293973)
*Matthew.struhar@doj.ca.gov*
Deputy Attorneys General
State Bar No. 288108
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 738-9640
  Fax: (916) 732-7920
*Attorneys for Plaintiff*
*California Department of Parks and*
*Recreation*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **California Department of Parks and Recreation,**<br><br>Plaintiff,<br><br>v.<br><br>**Sable Offshore Corp. and Pacific Pipeline Company,**<br><br>Defendant. | Case No. 2:26-cv-02946-WLH-MAA<br><br>**DEPARTMENT OF PARKS & RECREATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: April 24, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: Hon. Wesley L. Hsu<br>Trial Date: Not Set<br>Action Filed: 3/17/2026<br>Date Removed: 3/19/2026<br>Filed/Concurrently Lodged with: Declaration of Emma Siverson; Declaration of Dena Bellman; Declaration of David Flora; Proposed Preliminary Injunction Order; Request for Judicial Notice |

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................................1

Statement of Facts......................................................................................................2

    I.    The Previous Easement Issued by State Parks to Sable's Predecessor-in-Interest.........................................................................2

    II.    The 2015 Refugio Oil Spill.........................................................2

    III.    The Annual Right of Entry Permits Issued by State Parks to Sable and its Predecessors-in-Interest.......................................3

    IV.    The Right of Entry Permit Issued to PPC in May 2025 to Perform Anomaly Digs.................................................................4

    V.    Sable's Pending Easement Application with State Parks.....................4

    VI.    Recent Developments.................................................................6

Legal Standard...........................................................................................................7

Argument....................................................................................................................7

    I.    State Parks Is Likely To Succeed on the Merits...................................7

        A.    The Likelihood of Success on the Merits Relies on State Law.................................................................................7

        B.    State Parks Is Likely to Succeed on the Merits.........................7

    II.    There is a Grave Risk of Imminent, Irreparable harm.......................10

        A.    There is Irreparable Harm to State Parks' Enjoyment and Possession of the Land in Gaviota State Park.........................11

            1.    The Continuous Trespass Interferes with Possession and Enjoyment of Gaviota, Causing Irreparable Harm.................................................................12

            2.    The Continuous Trespass Will Likely Cause Physical Damage to Gaviota, Further Interfering with State Parks' Possession, Constituting Irreparable Harm.............................................................13

        B.    There is Irreparable Harm to State Parks' Ability to Conduct Environmental Review.............................................15

    III.    The Balance of Equities Tip Sharply in Favor of A Preliminary Injunction............................................................18

    IV.    The Public Interest Favors A Preliminary Injunction........................20

    V.    The Court Should Not Require A Bond From State Parks...................21

Conclusion...............................................................................................................22

i

## TABLE OF AUTHORITIES

**Page**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
901 F.3d 1166 (9th Cir. 2018)..................................................................7

*Alliance for Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011).................................................16, 20, 21

*Amoco Prod. Co. v. Village of Gambell, AK*
480 U.S. 531 (1987) ...............................................................................13

*Ariz. Dream Act. Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014)................................................................18

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad
River Reservation v. Enbridge Energy Co. Inc.*
626 F.Supp.3d 1030 (W.D. Wis. 2022).............................................8, 11

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023).................................................................21

*by Baral v. Schnitt*
1 Cal. 5th 376 (2016)..............................................................................12

*Cassinos v. Union Oil Co.*
14 Cal.App.4th 1770 (1993).....................................................................8

*City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*
408 F.Supp.3d 1057 (N.D. Cal. 2019)....................................................10

*Civic W. Corp. v. Zila Indus., Inc.*
66 Cal.App.3d 1 (1977) ............................................................................8

*Colorado Wild Inc. v. U.S. Forest Serv.*
523 F. Supp. 2d 1213 (D. Colo. 2007) ...................................................16

*DISH Network L.L.C. v. DelVecchio*
831 F.Supp.2d 595 (W.D.N.Y. 2012) .....................................................18

*Disney Enters., Inc. v. VidAngel, Inc.*
869 F.3d 848 (9th Cir. 2017).............................................................19, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*
232 Cal. App. 4th 1171 (2014)........................................................................12

*Dugas v. 3M Co.*
101 F. Supp. 3d 1246 (M.D. Fla. 2015) ...........................................................7

*eBay, Inc. v. Bidder's Edge, Inc.*
100 F. Supp. 2d 1058 (N.D. Cal. 2000)............................................................8

*Env't Democracy Project v. Green Sage Mgmt., LLC*
No. 22-CV-03970-JST, 2022 WL 4596616 (N.D. Cal. Aug. 23,
2022) ...............................................................................................................22

*ForestKeeper v. Elliott*
50 F. Supp. 3d 1371 (E.D. Cal. 2014)..............................................................16

*Gasperini v. Ctr. for Humanities., Inc.*
518 U.S. 415 (1996) ..........................................................................................7

*Gill v. LDI*
19 F. Supp. 2d 1188 (W.D. Wash. 1998) ........................................................13

*Harris v. Cnty. of Riverside*
904 F.2d 497 (9th Cir. 1990)...........................................................................13

*High Sierra Hikers Ass'n v. Blackwell*
390 F.3d 630 (9th Cir. 2004).............................................................16, 17, 18

*In re Brown*
No. 23-60035, 2024 WL 2127040 (9th Cir. May 13, 2024) .............................8

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
4 F.3d 819 (9th Cir. 1993)...............................................................................18

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009).........................................................................21

*League of Wilderness Defenders/Blue Mountains Biodiversity Project*
*v. Connaughton*
752 F.3d 755 (9th Cir. 2014)...........................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*
506 F. Supp. 3d 1018 (C.D. Cal. 2020) .............................................................. 7, 8

*M.F. Farming Co. v. Couch Distrib. Co.*
207 Cal. App. 4th 180 (2012) .............................................................................. 12

*M.R. v. Dreyfus*
697 F3d 706 (9th Cir. 2015) ................................................................................ 10

*Michigan v. U.S. Army Corps of Eng'rs*
667 F3d 765 (7th Cir. 2011) ................................................................................ 10

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018) ............................................................................................ 21

*Park Village Apts. Tenants Ass'n v. Mortimer Howard Trust*
636 F.3d 1150 (9th Cir. 2011) ........................................................................ 11, 13

*Pelfresne v. Vill. of Williams Bay*
865 F.2d 877 (7th Cir. 1989) .......................................................................... 11, 13

*Pharm. Soc'y of State of New York, Inc. v. New York State Dep't of Soc. Serv.*
50 F.3d 1168 (2nd Cir. 1995) .............................................................................. 22

*Richards v. Dep't of Bldg. Inspection of City & Cnty. of S.F.*
No. 20-CV-01242-JCS, 2020 WL 3892859 (N.D. Cal. July 10, 2020) ............................................................................................................ 8

*Samsung Elec. Co., Ltd. v. Early Bird Sav.*
Case No. 13–CV–3105–BEN (DHB), 2014 WL 324558 (S.D. Cal. Jan. 27, 2014) ...................................................................................................... 19

*Save Strawberry Canyon v. Dep't of Energy*
613 F. Supp. 2d 1177 (N.D. Cal. 2009) ............................................................... 16

*Shell Offshore Inc. v. Greenpeace*
864 F.Supp.2d 839 (D. Alaska 2012) ................................................. 13, 18, 19, 20

*Starrh & Starrh Cotton Growers v. Aera Energy LLC*
153 Cal.App.4th 583 (2007) ............................................................................ 8, 12

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*State of California v. Wright, et al.*
No. 3:26-cv-02500 (N.D. Cal. filed Mar. 23, 2026) ...........................................10

*Texas v. U.S. Dep't of Homeland Sec.*
123 F.4th 186 (5th Cir. 2024)..................................................................................12

*Tulare Lake Canal Co. v. Stratford Pub. Util. Dist.*
92 Cal.App.5th 380 (2023)...............................................................................16, 17

*U.S. v. Diapulse Corp. of America*
457 F.2d 25 (2d Cir. 1972)......................................................................................19

*U.S. v. Vertac Chem. Corp.*
46 F.3d 803, 812 (8th Cir. 1995).............................................................................10

*Union Oil Co. of Cal. v. Domengeaux*
30 Cal. App. 2d 266 (1939).....................................................................................12

*United States v. California*
921 F.3d 865 (9th Cir. 2019)...................................................................................21

*United States v. Rx Depot, Inc.*
290 F.Supp.2d 1238 (N.D. Okla. 2003) .................................................................19

*United States v. Zenon*
711 F.2d 476 (1st Cir. 1983) ...................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ..................................................................................................7, 10

**STATUTES**

United States Code, Title 50
§ 4557 ......................................................................................................................10

California Civil Code
§ 659 ..........................................................................................................................9
§ 829 ..........................................................................................................................9

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

California Public Resources Code
   § 5001(b)...........................................................................................................9
   § 5006(a)..........................................................................................................9
   § 5012 .............................................................................................................2
   § 21002 ..........................................................................................................17
   § 21160(a).......................................................................................................17

**OTHER AUTHORITIES**

California Code of Regulations, Title 14
   § 15002, subd. (a) .........................................................................................16

**INTRODUCTION**

Sable Offshore Corporation owns and operates Lines CA-324 and CA-325 (formerly known as Lines 901 and 903), two onshore oil and gas pipelines that transport hazardous liquids from a processing facility on the Santa Barbara Coast inland to Kern County. A four-mile segment of Line CA-325 (the "Pipeline") runs underground through Gaviota State Park, which the California Department of Parks and Recreation (State Parks) owns and operates. *See* Request for Judicial Notice ("RJN"), ¶ 2 and Ex. 2; Decl. of Dena Bellman ("Bellman Decl."), ¶¶ 2-4 and Ex. A (map depicting the segment of the Pipeline that runs through the Park). State Parks previously granted an easement to Sable's predecessor-in-interest to operate the Pipeline through Gaviota State Park. Bellman Decl. ¶5. That easement, however, expired in 2016, and neither Sable nor its predecessor-in-interest ever acquired a new easement. *Id*. Thus, Sable and its predecessors have not been authorized to transport oil through that portion of the Pipeline that runs through Gaviota State Park for nearly 10 years—and they have not done so, because that Pipeline was shut down following a catastrophic oil spill in 2015 at Refugio State Beach caused by the rupture of the immediately adjacent pipeline, Line CA-324, that connects to Line CA-325.

On or around March 16, 2026, Sable began transporting oil through the Pipeline without State Parks' permission. Sable is therefore trespassing. On March 21, 2026, State Parks employees observed erosion and the formation of a sinkhole depression in the land around the Pipeline, creating concerns that either the Pipeline restarting may be causing the earth to shift or that the earth is shifting around the Pipeline. This new condition creates a greater risk of pipeline failure within Gaviota State Park and increases the potential damage to Gaviota State Park if the newly restarted Pipeline fails. State Parks requests that the Court order Sable to cease trespassing on State Parks' property.

The continued presence of the Pipeline is itself a trespass and has been since 2016. But for purposes of seeking *preliminary* relief, State Parks requests only an order maintaining the status quo that existed until early last week: the pipeline sitting dormant without an easement, and not transporting oil through Gaviota State Park in the absence of any easement permitting such use of State Parks' property. State Parks has satisfied the elements necessary to support issuing a preliminary injunction, namely that it is likely to succeed on its trespass claim, State Parks would be irreparably harmed without injunctive relief from the continual trespass, the balance of equities supports ordering Sable to cease its invasive operation, and the public interest supports protecting state sovereignty as well as a public park from the private invasion.

## STATEMENT OF FACTS

### I. THE PREVIOUS EASEMENT ISSUED BY STATE PARKS TO SABLE'S PREDECESSOR-IN-INTEREST

In August 1987, pursuant to Public Resources Code section 5012, State Parks granted an easement to Celeron Pipeline Company of California ("Celeron") to "conduct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across" a portion of Gaviota State Park. Bellman Decl., ¶ 5 and Ex. B at 1, and Exs. C & I. The pipeline referenced in the easement is the Pipeline. *Id*. The 30-year easement began on July 28, 1986, and expired on July 27, 2016. *Id*.

Celeron is Sable's predecessor-in-interest. Bellman Decl., ¶ 6. Neither Sable nor any of its predecessors-in-interest acquired a new easement. *Id*. Sable therefore does not currently have an easement to transport oil under or across Gaviota State Park. *Id*.

### II. THE 2015 REFUGIO OIL SPILL

In May 2015, a portion of Line 901 (now Line CA-324), which is connected directly to the Pipeline, ruptured and discharged approximately 120,000 gallons of

2

heavy crude-oil in Santa Barbara County. Oil reached the Pacific Ocean and coastal areas in the County, including Refugio State Beach. *See* RJN, Ex. 1 at 1.

Subsequently, in or around 2024, Sable acquired Lines CA-324 and CA-325. Bellman Decl., ¶ 7. No oil was transported through the Pipeline from the time of the spill to approximately March 16, 2026. *Id.* In March 2020, the prior owner, along with the United States, the State of California, and various State agencies, entered a Consent Decree that resolved litigation related to the oil spill, providing for damages, penalties, and restrictions on restart of the pipelines. RJN, Ex. 1.

### III.   THE ANNUAL RIGHT OF ENTRY PERMITS ISSUED BY STATE PARKS TO SABLE AND ITS PREDECESSORS-IN-INTEREST

Since 2016, State Parks has issued annual Right of Entry ("ROE") permits to Sable's predecessors-in-interest or companies affiliated with Sable that have allowed them to access Gaviota State Park to physically enter and perform minimal maintenance on the Pipeline. Bellman Decl., ¶¶ 8-9 and Ex. D at 1. Sable needs those permits because it does not have an easement for this purpose. *Id.*

State Parks issued the most recent annual ROE permit to PPC in July 2025 ("Annual Permit"). The term of the Annual Permit began on July 27, 2025, and ends on July 26, 2026. Bellman Decl., ¶ 10 and Ex. E at 2. The Annual Permit states that "[a]ctivities related to any new or future projects, *including restarting Line 325* or constructing a new pipeline, *are not included in the Project and are not covered by this Right of Entry*. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart." Decl., ¶ 10 and Ex. E at 1, (emphasis added). The Annual Permit also provides that (1) State Parks "grants to [PPC] permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in [PPC] any interest" in Gaviota State Park; (2) PPC is permitted to enter the Park "for the purpose of pipeline maintenance and access

3

for existing Line 325 that is *currently subject to closure orders*." (emphasis added) *Id*.

## IV. THE RIGHT OF ENTRY PERMIT ISSUED TO PPC IN MAY 2025 TO PERFORM ANOMALY DIGS

In May 2025, State Parks issued a separate ROE permit to PPC that allowed it to perform eighteen (18) "anomaly" digs along the segment of the Pipeline that runs through Gaviota State Park. Bellman Decl., ¶ 11 and Ex. F. This was so PPC could expose the Pipeline in certain locations to allow a physical inspection of it and to determine if the Pipeline needed repairs. *Id.* The permit states that it "does not create or vest in [PPC] any interest" in Gaviota State Park, and that "[i]n no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit." *Id.* at pp. 1, 4. In June 2025, PPC completed the digs. PPC did not, however, complete one of the conditions of the ROE permit that required PPC to rehabilitate (by way of reseeding) some of the dig areas, and remediate damage PPC caused to San Julian Road, located in Gaviota State Park. Bellman Decl., ¶ 11, Ex. G. The permit expired on August 8, 2025. *Id.*

## V. SABLE'S PENDING EASEMENT APPLICATION WITH STATE PARKS

Since approximately April 2024, Sable has been attempting to obtain a new easement from State Parks that would allow Sable to restart the transportation of oil through the Pipeline. Siverson Decl., ¶¶ 2-3, Exs. I-J. In July 2024, Emma Siverson, Senior Staff Counsel at State Parks, sent an email to Lee Alcock, Sable's Assistant General Counsel, and copied Stephen Laperouse, Vice President of Land at Sable, among others, stating that "Sable does not currently have a land right to use its pipeline at Gaviota State Park. *In order for Sable to restart the pipeline running through State Parks' land, it needs an easement*. Last week we discussed that that

4

process is underway in that the applicable divisions of State Parks are aware that Sable wants an easement . . . ." (emphasis added) Decl. of Emma Siverson ("Siverson Decl."), ¶ 2, Ex. J.

In May 2025, representatives of Sable met with representatives of State Parks and the California Department of General Services to discuss Sable's interest in re-initiating its request for a pipeline easement through Gaviota State Park. Siverson Decl., ¶ 3. During the meeting, State Parks explained what Sable would need to do to apply for an easement, reiterating that Sable could not transport oil through the Pipeline until it obtained an easement from State Parks. *Id.* The following month, Ms. Siverson sent a letter to Mr. Alcock and Sable's outside counsel that set forth the steps Sable would need to take to apply for an easement. *Id*., ¶ 4. The letter also stated the following:

> [O]n May 22, 2025, you requested that Sable be permitted to restart pipeline operations under an interim agreement, such as the existing ROE or an additional ROE. *State Parks is not able [to] authorize the restart under a ROE, and as we have discussed, the current annual ROE does not authorize restart.* The current annual ROE is simply a method of authorizing Sable general, minimal access to its offline pipeline.
>
> A ROE is a license that authorizes physical, temporary access. *It does not authorize commencement of ongoing operations.* Ongoing operations of Sable's pipeline include the very real potential that all of the resource impacts listed above could occur.

(emphasis added) Siverson Decl., ¶ 4, Ex. K at 5.

In July and December 2025, Ms. Siverson sent further emails to Sable's counsel reiterating that the Annual Permit does not authorize Sable to restart the flow of oil through the Pipeline. *Id*., ¶¶ 5-8, Exs. L & N.

On March 14, 2026, after media reports that Sable intended to restart use of the Pipeline without an easement, State Parks conveyed its formal denial of Sable's requested easement and demanded Sable remove its Pipeline, pursuant to State Parks' rights under the expired easement to demand removal. Bellman Decl., ¶ 12, Ex. H. State Parks provided a detailed rationale including recent property damage

5

by Sable at Gaviota State Park. Sable does not currently have any easement rights or other property rights that would allow it to transport oil through Gaviota State Park.

On March 16, 2026, Sable announced that it had restarted the transportation of oil through the Pipeline, including through the segment that runs under Gaviota State Park. RJN, ¶ 2, Ex. 2; Bellman Decl., ¶ 4. Sable stated that it had restarted operations at the direction of the U.S. Secretary of Energy. *Id.* The Secretary's order purporting to direct the restart of the Pipeline (the "Wright Order"), under the federal Defense Production Act ("DPA"), noted that the Secretary issued the Wright Order at Sable's urging. RJN, ¶ 3, Ex. 3, fn.6.

## VI. RECENT DEVELOPMENTS

On March 21, 2026, State Parks staff discovered a depression or sinkhole forming in the area of Gaviota State Park that runs along a portion of the Pipeline. See Decl. of David Flora ("Flora Decl."), ¶¶ 5-11; Exs. O-R. It is unknown whether the restart of the Pipeline directly caused or contributed to the collapse in the ground overlying the Pipeline's path. *Id.* ¶ 12. However, whether the Pipeline is directly causing the subsidence or not, further evaluation is needed both to determine how the Pipeline is impacting Gaviota State Park, and whether the observed depression at Gaviota State Park impacts the operation of the Pipeline. *Id.* ¶ 13. In the meantime, the reduced structural integrity of the land surrounding the Pipeline may create greater risk of rupture and risk of another catastrophic spill if the Pipeline were to rupture. Bellman Decl., ¶ 19. Additionally, as the Pipeline in this location is adjacent to a small creek that flows directly to Gaviota Creek, any spill would release the oil into the waterway, rapidly spreading contamination into Gaviota Creek, an important refuge for rare species. *Id.*

To date, efforts to contact Sable about this condition have not resulted in any Sable employees examining or attempting to determine the risk caused by the shifting land around the Pipeline. Bellman Decl., ¶¶ 20-23.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018).

## ARGUMENT

### I. STATE PARKS IS LIKELY TO SUCCEED ON THE MERITS

#### A. The Likelihood of Success on the Merits Relies on State Law

State Parks' claims against Sable arise under California trespass and property law. Although Sable removed to federal court under 28 U.S.C. 1442(a) (asserting "federal officer" jurisdiction), this Court continues to "apply state substantive law" while applying "federal procedural law." *Dugas v. 3M Co.*, 101 F. Supp. 3d 1246, 1250 (M.D. Fla. 2015); *Gasperini v. Ctr. for Humanities., Inc.*, 518 U.S. 415, 427 (1996).

#### B. State Parks Is Likely to Succeed on the Merits

"The first factor under *Winter* is the most important—likely success on the merits." *Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1033 (C.D. Cal. 2020). State Parks will likely succeed on the merits because it can demonstrate all the elements of civil trespass under California law: "(1) the plaintiff's ownership or control of the property; (2) the defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for the entry or acts in excess of permission; (4) harm; and (5) the defendant's conduct was a substantial factor in causing the harm." *Id.* at 1035. "The essence of [a] cause

7

of action for trespass is an 'unauthorized entry' onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation." *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal.App.3d 1, 16 (1977).

Trespass also occurs in instances where a party abuses permission to use land for a particular purpose or exceeds the granted permission. "Where one has permission to use land for a particular purpose and proceeds to abuse the privilege, or commits any act hostile to the interests of the lessor, he becomes a trespasser." *Cassinos v. Union Oil Co.* 14 Cal.App.4th 1770, 1780 (1993); *see also eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000)*; In re Brown*, No. 23-60035, 2024 WL 2127040, at *1 (9th Cir. May 13, 2024). Further, damage "is not an essential element of a cause of action for trespass to real property" under California law. *Richards v. Dep't of Bldg. Inspection of City & Cnty. of S.F.*, No. 20-CV-01242-JCS, 2020 WL 3892859, at *6 (N.D. Cal. July 10, 2020).

"[C]ausing subsurface migration of fluids into a mineral estate without consent constitutes a trespass." (*Cassinos*, *supra*, 14 Cal.App.4th at 1778; see also *Starrh & Starrh Cotton Growers v. Aera Energy LLC* 153 Cal.App.4th 583, 592 (2007) ["Causing subsurface migration of oil field wastewater into a mineral estate (groundwater pore space) of another without that landowner's consent is a trespass under California law"]. Under functionally equivalent Wisconsin law that recognizes trespass for intentionally entry onto land in the possession of another, the precise situation here—transporting hydrocarbons across someone else's property without a valid easement—has been determined to be a trespass. *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Reservation v. Enbridge Energy Co. Inc.,* 626 F.Supp.3d 1030, 1040-1049 (W.D. Wis. 2022) (granting summary judgment in favor of Native American tribe on its trespass claim against company that operated oil and natural gas pipeline on tribe's land, based on company's continued operation of the pipeline without a valid easement).

The elements of trespass under California law are satisfied here. First, State

8

Parks controls the state park system and owns and operates Gaviota State Park. Cal. Pub. Res. Code §§ 5001(b), 5006(a); Bellman Decl., ¶ 1. As the owner of Gaviota State Park, State Parks has the right to the surface of the land at the Park and "everything permanently situated beneath or above it." Cal. Civ. Code § 829; *see also id.* § 659.

Second, as Sable has admitted, Sable intentionally entered Gaviota State Park when it restarted oil flowing in the Pipeline, including the portion of the Pipeline that runs through Gaviota State Park. ECF No. 1 ¶11.

Third, Sable lacked permission to run its oil through the Pipeline within Gaviota State Park. Sable does not have a fee interest in any land at Gaviota State Park. Bellman Decl., ¶ 3. While Sable does have certain rights under the Annual Permit (which expires on July 26, 2026), those rights are limited to entering the park to inspect and minimally maintain the pipeline; they do not extend to the *use* of the long-dormant Pipeline, including transportation of oil, as State Parks has made clear to Sable on multiple occasions. *See* Bellman Decl., ¶¶ 8-10; Siverson Decl., ¶ 9 and Exs. D, E. Moreover, the fact that Sable has requested an easement from State Parks that would allow Sable to transport oil through Gaviota State Park shows that Sable recognizes that it does not currently have that right to use State Parks' property in that way. By transporting oil through the Park without State Parks' permission, Sable has committed and continues to commit a trespass. Accordingly, State Parks is likely to prevail on its trespass claim.

Although Sable has pointed to the Wright Order as justifying its restart, the Wright Order in no way authorizes trespass or grants Sable any fee interest in any land at Gaviota State Park. RJN, ¶ 3, Ex. 3 at 3 (directing Sable to prioritize "orders and contracts".) The Wright Order does not purport to exercise federal eminent domain authority, and it does not (and cannot) grant Sable any legal interest in State Parks' property. Nor does the federal Defense Production Act provide that the federal government may permit or compel a company to trespass or encroach upon

9

another party's property against the owner's will, let alone a sovereign state's property.[1] Thus, nothing about the federal government's startling action alters State Parks' likelihood of success here.

Finally, Sable's trespass into Gaviota State Park is harming State Parks' ability to control its property, caused past damage to Gaviota State Park, and harmed State Parks' ability to evaluate the potential environmental impacts of running oil through the Pipeline.[2] Sable is running oil through State Parks' property, interfering with State Parks' full enjoyment of Gaviota State Park. Bellman Decl., ¶¶ 5, 8-10; Siverson Decl., ¶ 9 and Exs. B-E. Accordingly, State Parks demonstrated a clear likelihood of success on the merits.

## II.   THERE IS A GRAVE RISK OF IMMINENT, IRREPARABLE HARM

Ample evidence shows State Parks will suffer irreparable injury in the absence of an injunction. *See Winter*, 555 U.S. at 20. Sable's conduct need not be the exclusive cause of injury. *M.R. v. Dreyfus*, 697 F3d 706, 728-729 (9th Cir. 2015). Nor must the alleged harm be certain to occur before a court can grant a preliminary injunction. *Michigan v. U.S. Army Corps of Eng'rs* 667 F3d 765, 788 (7th Cir. 2011). Plaintiffs need show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an injunction. *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 408 F.Supp.3d 1057, 1121 (N.D. Cal. 2019).

Plaintiffs will suffer several types of irreparable harm in the absence of preliminary relief. Sable's trespass has impeded State Parks' ability to steward and manage Gaviota State Park, raising questions about environmental protection as

---

[1] Even if the Wright Order were a lawful exercise of delegated power under the DPA—a point the State of California is contesting in *State of California v. Wright, et al.*, No. 3:26-cv-02500 (N.D. Cal. filed Mar. 23, 2026)—that Act merely holds defense contractors harmless for damages or penalties in the course of complying with DPA orders. *See* 50 U.S.C. § 4557. It does not confer defense contractors with *carte blanche* to commit intentional torts like trespass. *See U.S. v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995).

[2] State Parks also suffered severe property damage at its separate property, Refugio State Beach, because of the 2015 Refugio Oil Spill discussed earlier.

well as public and staff safety. Sable's restart deprives State Parks of its ability to conduct necessary environmental analysis, fully evaluate the potential physical harms, and take steps to avoid or minimize those harms including to coastal resources, sensitive species and water quality *before* a project is implemented. Finally, State Parks will likely suffer physical harm, including harm consistent with the harm recently incurred in the course of Sable's destructive conduct under the guise of pipeline maintenance activities and anomaly digs. Bellman Decl. ¶12. Each of these distinct harms independently support finding that Plaintiff has demonstrated irreparable harm in the absence of an injunction.

### A.    There is Irreparable Harm to State Parks' Enjoyment and Possession of the Land in Gaviota State Park

The harm to State Parks' ability to conduct environmental review before project implementation, manage easements through its property, and control the operations to ensure Gaviota State Park is safe is particularly salient given that State Parks is acting in its capacity as a property owner. "It is well-established that the loss of an interest in real property constitutes an irreparable injury." *Park Village Apts. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011). Uninvited intrusion onto sovereign lands also constitutes irreparable harm. *See Bad River Band*, 626 F.Supp.3d at 1056 (court affirmed Native American tribe submitted ample evidence of irreparable harm, including concerns of potential environmental impacts as well as impact to the enjoyment and sovereign possession of land threatened by trespass); *see also Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); *Union Oil Co. of Cal. v. Domengeaux*, 30 Cal. App. 2d 266, 271 (1939); *M.F. Farming Co. v. Couch Distrib. Co.*, 207 Cal. App. 4th 180, 202 (2012), *disapproved of on other grounds by Baral v. Schnitt*, 1 Cal. 5th 376 (2016) ("An injunction is [ ] a

11

proper remedy for misuse or excessive use of an easement.").

### 1. The Continuous Trespass Interferes with Possession and Enjoyment of Gaviota, Causing Irreparable Harm

"When a trespass is continuous such that stopping it would require a multiplicity of suits, an injunction is justified because monetary relief is inadequate." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 212 (5th Cir. 2024) (citing *Donovan v. Pa. Co.*, 199 U.S. 279, 304-05 (1905)); *accord United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983) ("A court has power to enjoin a trespass . . . if there are *repeated* instances of trespassing, and a single injunction might forestall a 'multiplicity' of legal actions."). The same is true under California trespass law: "A trespass of a continuing nature, whose constant recurrence renders the remedy at law inadequate, unless by a multiplicity of suits, affords sufficient ground for relief by injunction." *Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th 1171, 1184 (2014) (internal citations and quotations omitted). [3] Sable is willfully pumping oil through Gaviota State Park without an easement to conduct this operation on State Parks' property. State Parks seeks to stop the continuing trespass, thereby preventing repeated instances of trespassing that would cause a multiplicity of actions.

Neither Sable nor its predecessors had an easement or any other property right authorizing transportation of oil under Gaviota State Park for nearly 10 years, and Sable was actively seeking to negotiate a new easement at the time it announced that it had instead decided to simply begin occupying State Parks' property without permission. Accordingly, and pursuant to the authorities cited above, State Parks does not have an adequate remedy at law and injunctive relief is

---

[3] Per California law, "a trespass may be continuing or permanent. [Citation.] A permanent trespass is an intrusion on property under circumstances that indicate an intention that the trespass shall be permanent." *Starrh, supra*, 153 Cal. App. 4th 583, 592 (2007). "In contrast, a continuing trespass is an intrusion under circumstances that indicate the trespass may be discontinued or abated." *Id*. Here, because Sable's transportation of oil through the Pipeline can be discontinued at any time, Sable's conduct constitutes a continuing trespass.

therefore an appropriate remedy.

### 2. The Continuous Trespass Will Likely Cause Physical Damage to Gaviota, Further Interfering with State Parks' Possession, Constituting Irreparable Harm.

Property rights generally confer the irreplaceable right to "enjoy and possess," which is unique to the land, making any monetary compensation inherently inadequate. *Harris v. Cnty. of Riverside*, 904 F.2d 497, 503 (9th Cir. 1990); *Pelfresne*, 865 F.2d at 883. Trespass to another's land infringes on the property owner's possession and enjoyment of its land. *Gill v. LDI,* 19 F. Supp. 2d 1188, 1198 (W.D. Wash. 1998); *accord, Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("loss of an interest in real property constitutes an irreparable injury."). Further, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987). Ongoing environmentally risky activities constitute irreparable harm for the simple reason that, without a preliminary injunction, they "cannot be remedied easily or at all." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014). And tortious conduct that creates a demonstrated risk to health and safety can constitute irreparable harm. *See, Shell Offshore Inc. v. Greenpeace*, 864 F.Supp.2d 839, 851 (D. Alaska 2012).

Sable's trespass burdens State Parks' use of its property because it deprives State Parks of typical contractual protections governing the allocation of responsibility between a landowner and an easement holder. While Sable may offer assurances that it intends to use the Pipeline to safely transport oil and that no harm will arise, Sable's assurances hold little water with State Parks in light of the pipelines' history of contamination and Sable's failure to comply with prior contractual terms, its current lack of responsiveness, and its decision to trespass despite clear warning that it lacks permission to resume use of State Parks's

property in this manner.

State Parks relies on the agencies with expertise in pipeline safety management in evaluating whether to grant an easement for a pipeline across State Parks property. Here, State Parks typically rely on regulatory approvals issued by the Office of the State Fire Marshal ("OSFM"), the State pipeline safety management agency. Bellman Decl, ¶ 13. Although OSFM issued certain "State Waivers," a set of conditional regulatory approvals, to Sable, Sable has to date not fully complied with them, and Sable subsequently "abandoned" those waivers, asserting that a federal pipeline safety agency now regulates pipelines CA-324 and CA-325. RJN ¶4, Ex. 4. Sable's temporary federal pipeline safety permit expired, no full federal pipeline safety permit has been formally issued, and the federal agency has since suggested that Sable *may* not even require a pipeline safety permit to continue its operations. RJN ¶¶5-8, Ex. 5-8. Considering this rapidly devolving landscape, including the recent federal pipeline safety "non-enforcement policy," State Parks is uncertain whether *any* permits are in place currently that ensure the safe operation of the Pipeline. Bellman Decl., ¶¶ 16-17; RJN¶¶ 4-8, Exs. 4-8. Lacking any ability to rely on a validly issued permit from a pipeline safety management agency, State Parks cannot determine whether the portions of Gaviota State Park through which the Pipeline runs are safe to use.

The other mechanism State Parks employs to ensure safety when it allows an easement for a pipeline is its contracting power. When State Parks previously allowed use of its property at Gaviota State Park for an oil pipeline, that agreement (the Expired Easement) included basic property owner and public access protections. Bellman Decl., ¶ 5, Ex.B. Specifically, within the Expired Easement, State Parks insisted on the following required conduct by the pipeline operator: (1) operator shall notify Parks immediately should any oil spill occur (*id.*, §12); (2) operator shall maintain liability insurance (*id.*, §13); and (3) operator is required to commit to a variety of coordination mechanisms to ensure that construction and

14

related activities minimize safety and inconvenience to Park operations (*id.*, §16; *see also id.*, §§18, 20, 22). Sable and State Parks were negotiating such an easement when Sable stopped communicating with State Parks and started transporting oil without permission. Siverson Decl., ¶¶ 2-10. Like a squatter, Sable has taken full use of State Parks' property for free, leaving State Parks without any protections or source of information about what is happening on its property, potentially without the protection of liability insurance, and no recourse other than to the courts.

Sable's rogue conduct exposes State Parks to tremendous risk as a property owner. Sable's history and current actions forced State Parks to risk irreparable harm from its inability to know, at the present time, if the Pipeline is being safely operated: State Parks' concerns are rooted in the above-discussed unclear status of the pipeline safety permit, lack of contractual protections caused by trespass, history of physical damage to Gaviota State Park, and recent erosion yet-to-be addressed by Sable. Bellman Decl. ¶¶ 16-23. All the above factors emphasize the importance for State Parks to be able to control whether operations continue on State Parks' own property.

**B.    There is Irreparable Harm to State Parks' Ability to Conduct Environmental Review**

Sable's self-help remedy of restarting the Pipeline without obtaining State Parks' approval to transport oil through its land also harms the public interest by circumventing State Parks' ability to conduct environmental review through the public, transparent process required by California law. The purpose of such environmental review, under both federal and state law, is to require public entities to assess and, if feasible, mitigate or avoid significant environmental impacts that would result from a proposed project *before* the project impacts begin. *Tulare Lake Canal Co. v. Stratford Pub. Util. Dist.*, 92 Cal.App.5th 380, 410 (2023). Here, the "project" requiring environmental review under California law is State Parks' decision whether to allow Sable's restart of the Pipeline through Gaviota State

Park. Sable's restart of the Pipeline has stripped State Parks of its ability to conduct meaningful environmental review, creating undue risk of harm to Gaviota State Park.

Federal courts recognize the importance of agencies completing environmental review prior to approving action that may adversely affect the environment, and the implied environmental harm from a failure to conduct evaluations under the National Environmental Policy Act (NEPA), in many ways an analogue to the California Environmental Quality Act (CEQA). *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) ("[I]rreparable injury flows from the failure to evaluate the environmental impact of a major federal action…."); *accord ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371, 1387 (E.D. Cal. 2014); *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007) (preliminary injunction favored by district court to halt developments, recognizing difficulties in reversing once "momentum" sets in); *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009), *adhered to*, No. C 08-03494 WHA, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009) (district court found failure to conduct proper NEPA evaluation deprived the plaintiff of a meaningful involvement in procedures in time to prevent adverse environmental impact); *see Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137-38 (9th Cir. 2011).

The same need to conduct environmental review applies here, as does the inevitable conclusion of irreparable harm for action following inadequate evaluations. CEQA informs public agencies "about the potential, significant environmental effects of proposed activities" in advance of undertaking them. Cal. Code Regs., title 14, § 15002, subd. (a); *see also* Cal. Pub. Res. Code § 21002. To that end, CEQA provides that "[w]henever any person applies to any public agency for a lease, permit, license, certificate, or other entitlement for use, the public agency may require that person to submit data and information that may be

16

necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment or to prepare an environmental impact report." Cal. Pub. Res. Code § 21160(a); *see also Tulare Lake Canal Co. v. Stratford Pub. Util. Dist.*, 92 Cal.App.5th 380, 410 (2023) ("CEQA requires a private person to disclose information about a proposed activity if that person 'applies to any public agency for a . . . permit . . . or other entitlement for use' … because an agency needs an accurate and complete description of the activity before it can comply with CEQA and approve the entitlement.").

Like the request for the permits in *High Sierra*, Sable's request for an easement triggered State Parks' duty to obtain information, and Sable's obligation to provide information, regarding the potential environmental impacts of the activities covered by the easement. Siverson Decl., ¶ 6; *see High Sierra Hikers Ass'n*, 390 F.3d at p. 641. State Parks conducted a preliminary review of Sable's easement request and determined that it would be a discretionary project under CEQA and that it is not exempt from CEQA. Siverson Decl., ¶ 6. Sable has not satisfied all of State Parks' requests from Sable for information generally, including information required for the CEQA process, and the CEQA process is not complete. *Id.*

Because Sable has not submitted a complete project description, and because State Parks has not completed its CEQA review of an easement, State Parks does not currently have the information necessary to determine whether an easement will have a significant effect on the environment. Siverson Decl., ¶ 6. By transporting oil through the Pipeline before State Parks' completion of its review of the easement request, Sable has prevented State Parks from complying with its legal obligations under CEQA. Siverson Decl., ¶ 6; *see High Sierra Hikers Ass'n*, *supra*, 390 F.3d at 641. That constitutes irreparable harm. *Id.*

Sable's use of the Pipeline creates an undue risk of harm to the environment that will significantly interfere with State Parks' use and enjoyment of Gaviota

17

State Park. The inadequate CEQA evaluations, the recent sinkhole around the Pipeline, and the history of prior incidents (both the damage Sable caused during recent pipeline maintenance, *infra,* and the 2015 Refugio Oil Spill) make this risk significant, and potentially conceals this harm until it is irreparable. Thus, injunction is a vital remedy.

## III.  THE BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF A PRELIMINARY INJUNCTION

When evaluating the balance of equities, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). Among other things, "by establishing a likelihood of success on the merits," a plaintiff "establish[es] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

The balance of equities tips sharply in State Parks' favor. The only hardship that Sable would incur if the Court issues a preliminary injunction is the cessation of tortious activity, which means the balance of equities supports interim injunctive relief. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F.Supp.2d 839, 851-52 (D. Alaska 2012) (balance of equities tipped in favor of enjoining trespass because trespass is wrongful); *DISH Network L.L.C. v. DelVecchio*, 831 F.Supp.2d 595, 601-602 (W.D.N.Y. 2012) ("The only hardship to Defendant from this injunction would be to prevent him from engaging in further illegal activity, so the balance clearly weighs in Plaintiffs' favor."). The bottom line is that, because its conduct is tortious, Sable has no protectable interest at stake here. *See U.S. v. Diapulse Corp. of America*, 457 F.2d 25, 29 (2d Cir. 1972).

*Shell Offshore* is instructive, and it adheres to the weight of authority finding that a party opposing a preliminary injunction has no legitimate interest in continuing unlawful activity. *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 869

18

F.3d 848, 867 (9th Cir. 2017); *Samsung Elec. Co., Ltd. v. Early Bird Sav.*, Case No. 13–CV–3105–BEN (DHB), 2014 WL 324558 at *3 (S.D. Cal. Jan. 27, 2014); *United States v. Rx Depot, Inc.*, 290 F.Supp.2d 1238, 1248 (N.D. Okla. 2003) ("The defendants have no vested interest in an illegal business activity.") In *Shell Offshore*, the District of Alaska enjoined Greenpeace's tortious trespass of Shell's vessels on federally managed oil and gas leases, holding that, to the extent Greenpeace's "competing interests … are illegal and tortious activities, the balance of equities *undoubtedly* tips to Shell." *Shell Offshore*, 864 F.Supp.2d at 851 (emphasis added). There, Greenpeace opposed the preliminary injunction on the grounds that it would infringe on its First Amendment rights. *Id*. at 851-52. The court acknowledged the importance of Greenpeace's First Amendment interest in protesting Shell's operations, but that interest only went so far "as such protest is done in a manner consistent with the law." *Id*. at 852. Although the court acknowledged that a preliminary injunction could burden Greenpeace's federally protected First Amendment rights, it nevertheless concluded that the balance of equities favored the issuance of the injunction. *Id*.

Here, Sable may have a pecuniary interest in transporting oil through the Pipeline, but that interest ends where the activity becomes tortious and unlawful—it ends where State Parks's property rights begin. And Sable's transporting of oil across Gaviota State Park is tortious under California law because Sable lacks permission from the property owner. *Supra* I.B.

Sable knows this. By applying for an easement from State Parks that would allow Sable to restart operations, Sable acknowledged that it does not have the right to transport oil through the Pipeline. And State Parks informed Sable that the Annual Permit to enter the park to maintain the Pipeline did not authorize Sable to transport oil through Gaviota State Park. *See* Bellman Decl., ¶¶ 8-10; Siverson Decl., ¶ 9 and Exs. D & E. Given the flagrancy of Sable's encroachment, the

19

balance of hardships clearly tips in favor of issuing an injunction. *See Shell Offshore*, 864 F.Supp.2d at 851-52.

State Parks' interest in mitigating or avoiding the potential adverse environmental impacts also supports an injunction. Preventing irreparable harm to the environment, and protecting the procedural rights of plaintiffs, will outweigh the pecuniary interest in creating such harm. *See Wild Rockies*, 632 F.3d at 1137-38. In *Wild Rockies*, the defendant's failure to comply with applicable federal laws prevented the plaintiff from participating in an administrative appeals process that could have resulted in significant changes to the proposed project. *Id*. Here, Sable's exercise of self-help has precluded State Parks from conducting environmental review for the purpose of identifying, mitigating, and avoiding potential impacts to Gaviota State Park resulting from Sable's use of the Pipelines. That harm outweighs Sable's pecuniary interest in the Pipeline, as Sable's use of the Pipeline is unlawful. *See Disney Enters.*, 869 F.3d at 867.

## IV. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION

The public interest favoring the issuance of an injunction must "outweigh other public interests that cut in favor of *not* issuing the injunction." *Wild Rockies*, 632 F.3d at 1138 (original italics). Here, an injunction would advance the public interest on net for three reasons.

*First*, enjoining tortious activity always advances the public interest. *See, e.g.*, *Shell Offshore*, 864 F.Supp.2d at 853 ("The public interest is not disserved by an injunction that precludes illegal or tortious conduct."). Here, Sable's transfer of oil through the Gaviota State Park constitutes a clear, willful trespass on State Parks' property, which means Sable is committing an intentional tort to the detriment of State Parks' property interests. The public interest is served by enjoining unpermitted trespass on public property.

*Second*, the Ninth Circuit has recognized that the public interest favors "careful consideration of environmental impacts before" projects go forward, such

20

that suspending "such projects until that consideration occurs 'comports with the public interest.'" *Wild Rockies*, 632 F.3d at 1138 (quoting *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009)). Without an injunction, State Parks will continue to shoulder the risk of Sable's unlawful conduct, and it will have to do so without being adequately informed as to the nature and extent of that risk.

*Third*, although State Parks's position is that the Wright Order and DPA afford Sable no right to trespass (see supra I.B.), if that is incorrect and the Wright Order did purport to authorize trespass, then , an injunction would prevent a sovereign State's resources (here, state-owned land) from being unconstitutionally commandeered at the instigation of the federal government. *See generally Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018); *United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019).  The Tenth Amendment allows California to administer its state lands to meet state goals—including forbidding Sable's trespass. An injunction will thus prevent injury to California's constitutional interests. That serves the public interest. *See Baird v. Bonta*, 81 F.4th 1036, 1048 (9th Cir. 2023). California retains a constitutional prerogative to decline to help Sable implement a federal program.

## V.   THE COURT SHOULD NOT REQUIRE A BOND FROM STATE PARKS

"Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Moreover, "[a]lthough the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for […] cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'" *Pharm. Soc'y of State of New York, Inc. v. New York State Dep't of Soc. Serv.,* 50 F.3d 1168, 1174 (2nd Cir. 1995) (citation omitted); *accord, Env't Democracy Project v. Green Sage Mgmt., LLC,* No. 22-CV-03970-JST, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022).

Because State Parks is a state agency and is pursuing relief solely in support of the public interest, the Court should exercise its discretion to waive the bond requirement in issuing injunctive relief in this matter.

## CONCLUSION

For all the foregoing reasons, State Parks respectfully urges the Court grant the motion.

Dated:  March 27, 2026                    Respectfully submitted,

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General


ALICE M. SEGAL
Deputy Attorney General
*Attorneys for Plaintiff California*
*Department of Parks and Recreation*

22

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff California Department of Parks and Recreation, certifies that this brief contains 6,993 words, which:

_X_  complies with the word limit of L.R. 11-6.1.

Dated:  March 27, 2026                              Respectfully submitted,

ROB BONTA
Attorney General of California

ALICE M. SEGAL
Deputy Attorney General
*Attorneys for Plaintiff California
Department of Parks and Recreation*

23