Docusign Envelope ID: B61B0F5C-747B-4D57-9F83-35010F099E45

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General
ALICE SEGAL (SBN 288108)
alice.segal@doj.ca.gov
MATTHEW STRUHAR (SBN 293973)
matthew.struhar@doj.ca.gov
Deputy Attorneys General
  600 West Broadway, Suite 1800
  San Diego, California 92101
  Tel: (619) 738-9640
*Attorneys for Plaintiff*
*Department of Parks & Recreation*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,**<br><br>Plaintiff,<br><br>v.<br><br>**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY**,<br><br>Defendants. | Case No. 2:26-cv-02946-WLH-MAA<br><br>**DECLARATION OF DENA BELLMAN IN SUPPORT OF THE DEPARTMENT OF PARKS & RECREATION'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:     April 24, 2026<br>Time:     1:30 p.m.<br>Courtroom: 9B<br>Judge:   Hon. Wesley L. Hsu<br>Trial Date: Not Set<br>Action Filed: 3/17/2026<br>Date Removed: 3/19/2026<br><br>Filed/Concurrently Lodged with: Motion for Preliminary Injunction; Declaration of Emma Siverson; Declaration of David Flora; Proposed Preliminary Injunction Order; Request for Judicial Notice |

I, Dena Bellman, declare as follows:

1. I am currently employed as the District Superintendent of the Channel Coast District at the Department of Parks and Recreation ("State Parks"). I have held this position since 2023. I have personal knowledge of the facts stated in this

1

declaration and could, if called upon to do so, testify competently thereto. State Parks controls the State Park system and it owns and operates Gaviota State Park.

2. I am informed and believe that Defendant Sable Offshore Corporation ("Sable") owns and operates Lines CA-324 and CA-325 (formerly known as Lines 901 and 903), two onshore oil and gas pipelines that transport hazardous liquids from a processing facility on the Santa Barbara Coast inland to Kern County. A four-mile segment of Line CA-325 ("Pipeline") runs underground and through Gaviota State Park, which is owned and operated by State Parks. A true and correct copy of a State Parks document that includes as page 3 a topographic map depicting the segment of the Pipeline that runs through the Park is attached hereto as **Exhibit A**.

3. Sable does not have a fee interest in any land at Gaviota State Park. Also, although the Pipeline crosses Highway 101 near Gaviota State Beach, no portion of the Pipeline under Gaviota State Park follows a public right-of-way.

4. On March 16, 2026, I reviewed a press release issued by Sable on March 16, 2026, announcing that it had restarted oil production. I am informed and believe that Sable restarted the transportation of oil through the Pipeline, including through the segment that runs under Gaviota State Park.

5. On August 26, 1987, State Parks granted an easement to Celeron Pipeline Company of California ("Celeron") to "conduct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across" a portion of Gaviota State Park ("Celeron Easement"). A true and correct copy of the Celeron Easement is attached hereto as **Exhibit B**. [1] A true and correct copy of a drawing depicting the pipeline that was attached to the Celeron Easement is attached hereto as **Exhibit C**. The

---

[1] The Celeron Easement was subsequently amended in 1996 to correct the legal description, as Sable's predecessor re-routed the pipeline during construction without State Parks' approval or knowledge until several years after construction. The amendment is included as part of **Exhibit B** attached hereto.

DECL. OF DENA BELLMAN ISO MOTION FOR PRELIMINARY INJUNCTION (2:26-02946-WLH-MAA)

pipeline referenced in the Celeron Easement is the same Pipeline through which Sable is currently transporting oil. The Celeron Easement was for a term of thirty (30) years and expired on July 27, 2016.

6. I am informed and believe that Celeron is Sable's predecessor-in-interest. Neither Celeron nor Sable was granted a new easement, and Sable does not currently have an easement to transport oil under or across Gaviota State Park.

7. I am informed and believe that in 2015, the Pipeline was owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P. ("Plains"). I am also informed and believe that in or around 2022, Pacific Pipeline Company ("PPC") purchased Lines 901 and 903 from Plains, and that in or around 2024, Sable acquired PPC and its assets, including Lines 901 and 903, which had been renamed Lines CA-324 and CA-325, respectively. I am further informed and believe that between 2015 and approximately March 16, 2026, no oil was transported through the Pipeline.

8. Since 2016, State Parks has issued annual Right of Entry ("ROE") permits to Sable's predecessors-in-interest or companies affiliated with Sable that allow them to access Gaviota State Park in order to physically enter and perform minimal maintenance on the Pipeline. Those permits are necessary because, as mentioned above, Sable does not have an easement that would otherwise allow it to access the Park.

9. Attached hereto as **Exhibit D** is a true and correct copy of the annual ROE permit that State Parks issued to PPC on July 25, 2024, and that expired on July 26, 2025.

10. The most recent ROE permit ("Annual Permit") was issued by State Parks to PPC on July 25, 2025. A true and correct copy of the Annual Permit is attached hereto as **Exhibit E**. The term of the Annual Permit began on July 27, 2025, and ends on July 26, 2026. The Annual Permit does not allow PPC or Sable to transport oil through that portion of the Pipeline that passes through Gaviota State Park.

DECL. OF DENA BELLMAN ISO MOTION FOR PRELIMINARY INJUNCTION (2:26-02946-WLH-MAA)

11. On May 8, 2025, State Parks issued a separate ROE permit to PPC that allowed it to perform eighteen (18) "anomaly" digs along the segment of the Pipeline that runs through Gaviota State Park. A true and correct copy of that permit is attached hereto as **Exhibit F**. The purpose of these digs was to expose the Pipeline in certain locations to allow a physical inspection of it and to make any needed repairs. In June 2025, PPC completed the 18 anomaly digs. PPC did not, however, complete one of the conditions of the ROE permit that required PPC to shore up certain areas where it conducted digs by replanting with native plants to strengthen against erosion, nor did PPC remediate substantial damage PPC caused to San Julian Road located in Gaviota State Park. State Parks reiterated these obligations to Sable, which Sable acknowledged, via an email sent on August 6, 2025, by Nathan Soderberg, Pipelines Operation Manager for Sable, to State Parks employee Kate Wilson. Ms. Wilson forwarded this e-mail to me on August 7, 2025. A true and correct copy of this August 7, 2025 email is attached hereto as **Exhibit G**. The permit expired on August 8, 2025. Sable failed to perform either of these requirements. The dig areas are overrun with invasive plants that offer no protection against erosion, and the damage to San Julian Road continues to erode and impede travel to the park and Vista de Las Cruces school.

12. On March 14, 2026, State Parks issued a letter, expressing its formal denial of Sable's requested easement and demanding Sable remove its Pipeline pursuant to State Parks' rights under the expired easement, providing a detailed rationale including recent property damage and physical harm caused as a result of the anomaly digs and related activity. State Parks stated it was prepared to withdraw its letter if Sable confirmed in writing no later than 12PM Pacific Time on Monday, March 16, 2026, that it had not restarted the pipeline traveling through Gaviota State Park and that it would not restart the pipeline until and unless it obtained all required state approvals and a new easement from State Parks, or it obtained a final judicial decision that any state approvals or easements were not needed. Attached

hereto as **Exhibit H** is a true and correct copy of the letter State Parks issued to Sable on March 14, 2026.  I am informed and believe that no response was received to that letter.

13. In my experience, State Parks relies on other parts of the state regulatory apparatus to inform aspects of State Parks' management of its property, including in State Parks' decision-making over whether to allow encumbrances on its property. Within the Channel Coast District that I am Superintendent of, State Parks does not have staff members with expertise on utility pipeline safety, and specifically does not have staff members with expertise on oil pipeline safety.   It would be consistent with State Parks' typical practices that, in the course of evaluating whether to grant an easement for a pipeline that would run on State Parks' property, that State Parks would rely on regulatory approvals issued by a pipeline safety agency such as the Office of the State Fire Marshal.

14. I am informed and believe that the pipeline underneath Gaviota State Park, line CA-325, has been determined by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA) to be within PHMSA's jurisdiction.

15. I have reviewed the documents included in State Parks' concurrently-filed Request for Judicial Notice as Exhibits 4, 5, 6, 7 and 8 and I am unclear if PHMSA's recent actions mean that any pipeline safety permits are currently, or will in the future be, in place at all with respect to line CA-325 at Gaviota State Park.

16. In my capacity as Superintendent of the Channel Coast District that includes Gaviota State Park, one of my responsibilities is, as a general matter, overseeing the management of Gaviota State Park in a manner consistent with public safety. At present, given Sable's statements that it does not need to and will not comply with state pipeline safety regulation, and what I understand is the lack of any federal pipeline safety permit, I am uncertain what regulatory agency, if any, is overseeing the safe operation of pipeline CA-325 within Gaviota State Park.

DECL. OF DENA BELLMAN ISO MOTION FOR PRELIMINARY INJUNCTION (2:26-02946-WLH-MAA)

Docusign Envelope ID: B61B0E5C-747B-4D57-9F83-35010F099E45

17. Taking together the uncertain pipeline safety regulatory environment, the absence of an easement that would offer contractual protections akin to protections in the Celeron Easement attached hereto as **Exhibit B** (such as a requirement that a pipeline operator maintain liability insurance and notify State Parks immediately of any spills), and Sable's recent history of damaging Gaviota State Park and disregarding basic requirements such as minimizing erosion after conducting digs, I believe that safety problems with CA-325 at Gaviota State Park are at high risk of being neglected. I further believe that Sable's likely failure to properly resolve issues affecting the safety of Gaviota Park puts visitors, staff, and the environment of Gaviota State Park at risk.

18. I am informed and believe that a State Parks employee, David Flora, recently took photos documenting evidence of erosion and subsidence along San Julian Road within a Gaviota State Park that lies above pipeline CA-325. I have spoken with Mr. Flora, examined these photos, and visited the area myself to observe the geomorphology of the setting and the subsidence observed by Mr. Flora.

19. The reduced structural integrity of the land surrounding the Pipeline at the location photographed by Mr. Flora may create greater risk of Pipeline rupture. Moreover, because the Pipeline is more exposed to the land surface, the effects of a rupture could be even more catastrophic because oil could more quickly reach the surface. Additionally, as the Pipeline in this location is immediately adjacent to an unnamed creek that flows into nearby Gaviota Creek, any spill would release the oil into the waterway, causing rapidly spreading contamination into Gaviota Creek, an important refuge for rare species such as the Southern Steelhead, the native Pond Turtle and the Red-Legged Frog.

20. I am informed and believe that State Parks first tried to inform Sable of the observed erosion on Saturday, March 21, 2026. At my direction, a State Parks employee, Ms. Wilson, texted Mr. Soderberg (who, as the Pipelines Operations Manager, was the on-site field contact that State Parks had for Sable) on March 21,

6

Docusign Envelope ID: B61B0E5C-747B-4D57-9F83-35010F099E45

2026. Ms. Wilson informed me that she also left a voice message for Mr. Soderberg on Saturday afternoon regarding the condition. I have not heard of any response received from Mr. Soderberg.

21. Subsequently on Monday morning, again at my direction, I am informed and believe that Ms. Wilson reached out to Jeremy Willett, a different Sable employee whose name was provided as the emergency contact for Sable by the California Office of the State Fire Marshal, and left a voice message for him. To date I have not heard of any response received from Mr. Willett.

22. On Tuesday, I directed Ms. Wilson to reach out to Sable again, this time to Stephen Laperouse, the Vice President of Land for Sable, and the point of contact for Sable's annual right of entry permit from State Parks. I am informed and believe that she texted him on Tuesday about State Parks' erosion concerns. I have viewed a copy of Mr. Laperouse's response text, confirming receipt of the information.

23. However, to my knowledge, to date, these efforts to contact Sable about this condition have not resulted in any Sable employees examining or attempting to determine the risk caused by the shifting land around the Pipeline. I have received no response from Sable indicating they have done so.

I declare under penalty of perjury laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 3/27/2026

DocuSigned by:

*Dena Bellman*

1FD96B85B9674A1...

Dena Bellman
Declarant

DECL. OF DENA BELLMAN ISO MOTION FOR PRELIMINARY INJUNCTION (2:26-02946-WLH-MAA)

EXHIBIT A

**State of California – The Resources Agency**
**DEPARTMENT OF PARKS AND RECREATION**

# NOTICE OF EXEMPTION

**TO:** Office of Planning and Research
1400 Tenth Street
Sacramento, CA  95814

**FROM:** Department of Parks and Recreation
1416 Ninth Street
P.O. Box 942896
Sacramento, CA  94296-0001

**PROJECT TITLE:** Pacific Pipeline 2025 Anomaly Digs

**LOCATION:** Gaviota State Park

**COUNTY:** Santa Barbara

**DESCRIPTION OF THE NATURE AND PURPOSE OF PROJECT:** The project is located in Gaviota S.P. along an existing crude oil pipeline known as Line 325 (see **Exhibit A**). The project entails granting a right-of-entry to the Pacific Pipeline Company, which would allow permittee to excavate and repair eighteen (18) discrete pipeline anomaly sites. When the work on each site is completed, the surface will be restored. Work will be performed by Pacific Pipeline Company and/or its subcontractors.

**PUBLIC AGENCY APPROVING THE PROJECT:** California Department of Parks and Recreation

**NAME OF DIVISION OR DISTRICT CARRYING OUT THE PROJECT:** Channel Coast District

**EXEMPT STATUS:**
☒ Statutory Exemption (Section 15284)
☒ Categorical Exemption
    *Classes:* 1, 2, 4, 5      *Sections:* 15301, 15302, 15304, 15305

**REASONS WHY PROJECT IS EXEMPT:**
- **Section 15284**: The project is less than eight miles in length; actual construction is not undertaken over a length of more than one-half mile at any one time; to State Parks' knowledge, the section of pipeline is not less than eight miles away from any section of pipeline that has been subject to this exemption in the past 12 months; the project is not solely for the purpose of excavating hazardous soil; the permittee's Integrated Contingency Plan results in notification of appropriate agencies to take action in the event of an emergency evacuation; project activities are undertaken within an existing right-of-way and the permit requires the right-of-way to be restored to its condition prior to the project; and the permit requires the permittee to comply with all conditions otherwise authorized by law.
- **Section 15301 (Class 1) Existing Facilities (d):** The project consists of restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety.
- **Section 15302 (Class 2) Replacement or Reconstruction (b):** Replacement of a commercial structure with a new structure of substantially the same size, purpose, and capacity.
- **Section 15304 (Class 4) Minor Alterations to Land (f):** The project consists of minor trenching and backfilling activities with planned surface restoration.
- **Section 15305 (Class 5) Minor Alterations in Land Use Limitations:** The project consists of minor alterations in land use limitations in areas with an average slope of less than 20%.

No potential for significant or cumulative impacts to the environment is anticipated in compliance with CEQA §15301, 15302, 15304, and 15305, as the project consists of repairs to an existing facility with no expansion of use. The footprint of the pipeline remains the same. All work shall be performed in

DPR 508 (Rev. 4/2003)(Word 2/11/2005)

accordance with applicable environmental regulations and State Parks' stipulated requirements, conditions, and restrictions to avoid and/or minimize the potential for environmental impact. All work shall be monitored by qualified environmental and cultural staff.

**CONTACT:** Dena Bellman
Channel Coast District

**PHONE NO.:** (805) 331-3955
**EMAIL:** Dena.Bellman@parks.ca.gov

DocuSigned by:

*Dena Bellman*

TFD96B85B9674A1...

Dena Bellman
District Superintendent
Channel Coast District

5/9/2025

Date

**EXHIBIT A – Gaviota State Park Line 325A Topographic Map**

DPR 508 (Rev. 4/2003)(Word 2/11/2005)

## EXHIBIT A



Legend
— Line CA-325A
▭ Gaviota State Park Assessor's Parcels

**Gaviota State Park**
**Line 325A - Topographic Map**
Pacific Pipeline Company
Santa Barbara County, California

SCS ENGINEERS

Santa Maria, CA    May 2025

Scale: 1:15,360

0    0.15    0.3 Miles    N

Esri Community Maps Contributors, California State Parks, Esri, TomTom, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, Bureau of Land Management, EPA, NPS, US Census Bureau, USDA, USFWS, Copyright:© 2013 National Geographic Society, i-cubed, California State Parks, Esri, TomTom, Garmin, SafeGraph, FAO, METI/NASA, USGS, Bureau of Land Management, EPA, NPS, USFWS

USGS Topographic Map (Source: ArcGIS Online)

DPR 508 (Rev. 4/2003)(Word 2/11/2005)



EXHIBIT B

# PIPELINE EASEMENT

## CELERON PIPELINE COMPANY OF CALIFORNIA

## GAVIOTA STATE PARK

STATE OF CALIFORNIA, acting by and through the Department of Parks and Recreation, hereinafter called "STATE", and pursuant to Public Resources Code Section 5012 and in accordance with Section 5400 et seq., grants to CELERON PIPELINE COMPANY OF CALIFORNIA, hereinafter called "COMPANY", an easement to construct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across that portion of Gaviota State Park described in Exhibit "A", attached hereto and made a part hereof.

THIS EASEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1. This easement is for a term of thirty (30) years, beginning July 28, 1986 and ending on July 27, 2016.

2. As consideration for the granting of this easement, COMPANY agrees to pay STATE $477,998.50, calculated as follows:

---

---

---

301-05.6-4


1047899

DO NOT RECORD!

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
88 34799

Inland Area    250    871-13    217,782.50                              $377,998.50

Mitigation of impacts to natural resources

and public recreation use                                               100,000.00

TOTAL                                                                   $477,998.50

Mitigation of impacts to natural resources and public recreation use are based on the project described in the Environmental Impact Report and Environmental Impact Statement, dated January 1985 and filed under State Clearing House Number 83110902. Impacts above and beyond those within said Gaviota State Park will be the subject of additional compensation to State.

This payment shall be made in a single lump sum payment within 60 days of the date of this easement.

Discrepancies between pipeline lengths actually installed and calculated lengths will be paid for additionally or reimbursed from one party to the other within 90 days of the completion of the construction of the pipeline, using the formula set forth above.

3. COMPANY acknowledges that this easement is expressly limited to the lands described in said Exhibit "A", and use of other STATE owned land is not conferred or implied, excepting the access road described in Paragraph 13 herein.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

301-0269

word "Grant" ein shall not be construed as covenant against the existence of any thereof.

5. COMPANY, in the exercise of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.

6. (a) In the exercise of this easement, COMPANY shall conduct archeological work under provisions of Exhibit "B", attached hereto and made a part hereof.

(b) COMPANY agrees that construction monitors, as required under Santa Barbara County Final Development Plan C-1, will oversee all construction activities within said Park. Said Plan C-1 is attached hereto as Exhibit "C" and made a part hereof.

(c) COMPANY agrees that all areas disturbed during construction activities and during the term of this easement will be restored and revegetated as required under the approved Gaviota State Park Restoration and Revegetation Plan, attached hereto as Exhibit "D" and made a part hereof.

7. COMPANY hereby waives all claims and recourse against the State of California, its officers, agents, and employees for loss or damage to persons or property arising from, growing out of, or in any way connected with or incident to this easement. COMPANY agrees to indemnify, save harmless, and defend the State of California, its officers, agents, and employees against

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 6-72)

3

301-0263

the State of California, its officers, agents, and employees arising out of or in any way connected with or incident to this easement, except those arising out of the sole negligence of STATE.

8. Upon any termination of this easement, COMPANY shall remove at the option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration.

9. It is mutually agreed that COMPANY, at its option, may extend the term of this easement for an additional period not to exceed ten (10) years, subject to the following provisions:

(a) COMPANY must give STATE, during year twenty-nine (29) of this easement, a written request for the extension of this easement. Said request shall set forth the length of the proposed extension.

(b) Consideration for said extension, payable by COMPANY in a lump sum prior to the expiration of the original term of this easement, shall be the fair market value of the property rights involved. If STATE and COMPANY fail to reach agreement as to said fair market value, the dispute shall be resolved under the provisions of paragraph 24 herein.

---

---

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

01-0263

and B of this clause, and those terms and conditions changed by mutual consent of STATE and COMPANY, the terms and conditions of this easement shall remain in full force and effect.

10. COMPANY can at any time by providing thirty (30) days written notice to STATE of its intent to terminate this easement, do so.

11. In the event that COMPANY shall at any time be in default in respect to any liquidated monetary payment due hereunder STATE may at its option declare this easement forfeited and terminated, provided, however, before any forfeiture shall be declared hereunder, STATE shall cause to be given to COMPANY a written notice specifying the particulars wherein COMPANY is in default and demanding performance in accordance with the terms of this easement. If within thirty (30) days after such notice is given, COMPANY shall fully comply therewith, no forfeiture by reason of breach shall be declared hereunder; but, in the event of the failure of COMPANY to comply with such notice, STATE may then declare and effect a forfeiture by reason of the default therein specified.

COMPANY is prohibited from assigning, mortgaging, hypothecating, or transferring this easement or any interest therein without the prior written consent of STATE, which consent will not be unreasonably withheld.

12. In the event of a spill or leak of said pipeline contents into or over said Park, COMPANY shall immediately notify STATE'S Regional Director for

---

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 9-72)

84 37916

5

SD1 0263

The name and company of the person reporting, an information telephone number that can be contacted for further information, the time and date of the spill, the location of the spill, the discharger, the substance spilled, the estimated quantity spilled, the cause of the spill, and the action taken. Thereafter, a written report shall be filed with the STATE identifying the source, cause, size of spill, and the action taken.

13. COMPANY shall during the herein term maintain in full force and effect, with respect to this easement, a policy or policies of public liability insurance in the amount of Five Hundred Thousand Dollars ($500,000) each occurrence for bodily injury and property damage combined ($500,000 combined single limit). The policy or policies shall be underwritten to the satisfaction of STATE, in a form satisfactory to STATE, and a complete and signed copy of a Certificate of Insurance thereof shall be submitted to STATE concurrently with the signed copy of this easement. Certificates of Insurance shall contain the following special endorsement:

"The State of California, California State Park and Recreation Commission, Department of Parks and Recreation, their officers, employees, and agents, are hereby declared to be additional insureds under the terms of this policy, both as to the activities of the Company and as to the activities of the State, the State Park and Recreation Commission, the Department of Parks and Recreation, their officers, employees, and agents, as related to the activities contemplated in this easement."

6

301-0268

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

and recreation.

"The State of California is not liable for the payment of any premiums or assessments on this policy."

This cancellation provision shall not be construed in derogation of the duty of the COMPANY to furnish insurance during the entire term of the easement.

In the event COMPANY fails to keep in effect at all times insurance coverage as herein provided, STATE may, in addition to any other remedies it may have, terminate this easement and all privileges COMPANY may have hereunder.

14. The road to be used by COMPANY for ingress, egress, and access by COMPANY to this easement shall be reasonably designated and redesignated by STATE. COMPANY shall not call upon STATE, nor shall STATE have any responsibility to perform any maintenance work or to make any repairs or improvements on said road. If COMPANY feels more maintenance or repair work is needed than is actually performed by STATE, COMPANY may perform such repairs or maintenance at COMPANY'S own expense. COMPANY shall immediately repair any damage caused by COMPANY, or its invitees, to the road surface.

15. In its use of this easement, COMPANY shall comply with all STATE requirements, including, but not limited to, parking control and the uses

16.  COMPANY shall coordinate all construction activities herein authorized within said Park with STATE'S Superintendent of the Gaviota District to assure the safety of said Park visitors and also to minimize the inconvenience to said Park visitors and possible detrimental effect on said Park operations or resources.

17.  If STATE grants other pipeline easements within this easement, each such easement shall require that the grantee pay COMPANY'S cost for inspectors to protect COMPANY'S pipeline, require grantee to indemnify COMPANY, and to have a plan that gives time and dates for revegetation and cathodic protection in accordance with industry standards.  STATE shall not be liable to COMPANY for failure to require said grantees to provide these protections unless COMPANY gives written notice to STATE, prior to such grant, of the provisions of this paragraph.  Also, in no event shall STATE have any liability for failure to require these protections if the pipeline is installed pursuant to a court order in an action in eminent domain.

18.  During construction, COMPANY shall provide or cause to be provided: (1) adequate signing for its work, including all of its excavations, within said Park warning the public of dangerous conditions, and (2) adequate lighting to warn against open excavations or other dangerous conditions created during said construction.  All trenches and excavations for the pipeline or other construction work shall be made in such a manner as to permit the visiting public uninterrupted access across the route of said construction.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 30296

8

301-0263

providing ac__s throughout said Park for the __iting public.

20. No tree or plants outside this easement within said park shall be cut, injured, or disturbed as a result of the herein construction by COMPANY without prior approval of said Superintendent. Any tree or slash so cut or removed shall be disposed of in a manner satisfactory to STATE. Any trees or plants removed within said Park shall be replaced at no cost to STATE with trees and plants acceptable to STATE in accordance with provisions under Paragraph 6(c) above.

21. To secure the full and complete performance of COMPANY'S obligation hereunder to the good faith satisfaction of STATE, and until the termination herein provided, COMPANY shall furnish evidence for STATE of its financial net worth in excess of $10,000,000 or as an alternative, COMPANY may provide a bond in the amount of One Million Dollars ($1,000,000). Said bond shall be in the form shown on Exhibit "E", attached hereto and made a part hereof.

22. If, in the judgment of said Superintendent, the herein construction becomes hazardous to said Park or said Park visitors, the said Superintendent shall immediately request COMPANY to cease that specific construction task and COMPANY shall not proceed with that specific construction task until the hazardous problem is resolved in a manner acceptable to said Superintendent.

23. In the event of a rupture of the pipeline and consequent spill of pollutants within the said Park, COMPANY, at no cost to STATE, shall

9

spill or pollutants. Upon approval by STATE and COMPANY of the monetary determination of loss, COMPANY shall submit said amount to STATE. If STATE and COMPANY fail to reach agreement, the dispute shall be resolved under provisions of paragraph 24 herein.

24. If a monetary dispute arises under paragraphs 9, 23, or 25 of this easement, it shall be resolved by two persons skilled in appraisal of the type of valuation sought by STATE. STATE shall appoint one appraiser and COMPANY the other appraiser. STATE and COMPANY shall be bound by the determination made by the two appraisers. If the two appraisers do not come to an agreement upon the appraised damages and/or values, a third appraiser shall be appointed by the first two appraisers so that a decision can be made by the majority.

25. In the event a spill of pollutants results in the permanent loss of usability of part or all of said Park, COMPANY, upon request by STATE, shall hire a professional real property appraiser acceptable to STATE for the purpose of determining fee value of the land no longer usable and the cost to replace said with land of equal value and utility. Upon review and approval of the appraisal by STATE and COMPANY, COMPANY will proceed to obtain land of equal value to provide STATE a dollar amount equal to the value of the land no longer usable. STATE and COMPANY will then exchange properties. If STATE and COMPANY cannot agree to the exchange, the dispute shall be resolved under provisions of paragraph 24 above.

----

----

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-78)

85 34769

3

301-0265

60   District Boulevard
Ba...rsfield, CA   93313

27.   Notices to STATE shall be addressed to:

District Superintendent
Gaviota District
Department of Parks and Recreation
#10 Refugio Beach Road
Goleta, CA   93117

IN WITNESS WHEREOF, the parties hereto have executed this Grant of easement this _____ day of _____, 19___.

CELERON PIPELINE COMPANY
OF CALIFORNIA

By _____
    Ronald L. Hinn

Title _____President_____

Date ____August 6, 1987____


STATE OF CALIFORNIA
DEPT. OF PARKS AND RECREATION

_____

Chief Deputy Director

_____5-26-87_____


APPROVED:


DEPARTMENT OF GENERAL SERVICES

By_____
    PAUL V. SAVONA, Chief
    Office of Real Estate
    and Design Services

Date:   NOV 23 1987

B-1132Q

87-0563

11



Centerline description of a fifty (50) foot wide right of way in, through and across that certain parcel of land situated in the County of Santa Barbara, State of California more particularly referred to and "Gaviota State Park." Said land is depicted in Record of Survey Map recorded in Book 85, page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 25' East a distance of 152.7 feet from a 2" Iron Pipe with brass cap tagged L.S. 2602 and depicted as monument 40A on Record of Survey Map recorded in Book 85, Page 9, Sheets 1 to 5 inclusive.

1) THENCE North 71° 38' West for a distance of 547.9 feet;

2) THENCE North 65° 09' West for a distance of 46.0 feet;

3) THENCE North 54° 19' West for a distance of 40.0 feet;

4) THENCE North 61° 30' West for a distance of 40.0 feet;

5) THENCE North 32° 41' West for a distance of 108.5 feet;

6) THENCE North 22° 12' West for a distance of 40.0 feet;

7) THENCE North 11° 43' West for a distance of 575.3 feet;

8) THENCE North 19° 28' West for a distance of 40.0 feet;

9) THENCE North 27° 13' West for a distance of 116.5 feet;

10) THENCE North 36° 58' West for a distance of 40.0 feet;

11) THENCE North 46° 42' West for a distance of 40.0 feet;

12) THENCE North 56° 27' West for a distance of 33.5 feet;

13) THENCE North 68° 37' West for a distance of 40.0 feet;

14) THENCE North 80° 47' West for a distance of 40.0 feet;

15) THENCE South 87° 03' West for a distance of 45.8 feet;

16) THENCE South 78° 34' West for a distance of 40.0 feet;

17) THENCE South 70° 05' West for a distance of 40.0 feet;

18) THENCE South 61° 36' West for a distance of 75.5 feet;

19) THENCE South 72° 53' West for a distance of 40.0 feet;

21) THENCE North 85° 09' West for a distance of 40.0 feet;

22) THENCE North 74° 29' West for a distance of 40.0 feet;

23) THENCE North 63° 48' West for a distance of 208.8 feet to a point of curvature;

24) THENCE along a curve to the right with a radius of 44.5 feet and a central angle of 51° 30' for a distance of 40.0 feet;

25) THENCE North 12° 19' West for a distance of 808.0 feet to a point of curvature;

-1-

EXHIBIT-A

301-0263

28) THENCE South 74° 20' West for a distance of 43.5 feet;

29) THENCE South 65° 13' West for a distance of 121.3 feet;

30) THENCE South 41° 19' West for a distance of 149.5 feet;

31) THENCE South 29° 36' West for a distance of 991.4 feet;

32) THENCE South 40° 41' West for a distance of 40.0 feet;

33) THENCE South 31° 46' West for a distance of 305.6 feet;

34) THENCE South 62° 01' West for a distance of 40.0 feet;

35) THENCE South 72° 16' West for a distance of 40.0 feet;

36) THENCE South 82° 32' West for a distance of 40.0 feet;

37) THENCE North 87° 13' West for a distance of 261.4 feet;

38) THENCE South 81° 05' West for a distance of 238.7 feet;

39) THENCE South 70° 18' West for a distance of 40.0 feet;

40) THENCE South 59° 32' West for a distance of 40.0 feet;

41) THENCE South 48° 45' West for a distance of 40.0 feet;

42) THENCE South 38° 00' West for a distance of 281.4 feet;

43) THENCE South 49° 01' West for a distance of 40.0 feet;

44) THENCE South 60° 03' West for a distance of 157.1 feet;

45) THENCE South 70° 33' West for a distance of 107.0 feet to a point of curvature;

46) THENCE along a curve to the right having a radius of 32.1 feet and a central angle of 71° 52' for a distance of 40.2 feet;

47) THENCE North 37° 35' West for a distance of 383.3 feet;

48) THENCE North 48° 49' West for a distance of 40.0 feet;

49) THENCE North 60° 14' West for a distance of 40.0 feet;

50) THENCE North 71° 33' West for a distance of 736.2 feet;

51) THENCE North 79° 07' West for a distance of 485.2 feet;

52) THENCE North 70° 38' West for a distance of 40.0 feet;

53) THENCE North 62° 08' West for a distance of 40.0 feet;

54) THENCE North 53° 38' West for a distance of 82.2 feet to the POINT OF TERMINATION in the West property line of the above described tract of land. Said POINT OF TERMINATION bears South 07° 36' East a distance of 2280.9 feet from a standard P&R bronze disc index number 3 as per Record of Survey mentioned above:

55) THENCE re-entering Gaviota State Park along the West property line. Said POINT OF BEGINNING bears South 07° 36' East a distance of 25.6 feet from a standard P&R bronze disc mentioned above. THENCE along a curve to the right having a radius of 35.3 feet and a central angle of 69° 02' for a distance of 42.5 feet;

-2-

EXHIBIT A

301-0208

61)   THENCE North 64° 21' East for a distance of 201.7 feet;

62)   THENCE North 56° 54' East for a distance of 21.4 feet;

63)   THENCE North 44° 55' East for a distance of 40.0 feet;

64)   THENCE North 32° 57' East for a distance of 40.0 feet;

65)   THENCE North 20° 58' East for a distance of 40.0 feet;

66)   THENCE North 08° 59' East for a distance of 40.0 feet;

67)   THENCE North 02° 59' West for a distance of 40.0 feet;

68)   THENCE North 14° 58' West for a distance of 612.9 feet;

69)   THENCE North 25° 52' West for a distance of 40.0 feet;

70)   THENCE North 36° 46' West for a distance of 40.0 feet;

71)   THENCE North 47° 39' West for a distance of 342.0 feet;

72)   THENCE North 45° 52' West for a distance of 286.0 feet;

73)   THENCE North 35° 30' West for a distance of 40.0 feet;

74)   THENCE North 25° 08' West for a distance of 40.0 feet;

75)   THENCE North 14° 47' West for a distance of 40.0 feet;

76)   THENCE North 04° 25' West for a distance of 40.0 feet;

77)   THENCE North 05° 57' East for a distance of 613.4 feet;

78)   THENCE North 05° 51' West for a distance of 40.0 feet;

79)   THENCE North 17° 39' West for a distance of 40.0 feet;

80)   THENCE North 29° 27' West for a distance of 40.0 feet;

81)   THENCE North 41° 16' West for a distance of 40.0 feet;

82)   THENCE North 53° 02' West for a distance of 149.4 feet;

83)   THENCE North 42° 33' West for a distance of 40.0 feet;

84)   THENCE North 32° 04' West for a distance of 40.0 feet;

85)   THENCE North 21° 35' West for a distance of 40.0 feet;

86)   THENCE North 11° 06' West for a distance of 415.3 feet;

87)   THENCE North 19° 10' West for a distance of 271.6 feet;

88)   THENCE North 11° 59' West for a distance of 113.1 feet;

-3-

3

EXHIBIT A

301-0268

94) THENCE North 24° 49' East for a distance of 40.0 feet;

95) THENCE North 37° 09' East for a distance of 213.5 feet;

96) THENCE North 26° 49' East for a distance of 40.0 feet;

97) THENCE North 16° 28' East for a distance of 372.3 feet;

98) THENCE North 28° 03' East for a distance of 40.0 feet;

99) THENCE North 39° 39' East for a distance of 660.1 feet;

100) THENCE North 29° 57' East for a distance of 40.0 feet;

101) THENCE North 20° 16' East for a distance of 40.0 feet;

102) THENCE North 10° 34' East for a distance of 40.0 feet;

103) THENCE North 00° 52' East for a distance of 96.6 feet;

104) THENCE North 12° 24' East for a distance of 40.0 feet;

105) THENCE North 23° 56' East for a distance of 40.0 feet;

106) THENCE North 35° 28' East for a distance of 40.0 feet;

107) THENCE North 47° 00' East for a distance of 264.6 feet;

108) THENCE North 39° 36' East for a distance of 40.0 feet;

109) THENCE North 32° 12' East for a distance of 365.5 feet;

110) THENCE North 33° 15' East for a distance of 787.1 feet;

111) THENCE North 25° 53' East for a distance of 180.5 feet;

112) THENCE North 34° 22' East for a distance of 366.8 feet;

113) THENCE North 33° 21' East for a distance of 210.2 feet;

114) THENCE North 39° 14' East for a distance of 153.5 feet;

115) THENCE North 31° 35' East for a distance of 33.7 feet;

116) THENCE North 42° 25' East for a distance of 40.0 feet;

117) THENCE North 53° 15' East for a distance of 40.0 feet;

118) THENCE North 64° 05' East for a distance of 40.0 feet;

119) THENCE North 74° 55' East for a distance of 40.0 feet;

120) THENCE North 85° 45' East for a distance of 74.0 feet;

121) THENCE North 84° 50' East for a distance of 357.5 feet;

122) THENCE North 73° 09' East for a distance of 40.0 feet;

123) THENCE North 61° 28' East for a distance of 268.1 feet;

-4-

EXHIBIT-A

301-D268

129) THENCE North 56° ' East for a distance of 40.0 feet;

130) THENCE North 45° 13' East for a distance of 40.0 feet;

131) THENCE North 34° 12' East for a distance of 189.0 feet;

132) THENCE North 45° 19' East for a distance of 40.0 feet;

133) THENCE North 56° 25' East for a distance of 142.6 feet;

134) THENCE North 45° 49' East for a distance of 40.0 feet;

135) THENCE North 35° 12' East for a distance of 40.0 feet;

136) THENCE North 24° 36' East for a distance of 40.0 feet;

137) THENCE North 14° 00' East for a distance of 40.0 feet;

138) THENCE North 03° 23' East for a distance of 80.0 feet;

139) THENCE North 11° 40' East for a distance of 40.0 feet;

140) THENCE North 19° 57' East for a distance of 234.0 feet to the POINT OF TERMINATION in the Northerly property line of the above described tract of land.  Said POINT OF TERMINATION bears North 68° 27' West a distance of 119.9 feet from Caltrans monument +00"A"/180.0 as shown on Caltrans Map for State Highway 1 Map P.M. 0.0-SB1.

Said centerline contains 21,452.7 lineal feet or 1300.2 rods in length, more or less.

The bearings calculated to establish the location of the above centerline was obtained from monuments "Surprise" and "Orford."

# EXHIBIT-A



S21-0263



ALL AMERICAN PIPELINE COMPANY   Kenneth A Pettit
3600 NW AVENUE SUITE 300                    Recorded
BAKERSFIELD, CALIFORNIA 93304   10:28am 27-Ju.-89
ATT: RIGHT-OF-WAY DEPARTMENT                                   RD   5

When Recorded Mail To:

DOCUMENTARY TRANSFER TAX $ ....... 0 .....
.......COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
.......OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.

All American Pipe Line Co. By _____

Signature of Declarant or Agent determining tax, firm Name

**5**

Space Above for Recorder's Use

AGREEMENT AND GRANT OF EASEMENT          Grantee:   All American Pipeline Company
~~Celeron Pipeline Company of California~~

TRB9 100-E

Project:   Underground Communication and
Electrical Supply Systems

Park Unit:   Gaviota State Park

THIS AGREEMENT made and entered into by and between the STATE OF CALIFORNIA, acting through the Department of Parks and Recreation, hereinafter called State, and ~~CELERON PIPELINE COMPANY OF CALIFORNIA~~ ALL AMERICAN PIPELINE COMPANY, a ~~Delaware~~ Texas Corporation, hereinafter called Grantee.

State pursuant to the provisions of Section 5012 of the Public Resources Code of the State of California, and for valuable consideration, receipt of which is hereby acknowledged, hereby grants unto Grantee, its successors and assigns forever, an easement for the use, construction, reconstruction, placement, replacement, repair, inspection, operation and maintenance of an underground communication and electrical supply systems consisting of underground conduits, cables, and vaults including aboveground enclosures, markers, and concrete pads and all incidental appurtenant fixtures and/or equipment in, under, across and along that certain real property conveyed to the State of California by deed recorded October 10, 1967, in

COURT PAPER
STATE OF CALIFORNIA
TD. 113 (REV 5-72)
5 34769


1047903

301- 02 o7

California, and more particularly described as follows:

A strip of land 10 feet in width, lying 7 feet to the Westerly and 3 feet to the Easterly of the following described line:

Beginning at a point which bears North 20° 49' West, 1644.3 feet from a State Highway R.O.W. monument designated 05-SB-101 + 24.93/121 thence South 61° 14' East 13.3 feet; thence South 18° 40' East, 28.9 feet to point of termination on the North boundary of Celeron's existing East-West 50-foot wide pipeline easement recorded April 7, 1988 as Document No. 88-020459 Official Records, County of Santa Barbara.

PROVIDED, this Grant of Easement is subject to the following terms and conditions:

1. This Grant is subject to existing contracts, leases, licenses, easements, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

2. Grantee waives all claims against State, its officers, agents, and employees, for loss or damage caused by, arising out of, or in any way connected with the exercise of this Easement, and Grantee agrees to save harmless, indemnify, and defend State, its officers, agents, and employees, from any and all loss, damage, or liability which may be suffered or incurred by State, its officers, agents, and employees caused by, arising out of, or in any way connected with exercise by Grantee of the rights hereby granted, except those arising out of the sole negligence of State.

---

hereunder.

4.   State expressly reserves the right to require Grantee, at the expense of Grantee, to remove and relocate all improvements placed by Grantee within the easement, upon determination by State that the same interfere with future development of State's property.  Within 180 days after State's written notice and demand for removal and relocation of the improvements, Grantee shall remove and relocate the improvements to a feasible location on the property of State, as designated by State, and State shall furnish Grantee with a good and sufficient similar easement in such new location, on the same terms and conditions as herein stated, and Grantee thereupon shall reconvey to State the Easement herein provided.

5.   This Easement shall terminate in the event Grantee fails for a continuous period of one (1) year to use the Easement for the purposes herein granted.  Upon such termination, Grantee shall forthwith upon service of written demand, deliver to State a quitclaim deed, to its right, title, and interest hereunder, and shall, on State request, without cost to State, and within 90 days from written demand by State, remove all property placed by or for Grantee upon said property and restore said premises as nearly as possible to the same condition they were in prior to the execution of this Easement. In the event Grantee should fail to restore the premises in accordance with such request, State may do so at the risk of Grantee, and all costs of such removal and restoration shall be paid by Grantee upon demand.

- - -

3     301-0267

the ground around such excavation, and shall replace the earth so removed by it and restore the surface of the ground and any improvement thereon to as near the same condition as they were prior to such excavation as is practicable.

7.   Grantee is further given the right of reasonable ingress to and egress from the Easement hereby granted, provided, however, that existing roads and trails shall be utilized for such purpose whenever reasonably possible and further provided that if such road or trail is not available, Grantee shall secure the consent of the State as to the route or routes to be followed for the purpose of such ingress and egress.  Such right of ingress and egress shall at all times be exercised in a manner which will cause the least damage to the property of the State.

JUN 2 0 1989
_____
Date

STATE OF CALIFORNIA
DEPARTMENT OF PARKS AND RECREATION

By _____

GRANTEE:
~~CELERON PIPELINE COMPANY OF~~ _Umw_
~~CALIFORNIA~~
ALL AMERICAN PIPELINE COMPANY

By _____

APPROVED
Department of General Services

Y-16000

By
Senior Land Agent
Office of Real Estate and Design Services

4

301-0267

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

65 34789

On this _____ 26ᵗʰ _____ day of _____ June _____, in the year of 1989, before me, a Notary Public in and for the STATE OF CALIFORNIA, duly commissioned and sworn, personally appeared _____ Henry G. Agonia _____, known to me to be the _____ DIRECTOR OF PARKS AND RECREATION OF THE STATE OF CALIFORNIA and acknowledged to me that (x)he executed the within instrument in the name of and on behalf of the STATE OF CALIFORNIA.

IN WITNESS WHEREOF, I have hereunder set my hand and affixed my official seal in said County, the day and year first above written.

_____ Susan P. Harrington _____
Notary Public

OFFICIAL SEAL
SUSAN P HARRINGTON
NOTARY PUBLIC CALIFORNIA
SACRAMENTO COUNTY
My Comm. Expires Sept 25, 1990

STATE OF CALIFORNIA )
) SS.
COUNTY OF _Kern_ )

On _____ June 9, 1989 _____, before me, the undersigned, a Notary Public in and for said State, personally appeared HARRY M. WEED, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the VICE PRESIDENT – OPERATIONS of ALL AMERICAN PIPELINE COMPANY, a Texas corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

_____ Freda Dianna Bagby _____
Notary Public

OFFICIAL SEAL
FREDA DIANNA BAGBY
NOTARY PUBLIC - CALIFORNIA
KERN COUNTY
My comm. expires AUG 25, 1992

3)1- 02.7

**RECORDING REQUESTED BY WHEN RECORDED MAIL TO:**
**ALL AMERICAN PIPELINE COMPANY**
**5500 MING AVENUE, SUITE 300**
**BAKERSFIELD, CALIFORNIA 93309**
**ATT: RIGHT-OF-WAY DEPARTMENT**

```
                                    :         Fee  Page   68.00
                                    : AU2            2.00
              Recorded              : COP           23.00
        Official Records            : CER            2.00
           County of                : NCO           66.00
        Santa Barbara               : CR Crd       161.00
        Kenneth A Pettit            :
           Recorder                 :
        11:33am 26-Jan-96           :    CARD    MM  22
```

DOCUMENTARY TRANSFER TAX $.............................
☐ Computed on full value of property conveyed, or
☐ Computed on full value less liens & encumbrances
remaining thereon at time of sale.

................................................
Signature of declarant or agent determining tax - firm name

**SEPTEMBER 26, 1995**
**R/W 93050-OSB-023**
**GAVIOTA STATE PARK**
**COUNTY OF SANTA BARBARA**
**STATE OF CALIFORNIA**

## MEMORANDUM OF AMENDMENT TO PIPELINE EASEMENT

This Memorandum of Amendment to Pipeline Easement is made and entered into by and between the State of California, acting by and through the Department of Parks and Recreation ("**State**"), on the one hand, and All American Pipeline Company, successor by merger to Celeron Pipeline Company of California, ("**AAPL**"), on the other.

## RECITALS

WHEREAS, on or about August 6, 1987, a Pipeline Easement was made and entered into by and between **State** and **AAPL**, a memorandum of which said Pipeline Easement entitled Memorandum of Pipeline Easement, herein referred to as ("**Memorandum**"), was recorded April 7, 1988 as Document No. 88-020459 of the Official Records of Santa Barbara County, California, and;

WHEREAS, subsequent to the making of the **Memorandum**, the parties amended said Pipeline Easement, substituting Exhibit A-1 for Exhibit-A containing a centerline description and plat of the fifty foot (50') wide easement granted to **AAPL** to more specifically describe the location of the easement across and through Gaviota State Park property;

WHEREAS, it is the desire of the parties hereto to record this Memorandum of Amendment to Pipeline Easement to reflect the revised description of the fifty foot (50') wide easement as described in Exhibit A-1 of the Amendment of Pipeline Easement.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do mutually agree as follows, to wit:

The centerline description and plat contained in Exhibit A-1 attached hereto and incorporated herein is the legal description and location of the fifty foot (50') wide easement through the Gaviota State Park property which is covered by the Pipeline Easement, entered into on or about August 6, 1987, and the amendment thereto. Exhibit-A of said **Memorandum** and said Pipeline Easement and any reference thereto shall be deleted therefrom and said Exhibit A-1 is substituted therefor.

All terms, conditions and provisions of the Pipeline Easement, as amended, are incorporated herein by reference and shall remain in full force and effect.

This Memorandum of Amendment to Pipeline Easement and the Pipeline Easement, as amended, shall be read together as one document. To the extent that there may be any conflict or inconsistency between the unrecorded Pipeline Easement, as amended, and this Memorandum of Amendment to Pipeline Easement, the unrecorded Pipeline Easement, as amended, shall control.

In witness whereof, the parties hereto have executed this Memorandum of Amendment to Pipeline Easement as of the day and year indicated below by the signature of their duly authorized representatives.

DATED:    11/30           , 1995          STATE OF CALIFORNIA,
                                          DEPARTMENT OF PARKS AND
                                          RECREATION

                                          By:  _Donald W Murphy_
                                               Donald W. Murphy, Director


DATED:   January 23         , 1995 6      ALL  AMERICAN  PIPELINE
                                          COMPANY, a Texas corporation

                                          By:  _Bruce K. Murchison_
                                               Bruce K. Murchison, President

1757.doc

STATE OF CALIFORNIA          )
                             )
COUNTY OF KERN               )

On _January 23, 1996_____, 1995, before me Debbie S. Cardell, Notary Public, personally appeared **BRUCE K. MURCHISON, PRESIDENT,** of **ALL AMERICAN PIPELINE COMPANY,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.



_____
NOTARY PUBLIC

STATE OF CALIFORNIA                )
                                   )
COUNTY OF _Sacramento_____         )

On __8 January_____, 1995, before me _Rebecca J. McGown_, Notary Public, personally appeared **DONALD W. MURPHY, DIRECTOR,** of **CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

REBECCA J. MC GOWN
COMM. #1006175
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires September 30, 1997

_____
NOTARY PUBLIC

STATE OF CALIFORNIA

0SB-023-SZ

Centerline description of a fifty (50') foot wide right-of-way in, through and across that certain parcel of land situated in the County of Santa Barbara, State of California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map, recorded in Book 85, Page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 24'51" East a distance of 154.93 feet from a 2" iron pipe with a brass cap tagged L.S. 2602 and depicted as index number 40A on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.

1)      THENCE, from said POINT OF BEGINNING North 71° 46' 31" West for a distance of 559.06 feet;

2)      THENCE, North 66° 01' 16" West for a distance of 40.88 feet;

3)      THENCE, North 51° 52' 50" West for a distance of 39.95 feet;

4)      THENCE, North 41° 33' 53" West for a distance of 42.43 feet;

5)      THENCE, North 30° 41' 54" West for a distance of 112.93 feet;

6)      THENCE, North 19° 45' 18" West for a distance of 39.03 feet;

7)      THENCE, North 11° 38' 46" West for a distance of 539.90 feet;

8)      THENCE, North 13° 34' 45" West for a distance of 44.33 feet;

9)      THENCE, North 26° 42' 46" West for a distance of 81.79 feet;

10)     THENCE, North 26° 53' 47" West for a distance of 63.95 feet;

11)     THENCE, North 36° 32' 47" West for a distance of 39.72 feet;

12)     THENCE, North 54° 46' 50" West for a distance of 31.32 feet;

13)     THENCE, North 67° 13' 49" West for a distance of 53.58 feet;

14)     THENCE, North 72° 37' 51" West for a distance of 31.30 feet;

15)     THENCE, North 79° 25' 18" West for a distance of 29.61 feet;

EXHIBIT A-1

16)     THENCE, North 86° 10' 12" West for a distance of 33.59 feet;

17)     THENCE, South 84° 47' 57" West for a distance of 40.24 feet;

18)     THENCE, South 69° 09' 40" West for a distance of 38.90 feet;

19)     THENCE, South 59° 23' 22" West for a distance of 41.73 feet;

20)     THENCE, South 62° 25' 23" West for a distance of 45.67 feet;

21)     THENCE, South 75° 02' 42" West for a distance of 44.89 feet;

22)     THENCE, South 83° 27' 42" West for a distance of 92.86 feet;

23)     THENCE, South 84° 22' 03" West for a distance of 656.41 feet;

24)     THENCE, South 84° 10' 55" West for a distance of 374.04 feet;

25)     THENCE, South 85° 01' 08" West for a distance of 75.41 feet;

26)     THENCE, South 89° 46' 18" West for a distance of 69.44 feet;

27)     THENCE, North 70° 54' 45" West for a distance of 51.81 feet;

28)     THENCE, North 64° 11' 39" West for a distance of 48.39 feet;

29)     THENCE, North 62° 37' 30" West for a distance of 157.42 feet;

30)     THENCE, North 41° 32' 31" West for a distance of 15.41 feet;

31)     THENCE, North 13° 47' 08" West for a distance of 18.15 feet;

32)     THENCE, North 12° 13' 05" West for a distance of 741.84 feet;

33)     THENCE, North 36° 29' 21" West for a distance of 17.90 feet;

34)     THENCE, North 63° 25' 05" West for a distance of 22.59 feet;

35)     THENCE, North 65° 52' 37" West for a distance of 23.65 feet;

36)     THENCE, North 86° 32' 11" West for a distance of 24.60 feet;

37)     THENCE, South 69° 41' 56" West for a distance of 95.08 feet to a point in the Eastern right-of-way for State Highway 101. Said point bears North 19° 35' 06" West a distance of 805.01 feet from a State Highway angle point described as +00/121' on the Eastern right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.

38)     THENCE, continuing South 69° 41' 56" West for a distance of 175.91 feet to a point in the Western right-of-way for State Highway 101. Said point bears North 19° 40' 36" West a distance of 502.66 feet from a State Highway angle point described as +00/54' on the Western right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.

EXHIBIT A-1                                         2

39)    THENCE, South 69° 41' 56" West for a distance of 109.97 feet;

40)    THENCE, South 64° 30' 25" West for a distance of 54.07 feet;

41)    THENCE, South 46° 32' 08" West for a distance of 90.02 feet;

42)    THENCE, South 41° 09' 43" West for a distance of 74.01 feet;

43)    THENCE, South 35° 30' 43" West for a distance of 53.14 feet;

44)    THENCE, South 29° 47' 06" West for a distance of 775.30 feet;

45)    THENCE, South 30° 30' 07" West for a distance of 185.42 feet;

46)    THENCE, South 49° 31' 39" West for a distance of 85.95 feet;

47)    THENCE, South 52° 18' 48" West for a distance of 205.04 feet;

48)    THENCE, South 53° 43' 14" West for a distance of 44.79 feet;

49)    THENCE, South 59° 04' 57" West for a distance of 41.23 feet;

50)    THENCE, South 74° 07' 05" West for a distance of 42.08 feet;

51)    THENCE, South 89° 42' 05" West for a distance of 44.94 feet;

52)    THENCE, North 87° 15' 03" West for a distance of 224.68 feet;

53)    THENCE, South 88° 01' 54" West for a distance of 45.09 feet;

54)    THENCE, South 80° 38' 57" West for a distance of 235.82 feet;

55)    THENCE, South 72° 00' 44" West for a distance of 40.47 feet;

56)    THENCE, South 50° 17' 05" West for a distance of 44.07 feet;

57)    THENCE, South 40° 26' 17" West for a distance of 91.96 feet;

58)    THENCE, South 36° 43' 35" West for a distance of 142.61 feet;

59)    THENCE, South 42° 48' 46" West for a distance of 54.02 feet;

60)    THENCE, South 46° 45' 05" West for a distance of 62.46 feet;

61)    THENCE, South 60° 18' 40" West for a distance of 46.92 feet;

62)    THENCE, South 59° 53' 44" West for a distance of 32.62 feet;

63)    THENCE, South 60° 07' 59" West for a distance of 47.52 feet;

64)    THENCE, South 65° 17' 02" West for a distance of 31.64 feet;

65)    THENCE, South 70° 32' 54" West for a distance of 83.25 feet;

66)    THENCE, South 75° 47' 18" West for a distance of 22.00 feet;

67)    THENCE, North 71° 55' 40" West for a distance of 17.95 feet;

68)    THENCE, North 37° 42' 10" West for a distance of 297.01 feet;

69)    THENCE, North 37° 59' 16" West for a distance of 51.49 feet;

70)    THENCE, North 42° 03' 53" West for a distance of 20.85 feet;

71)    THENCE, North 54° 04' 30" West for a distance of 42.79 feet;

EXHIBIT A-1                                    3

72)    THENCE, North 71° 01' 20" West for a distance of 636.85 feet;

73)    THENCE, North 71° 51' 38" West for a distance of 53.12 feet;

74)    THENCE, North 76° 45' 06" West for a distance of 93.87 feet;

75)    THENCE, North 79° 02' 12" West for a distance of 380.69 feet;

76)    THENCE, North 79° 26' 57" West for a distance of 65.46 feet;

77)    THENCE, North 67° 59' 02" West for a distance of 85.73 feet;

78)    THENCE, North 53° 34' 28" West for a distance of 83.03 to the POINT OF EXIT in the West property line of the above described tract of land.  Said POINT OF EXIT bears South 07° 39' 18" East a distance of 2278.66 feet from a standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.


THENCE re-entering Gaviota State Park along the West property line. Said POINT OF RE-ENTRY bears South 07° 39' 18" East a distance of 23.84 feet from standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the Recorder of Santa Barbara County.

79)    THENCE, North 41° 19' 12" East for a distance of 0.39 feet;

80)    THENCE, North 22° 20' 38" East for a distance of 21.66 feet;

81)    THENCE, North 22° 31' 52" West for a distance of 30.68 feet;

82)    THENCE, North 27° 39' 40" West for a distance of 97.35 feet;

83)    THENCE, North 26° 35' 06" West for a distance of 25.05 feet;

84)    THENCE, North 10° 16' 17" East for a distance of 29.77 feet;

85)    THENCE, North 41° 01' 27" East for a distance of 31.83 feet;

86)    THENCE, North 55° 08' 54" East for a distance of 96.41 feet;

87)    THENCE, North 55° 30' 31" East for a distance of 58.30 feet;

88)    THENCE, North 57° 48' 50" East for a distance of 100.47 feet;

89)    THENCE, North 58° 14' 25" East for a distance of 124.73 feet;

90)    THENCE, North 58° 50' 09" East for a distance of 57.49 feet;

91)    THENCE, North 62° 29' 33" East for a distance of 78.22 feet;

92)    THENCE, North 63° 33' 16" East for a distance of 153.71 feet;

EXHIBIT A-1                                                    4

93)    THENCE, North 58° 26' 55" East for a distance of 205.93 feet;

94)    THENCE, North 64° 43' 52" East for a distance of 138.72 feet;

95)    THENCE, North 64° 02' 35" East for a distance of 52.57 feet;

96)    THENCE, North 64° 46' 08" East for a distance of 41.81 feet;

97)    THENCE, North 53° 57' 37" East for a distance of 43.32 feet;

98)    THENCE, North 36° 37' 58" East for a distance of 44.62 feet;

99)    THENCE, North 22° 01' 34" East for a distance of 33.85 feet;

100)    THENCE, North 12° 45' 49" East for a distance of 25.01 feet;

101)    THENCE, North  4° 44' 59" East for a distance of 51.96 feet;

102)    THENCE, North 11° 53' 42" West for a distance of 71.53 feet;

103)    THENCE, North 14° 00' 26" West for a distance of 105.86 feet;

104)    THENCE, North 13° 38' 52" West for a distance of 87.21 feet;

105)    THENCE, North 13° 22' 59" West for a distance of 112.95 feet;

106)    THENCE, North 16° 32' 23" West for a distance of 99.93 feet;

107)    THENCE, North 17° 30' 21" West for a distance of 3.43 feet;

108)    THENCE, North 14° 53' 47" West for a distance of 72.90 feet;

109)    THENCE, North 17° 21' 18" West for a distance of 51.51 feet;

110)    THENCE, North 18° 18' 23" West for a distance of 41.73 feet;

111)    THENCE, North 21° 22' 16" West for a distance of 40.21 feet;

112)    THENCE, North 29° 34' 32" West for a distance of 44.13 feet;

113)    THENCE, North 36° 30' 22" West for a distance of 39.28 feet;

114)    THENCE, North 45° 09' 01" West for a distance of 49.86 feet;

115)    THENCE, North 48° 02' 46" West for a distance of 104.93 feet;

116)    THENCE, North 46° 57' 01" West for a distance of 128.51 feet;

117)    THENCE, North 45° 57' 45" West for a distance of 271.46 feet;

118)    THENCE, North 44° 07' 00" West for a distance of 39.59 feet;

119)    THENCE, North 34° 49' 04" West for a distance of 38.60 feet;

120)    THENCE, North 18° 20' 18" West for a distance of 45.18 feet;

121)    THENCE, North  4° 27' 42" West for a distance of 52.97 feet;

122)    THENCE, North  6° 28' 32" East for a distance of 512.96 feet;

123)    THENCE, North  6° 59' 05" East for a distance of 88.22 feet;

124)    THENCE, North  6° 50' 30" East for a distance of 45.27 feet;

EXHIBIT A-1                                              5

125)    THENCE, North  4° 16' 55" West for a distance of 33.12 feet;

126)    THENCE, North 17° 53' 09" West for a distance of 16.52 feet;

127)    THENCE, North 28° 54' 53" West for a distance of 15.54 feet;

128)    THENCE, North 38° 02' 45" West for a distance of 18.84 feet;

129)    THENCE, North 45° 02' 54" West for a distance of 25.04 feet;

130)    THENCE, North 52° 21' 14" West for a distance of 195.48 feet;

131)    THENCE, North 51° 58' 28" West for a distance of 29.67 feet;

132)    THENCE, North 35° 07' 42" West for a distance of 18.66 feet;

133)    THENCE, North 21° 19' 25" West for a distance of 24.24 feet;

134)    THENCE, North 12° 30' 01" West for a distance of 28.37 feet;

135)    THENCE, North 11° 03' 54" West for a distance of 34.11 feet;

136)    THENCE, North 10° 44' 57" West for a distance of 102.86 feet;

137)    THENCE, North 11° 01' 53" West for a distance of 135.30 feet;

138)    THENCE, North 10° 39' 33" West for a distance of 137.91 feet;

139)    THENCE, North 18° 21' 28" West for a distance of 52.38 feet;

140)    THENCE, North 18° 34' 30" West for a distance of 84.62 feet;

141)    THENCE, North 18° 57' 14" West for a distance of 89.59 feet;

142)    THENCE, North 18° 45' 23" West for a distance of 61.87 feet;

143)    THENCE, North 10° 25' 56" West for a distance of 37.78 feet;

144)    THENCE, North 13° 19' 34" West for a distance of 63.92 feet;

145)    THENCE, North 20° 37' 59" West for a distance of 36.44 feet;

146)    THENCE, North 24° 09' 47" West for a distance of 395.90 feet;

147)    THENCE, North 24° 25' 34" West for a distance of 68.71 feet;

148)    THENCE, North 17° 57' 30" West for a distance of 44.41 feet;

149)    THENCE, North 12° 04' 41" West for a distance of 41.00 feet;

150)    THENCE, North  5° 14' 59" West for a distance of 42.99 feet;

151)    THENCE, North  4° 16' 52" East for a distance of 42.38 feet;

152)    THENCE, North  9° 59' 24" East for a distance of 170.03 feet;

153)    THENCE, North 10° 28' 26" East for a distance of 77.66 feet;

154)    THENCE, North 13° 48' 46" East for a distance of 42.89 feet;

155)    THENCE, North 20° 14' 29" East for a distance of 41.82 feet;

156)    THENCE, North 25° 08' 23" East for a distance of 40.43 feet;

157)    THENCE, North 30° 40' 03" East for a distance of 45.05 feet;

EXHIBIT A-1                                        6

158)    THENCE, North 36° 59' 39" East for a distance of 147.17 feet;

159)    THENCE, North 35° 04' 06" East for a distance of 40.49 feet;

160)    THENCE, North 23° 40' 36" East for a distance of 37.62 feet;

161)    THENCE, North 16° 37' 43" East for a distance of 288.02 feet;

162)    THENCE, North 20° 20' 19" East for a distance of 45.69 feet;

163)    THENCE, North 24° 12' 35" East for a distance of 51.76 feet;

164)    THENCE, North 28° 39' 33" East for a distance of 39.64 feet;

165)    THENCE, North 37° 26' 37" East for a distance of 32.91 feet;

166)    THENCE, North 39° 58' 38" East for a distance of 557.98 feet;

167)    THENCE, North 36° 00' 37" East for a distance of 39.90 feet;

168)    THENCE, North 28° 53' 01" East for a distance of 41.77 feet;

169)    THENCE, North 19° 46' 53" East for a distance of 40.21 feet;

170)    THENCE, North 13° 39' 38" East for a distance of 35.75 feet;

171)    THENCE, North  3° 07' 48" East for a distance of 51.70 feet;

172)    THENCE, North  0° 47' 39" East for a distance of 71.48 feet;

173)    THENCE, North 13° 48' 46" East for a distance of 33.49 feet;

174)    THENCE, North 24° 14' 56" East for a distance of 20.88 feet;

175)    THENCE, North 39° 40' 01" East for a distance of 29.72 feet;

176)    THENCE, North 45° 50' 18" East for a distance of 26.31 feet;

177)    THENCE, North 47° 56' 23" East for a distance of 197.62 feet;

178)    THENCE, North 44° 32' 33" East for a distance of 42.46 feet;

179)    THENCE, North 42° 17' 35" East for a distance of 24.87 feet;

180)    THENCE, North 38° 16' 06" East for a distance of 30.45 feet;

181)    THENCE, North 32° 28' 19" East for a distance of 382.18 feet;

182)    THENCE, North 33° 23' 25" East for a distance of 283.83 feet;

183)    THENCE, North 33° 25' 42" East for a distance of 376.89 feet;

184)    THENCE, North 31° 25' 08" East for a distance of 653.67 feet;

185)    THENCE, North 33° 54' 45" East for a distance of 144.36 feet;

186)    THENCE, South 89° 39' 48" East for a distance of 0.22 feet;

187)    THENCE, North 34° 26' 20" East for a distance of 70.85 feet;

188)    THENCE, North 37° 52' 29" East for a distance of 43.92 feet;

189)    THENCE, North 42° 45' 48" East for a distance of 38.72 feet;

190)    THENCE, North 37° 50' 22" East for a distance of 58.92 feet;

EXHIBIT A-1                                    7

191) THENCE, North 31° 41' 18" East for a distance of 90.60 feet;

192) THENCE, North 45° 58' 50" East for a distance of 21.64 feet;

193) THENCE, North 57° 22' 06" East for a distance of 29.65 feet;

194) THENCE, North 82° 34' 03" East for a distance of 35.75 feet;

195) THENCE, North 84° 38' 52" East for a distance of 469.23 feet;

196) THENCE, North 68° 01' 29" East for a distance of 45.18 feet;

197) THENCE, North 61° 29' 57" East for a distance of 273.42 feet;

198) THENCE, North 79° 29' 29" East for a distance of 85.81 feet;

199) THENCE, North 89° 24' 26" East for a distance of 132.44 feet;

200) THENCE, South 86° 25' 22" East for a distance of 48.24 feet;

201) THENCE, South 77° 29' 49" East for a distance of 34.14 feet;

202) THENCE, South 72° 08' 48" East for a distance of 38.14 feet;

203) THENCE, North 83° 46' 08" East for a distance of 37.69 feet;

204) THENCE, North 55° 46' 08" East for a distance of 39.03 feet;

205) THENCE, North 34° 31' 01" East for a distance of 268.34 feet;

206) THENCE, North 40° 49' 03" East for a distance of 35.28 feet;

207) THENCE, North 55° 31' 12" East for a distance of 135.38 feet;

208) THENCE, North 56° 14' 40" East for a distance of 66.47 feet;

209) THENCE, North 48° 18' 15" East for a distance of 41.07 feet;

210) THENCE, North 22° 19' 57" East for a distance of 35.86 feet;

211) THENCE, North 10° 17' 19" East for a distance of 42.15 feet;

212) THENCE, North 4° 35' 14" East for a distance of 146.90 feet;

213) THENCE, North 18° 11' 40" East for a distance of 49.66 feet;

214) THENCE, North 20° 22' 15" East for a distance of 191.73 feet to the POINT OF TERMINATION in the North property line of the above described tract of land.  Said POINT OF TERMINATION bears North 68° 27' 25" West a distance of 113.70 feet from a State Highway angle point in the South right-of-way line for State Highway 1.  Said angle point is described as +00 "A" 185.00' and is shown on California State Highway, State of California, Department of Public Works, District 5 drawing number SB-1-R0.00/SB-101-R48.85.

Said centerline contains 21,682.58 lineal feet or 1314.10 rods in length.

The bearings calculated to establish the location of the above centerline were obtained from U.S.C. & G.S. monuments "TANK" and "SURPRISE" and monument 40A as shown on the Record of Survey Maps indicated above.

| | | | |
|---|---|---|---|
| 1 | N 71° 46' 31" W, 559.06' | 56 | S 50° 17' 05" W, 44.07' |
| 2 | N 66° 01' 16" W, 40.88' | 57 | S 40° 26' 17" W, 91.96' |
| 3 | N 51° 52' 50" W, 39.95' | 58 | S 36° 43' 35" W, 142.61' |
| 4 | N 41° 33' 53" W, 42.43' | 59 | S 42° 48' 46" W, 54.02' |
| 5 | N 30° 41' 54" W, 112.93' | 60 | S 46° 45' 05" W, 62.46' |
| 6 | N 19° 45' 18" W, 39.03' | 61 | S 60° 18' 40" W, 46.92' |
| 7 | N 11° 38' 46" W, 539.90' | 62 | S 59° 53' 44" W, 32.62' |
| 8 | N 13° 34' 45" W, 44.33' | 63 | S 60° 07' 59" W, 47.52' |
| 9 | N 26° 42' 46" W, 81.79' | 64 | S 65° 17' 02" W, 31.64' |
| 10 | N 26° 53' 47" W, 63.95' | 65 | S 70° 32' 54" W, 83.25' |
| 11 | N 36° 32' 47" W, 39.72' | 66 | S 75° 47' 18" W, 22.00' |
| 12 | N 54° 46' 50" W, 31.32' | 67 | N 71° 55' 40" W, 17.95' |
| 13 | N 67° 13' 49" W, 53.58' | 68 | N 37° 42' 10" W, 297.01' |
| 14 | N 72° 37' 51" W, 31.30' | 69 | N 37° 59' 16" W, 51.49' |
| 15 | N 79° 25' 18" W, 29.61' | 70 | N 42° 03' 53" W, 20.85' |
| 16 | N 86° 10' 12" W, 33.59' | 71 | N 54° 04' 30" W, 42.79' |
| 17 | S 84° 47' 57" W, 40.24' | 72 | N 71° 01' 20" W, 636.85' |
| 18 | S 69° 09' 40" W, 38.90' | 73 | N 71° 51' 38" W, 53.12' |
| 19 | S 59° 23' 22" W, 41.73' | 74 | N 76° 45' 06" W, 93.87' |
| 20 | S 62° 25' 23" W, 45.67' | 75 | N 79° 02' 12" W, 380.69' |
| 21 | S 75° 02' 42" W, 44.89' | 76 | N 79° 26' 57" W, 65.46' |
| 22 | S 83° 27' 42" W, 92.86' | 77 | N 67° 59' 02" W, 85.73' |
| 23 | S 84° 22' 03" W, 656.41' | 78 | N 53° 34' 28" W, 83.03' |
| 24 | S 84° 10' 55" W, 374.04' | 79 | N 41° 19' 12" E, 0.39' |
| 25 | S 85° 01' 08" W, 75.41' | 80 | N 22° 20' 38" E, 21.66' |
| 26 | S 89° 46' 18" W, 69.44' | 81 | N 22° 31' 52" W, 30.68' |
| 27 | N 70° 54' 45" W, 51.81' | 82 | N 27° 39' 40" W, 97.35' |
| 28 | N 64° 11' 39" W, 48.39' | 83 | N 26° 35' 06" W, 25.05' |
| 29 | N 62° 37' 30" W, 157.42' | 84 | N 10° 16' 17" E, 29.77' |
| 30 | N 41° 32' 31" W, 15.41' | 85 | N 41° 01' 27" E, 31.83' |
| 31 | N 13° 47' 08" W, 18.15' | 86 | N 55° 08' 54" E, 96.41' |
| 32 | N 12° 13' 05" W, 741.84' | 87 | N 55° 30' 31" E, 58.30' |
| 33 | N 36° 29' 21" W, 17.90' | 88 | N 57° 48' 50" E, 100.47' |
| 34 | N 63° 25' 05" W, 22.59' | 89 | N 58° 14' 25" E, 124.73' |
| 35 | N 65° 52' 37" W, 23.65' | 90 | N 58° 50' 09" E, 57.49' |
| 36 | N 86° 32' 11" W, 24.60' | 91 | N 62° 29' 33" E, 78.22' |
| 37 | S 69° 41' 56" W, 95.08' | 92 | N 63° 33' 16" E, 153.71' |
| 38 | S 69° 41' 56" W, 175.91' | 93 | N 58° 26' 55" E, 205.93' |
| 39 | S 69° 41' 56" W, 109.97' | 94 | N 64° 43' 52" E, 138.72' |
| 40 | S 64° 30' 25" W, 54.07' | 95 | N 64° 02' 35" E, 52.57' |
| 41 | S 46° 32' 08" W, 90.02' | 96 | N 64° 46' 08" E, 41.81' |
| 42 | S 41° 09' 43" W, 74.01' | 97 | N 53° 57' 37" E, 43.32' |
| 43 | S 35° 30' 43" W, 53.14' | 98 | N 36° 37' 58" E, 44.62' |
| 44 | S 29° 47' 06" W, 775.30' | 99 | N 22° 01' 34" E, 33.85' |
| 45 | S 30° 30' 07" W, 185.42' | 100 | N 12° 45' 49" E, 25.01' |
| 46 | S 49° 31' 39" W, 85.95' | 101 | N 04° 44' 59" E, 51.96' |
| 47 | S 52° 18' 48" W, 205.04' | 102 | N 11° 53' 42" W, 71.53' |
| 48 | S 53° 43' 14" W, 44.79' | 103 | N 14° 00' 26" W, 105.86' |
| 49 | S 59° 04' 57" W, 41.23' | 104 | N 13° 38' 52" W, 87.21' |
| 50 | S 74° 07' 05" W, 42.08' | 105 | N 13° 22' 59" W, 112.95' |
| 51 | S 89° 42' 05" W, 44.94' | 106 | N 16° 32' 23" W, 99.93' |
| 52 | N 87° 15' 03" W, 224.68' | 107 | N 17° 30' 21" W, 3.43' |
| 53 | S 88° 01' 54" W, 45.09' | 108 | N 14° 53' 47" W, 72.90' |
| 54 | S 80° 38' 57" W, 235.82' | 109 | N 17° 21' 18" W, 51.51' |
| 55 | S 72° 00' 44" W, 40.47' | 110 | N 18° 18' 23" W, 41.73' |



# NTA BARBARA COUNTY, CALIFORNIA

## CHO NUESTRA SENORA DEL REFUGIO
## RANCHO LAS CRUCES



# CHEVRON U.S.A., INC.

OSB-019.00-PN

N00°24'51"E
154.93'

② 1

2" I.P. WITH TAG
L.S. 2602
N 362,510.46
E 1,331,520.35

SEMENT

PACIFIC OCEAN

| | | |
|---|---|---|
| 111 | N 21° 22' 16" W, | 40.21' |
| 112 | N 29° 34' 32" W, | 44.13' |
| 113 | N 36° 30' 22" W, | 39.28' |
| 114 | N 45° 09' 01" W, | 49.86' |
| 115 | N 48° 02' 46" W, | 104.93' |
| 116 | N 46° 57' 01" W, | 128.51' |
| 117 | N 45° 57' 45" W, | 271.46' |
| 118 | N 44° 07' 00" W, | 39.59' |
| 119 | N 34° 49' 04" W, | 38.60' |
| 120 | N 18° 20' 18" W, | 45.18' |
| 121 | N 04° 27' 42" W, | 52.97' |
| 122 | N 06° 28' 32" E, | 512.96' |
| 123 | N 06° 59' 05" E, | 88.22' |
| 124 | N 06° 50' 30" E, | 45.27' |
| 125 | N 04° 16' 55" W, | 33.12' |
| 126 | N 17° 53' 09" W, | 16.52' |
| 127 | N 28° 54' 53" W, | 15.54' |
| 128 | N 38° 02' 45" W, | 18.84' |
| 129 | N 45° 02' 54" W, | 25.04' |
| 130 | N 52° 21' 14" W, | 195.48' |
| 131 | N 51° 58' 28" W, | 29.67' |
| 132 | N 35° 07' 42" W, | 18.66' |
| 133 | N 21° 19' 25" W, | 24.24' |
| 134 | N 12° 30' 01" W, | 28.37' |
| 135 | N 11° 03' 54" W, | 34.11' |
| 136 | N 10° 44' 57" W, | 102.86' |
| 137 | N 11° 01' 53" W, | 135.30' |
| 138 | N 10° 39' 33" W, | 137.91' |
| 139 | N 18° 21' 28" W, | 52.38' |
| 140 | N 18° 34' 30" W, | 84.62' |
| 141 | N 18° 57' 14" W, | 89.59' |
| 142 | N 18° 45' 23" W, | 61.87' |
| 143 | N 10° 25' 56" W, | 37.78' |
| 144 | N 13° 19' 34" W, | 63.92' |
| 145 | N 20° 37' 59" W, | 36.44' |
| 146 | N 24° 09' 47" W, | 395.90' |
| 147 | N 24° 25' 34" W, | 68.71' |
| 148 | N 17° 57' 30" W, | 44.41' |
| 149 | N 12° 04' 41" W, | 41.00' |
| 150 | N 05° 14' 59" W, | 42.99' |
| 151 | N 04° 16' 52" E, | 42.38' |
| 152 | N 09° 59' 24" E, | 170.03' |
| 153 | N 10° 28' 26" E, | 77.66' |
| 154 | N 13° 48' 46" E, | 42.89' |
| 155 | N 20° 14' 29" E, | 41.82' |
| 156 | N 25° 08' 23" E, | 40.43' |
| 157 | N 30° 40' 03" E, | 45.05' |
| 158 | N 36° 59' 39" E, | 147.17' |
| 159 | N 35° 04' 06" E, | 40.49' |
| 160 | N 23° 40' 36" E, | 37.62' |
| 161 | N 16° 37' 43" E, | 288.02' |
| 162 | N 20° 20' 19" E, | 45.69' |
| 163 | N 24° 12' 35" E, | 51.76' |
| 164 | N 28° 39' 33" E, | 39.64' |
| 165 | N 37° 26' 37" E, | 32.91' |
| 166 | N 39° 58' 38" E, | 557.98' |
| 167 | N 36° 00' 37" E, | 39.90' |
| 168 | N 28° 53' 01" E, | 41.77' |
| 169 | N 19° 46' 53" E, | 40.21' |
| 170 | N 13° 39' 38" E, | 35.75' |
| 171 | N 03° 07' 48" E, | 51.70' |
| 172 | N 00° 47' 39" E, | 71.48' |
| 173 | N 13° 48' 46" E, | 33.49' |
| 174 | N 24° 14' 56" E, | 20.88' |
| 175 | N 39° 40' 01" E, | 29.72' |
| 176 | N 45° 50' 18" E, | 26.31' |
| 177 | N 47° 56' 23" E, | 197.62' |





## STATE OF CALIFORNIA
## (GAVIOTA STATE PARK)
OSB–023.00–SZ

PAUL A. MITCHELL

OSB–025.00–PN



**U.S. HIGHWAY 101**

OSB—023.01—HZ

U.S. HWY. 101
RIGHT-OF-WAY

CL EASEMENT

**MGIC EQUITIES CORP.**

OSB—024.00—PN

P&R BRONZE DISK
N 365,701.25
E 1,324,140.94

S07°39'18"E
2278.66'

NOTES:
1. THIS
   THR
   COU
   PAR
   LANE
   BOOI
   OF T
2. A 50
   SURV
3. PROP
   HAROI
   IN THI
   1992.

**EXHIBIT A-1**

SHEET 1 of 1

*PIPELINE*

AS-BUILT 30" PIPELINE
OF GAVIOTA

| DRAWN BY: R.H.W. | DATE: 2-18-87 |
|---|---|
| SCALE: | 1"=600' |



| 178 | | 32' 33" E, 42.46' |
|---|---|---|
| 179 | N 42° 17' 35" E, 24.87' |
| 180 | N 38° 16' 06" E, 30.45' |
| 181 | N 32° 28' 19" E, 382.18' |
| 182 | N 33° 23' 25" E, 283.83' |
| 183 | N 33° 25' 42" E, 376.89' |
| 184 | N 31° 25' 08" E, 653.67' |
| 185 | N 33° 54' 45" E, 144.36' |
| 186 | S 89° 39' 48" E, 0.22' |
| 187 | N 34° 26' 20" E, 70.85' |
| 188 | N 37° 52' 29" E, 43.92' |
| 189 | N 42° 45' 48" E, 38.72' |
| 190 | N 37° 50' 22" E, 58.92' |
| 191 | N 31° 41' 18" E, 90.60' |
| 192 | N 45° 58' 50" E, 21.64' |
| 193 | N 57° 22' 06" E, 29.65' |
| 194 | N 82° 34' 03" E, 35.75' |
| 195 | N 84° 38' 52" E, 469.23' |
| 196 | N 68° 01' 29" E, 45.18' |
| 197 | N 61° 29' 57" E, 273.42' |
| 198 | N 79° 29' 29" E, 85.81' |
| 199 | N 89° 24' 26" E, 132.44' |
| 200 | S 86° 25' 22" E, 48.24' |
| 201 | S 77° 29' 49" E, 34.14' |
| 202 | S 72° 08' 48" E, 38.14' |
| 203 | N 83° 46' 08" E, 37.69' |
| 204 | N 55° 46' 08" E, 39.03' |
| 205 | N 34° 31' 01" E, 268.34' |
| 206 | N 40° 49' 03" E, 35.28' |
| 207 | N 55° 31' 12" E, 135.38' |
| 208 | N 56° 14' 40" E, 66.47' |
| 209 | N 48° 18' 15" E, 41.07' |
| 210 | N 22° 19' 57" E, 35.86' |
| 211 | N 10° 17' 19" E, 42.15' |
| 212 | N 04° 35' 14" E, 146.90' |
| 213 | N 18° 11' 40" E, 49.66' |
| 214 | N 20° 22' 15" E, 191.73' |

TRACT: OSB−023.00−SZ
GAVIOTA STATE PARK
FEET: 21,682.58'
RODS: 1,314.10

TRACT: OSB−023.01−HZ
U.S. HIGHWAY 101
FEET: 175.91'
RODS: 10.66

NOTES:
1. THIS CENTERLINE DESCRIBES A 50' WIDE RIGHT−OF−WAY IN,
   THROUGH AND ACROSS A PARCEL OF LAND SITUATED IN THE
   COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA MORE
   PARTICULARY REFERED TO AS "GAVIOTA STATE PARK."  SAID
   LAND IS DEPICTED IN RECORD OF SURVEY MAP, RECORDED IN
   BOOK 85, PAGE 29, SHEETS 1 TO 5 INCLUSIVE, IN THE OFFICE
   OF THE COUNTY RECORDER OF SANTA BARBARA COUNTY.
2. A 50' PERMANENT RIGHT−OF−WAY (25' ON EACH SIDE OF THE
   SURVEYED LINE) EXISTS.
3. PROPERTY SURVEY FOR GAVIOTA STATE PARK WAS DONE BY
   HAROLD D. HARDIN, L.S. 3555, A LICENSED LAND SURVEYOR
   IN THE STATE OF CALIFORNIA DURING DEC. 1991 THRU FEB.
   1992.

2278.66

EXHIBIT A−1

| 1 | 10−9−95 | AS−BUILT & DRAWN IN AUTOCAD | J.D.R. |
|---|---|---|---|
| NO. | DATE | REVISION | BY |

**ALL AMERICAN PIPELINE COMPANY**

AS−BUILT 30" PIPELINE CROSSING PROPERTY
OF GAVIOTA STATE PARK

| DRAWN BY: R.H.W. | DATE: 2−18−87 | APPROVED BY: C.R.C. | DATE: 2−18−87 |
|---|---|---|---|
| SCALE: 1"=600' | | DWG NO: PL−1119A | |

SHEET 1 of 1



EXHIBIT C

**EXHIBIT B**



### SANTA BARBARA COUNTY , CALIFORNIA
#### RANCHO NUESTRA SENORA DEL REFUGIO
#### RANCHO LAS CRUCES

# EXHIBIT D

| **RIGHT OF ENTRY PERMIT** | Agency:  Department of Parks and Recreation |
|---|---|
| | Project:  **Pacific Pipeline 2024-25**<br>Gaviota State Park |

This Right of Entry Permit (Permit) is made and entered into this 16th day of July 2024, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and

- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325.**

- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1.  **Project Description:**  By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

    a)  **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
    b)  **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
    c)  **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
    d)  **In the event of an oil spill of pipeline contents onto State land, Permittee shall immediately notify State's District Superintendent or authorized representative. Information to be reported includes but is not limited to location, volume of oil spilled, cause, time of spill, name and callback number of person reporting, and action taken so far. Thereafter, a written report will be filed with the State the summary of all details of the spill event.**
    e)  **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**



responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent.  If Permittee damages any road it shall immediately repair the damage in accordance with State standards.

  f)   In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.

  g)   Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.

  h)   No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.

2. **Permit Subject to Laws and Regulatory Agency Permits:**  This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

3. **Term of Permit:**  This Permit shall only be for the period beginning on **July 27, 2024**, and ending on, **July 26, 2025** or as may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:**  Permittee agrees to pay State the sum of **$ 42,154.42** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5. **Permit Subject to Existing Claims:**  This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:**  Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted.  Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State.  Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:**  Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder.  Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein.  Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements:**  As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**General Provisions Applying to All Policies**

  A.   **Coverage Term –** Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

**B.** **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

**C.** **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

**D.** **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

**E.** **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management.  If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

**F.** **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

**G.** **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

**H.** **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR).  The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

**I.** **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

**J.** **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State.  This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract.  Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence.  Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

**9.** **Reservation of Rights:**  State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

**10.** **Access Limits and Conditions:**  Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least forty-eight (48) hours prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least forty-eight (48) hours prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**

Contact: Katharine Wilson
    District Planning Chief
    Katharine.Wilson@Parks.Ca.Gov

District:   Channel Coast
Address:  911 San Pedro Street
     Ventura, CA

Telephone: (805) 804-2060

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
    Vice President Land
    slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
     Houston, Texas 77002

Telephone: (337) 316-3034

12. **Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed. Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days. Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:** Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit.

16. **Right to Halt Work:** The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

17. **Use Restrictions:** The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park. Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

18. **State's Right to Enter:** At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

Permittee shall not interfere with State's right to enter.

19. **Protection of Property:** Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

(a) Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

(b) Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

(c) Permittee shall not cut, prune or remove any vegetation upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(d) Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e) Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as herein permitted, or subsequently approved in writing by the District Superintendent.

(f)     Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g)     Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as herein permitted, or subsequently approved in writing by the District Superintendent.

(h)     Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

20.  **Default:**  In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a)     Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b)     Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property.  In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

   (i)     any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

   (ii)    at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

21.  **State's Right to Cure Permittee's Default:**  At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost.  If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid.  The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

22.  **Revocation of Permit:**  The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee.  Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery.  If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed.  Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

23.  **Recovery of Legal Fees:**  In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

24.  **Voluntary Execution and Independence of Counsel:**  By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

25.  **Reliance on Investigations:**  Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit.  Permittee

Docusign Envelope ID: 41673744-F253-4956-9438-CACAA0D23284

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.


**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: _Dena Bellman_
DocuSigned by:
1FD96B85B9674A1...

Date: 7/25/2024

Name: **Dena Bellman**
Title:    District Superintendent
          Channel Coast District


**PACIFIC PIPELINE COMPANY**

Signature: _[signature]_
DocuSigned by:
7FE2F35928C04E0...

Date: 7/25/2024

Name: **J. Caldwell Flores**
Title:    President



# EXHIBIT E

| **RIGHT OF ENTRY PERMIT** | Agency:  Department of Parks and Recreation<br><br>Project:  **Pacific Pipeline 2025-26**<br>Gaviota State Park |
| --- | --- |

This Right of Entry Permit (Permit) is made and entered into this 27 day of July 2025, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and

- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart.**

- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:**  By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

   a) **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
   b) **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
   c) **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
   d) **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**

responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent. If Permittee damages any road it shall immediately repair the damage in accordance with State standards.

e) In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.

f) Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.

g) No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.

2. **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.



3. **Term of Permit:** This Permit shall only be for the period beginning on **July 27, 2025**, and ending on, **July 26, 2026** or as may be reasonably extended by written mutual agreement of the Parties.



4. **Consideration:** Permittee agrees to pay State the sum of **$ 48,046.85** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5. **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements:** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**General Provisions Applying to All Policies**

A. **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

**B.    Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

**C.    Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

**D.    Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

**E.    Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management.  If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

**F.    Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

**G.    Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

**H.    Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR).  The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

**I.    Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

**J.    Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State.  This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract.  Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence.  Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

9.    **Reservation of Rights:**  State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10.   **Access Limits and Conditions:**  Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below.  At least two full business days (which do not include state holidays) prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property.  Permittee shall also notify the State contact[s] listed below in writing at least two full business days (which do not include state holidays) prior to any change in the Project schedule or cessation or completion of work.  Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**

Contact: Katharine Wilson
      District Planning Chief
      Katharine.Wilson@Parks.Ca.Gov

District:   Channel Coast
Address:  911 San Pedro Street
        Ventura, CA

Telephone: (805) 804-2060

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
      Vice President Land
      slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
        Houston, Texas 77002

Telephone: (337) 316-3034

12. **Limits of Work:**  In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval.  Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone.  Permittee shall remove such fencing within two (2) days after the completion of work.  Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work.  State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site.  Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring.  During excavation, the State archaeological monitor may observe and report to the State on all excavation activities.  State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee.  The specific protocol, guidelines and channels of communication outlined by the California Native

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed.  Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days.  Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:**  Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first.  This obligation shall survive the expiration or termination of this Permit.

16. **Right to Halt Work:**  The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

17. **Use Restrictions:**  The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park.  Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

18. **State's Right to Enter:**  At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

Permittee shall not interfere with State's right to enter.

19. **Protection of Property:**  Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

(a)    Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

(b)    Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

(c)    Permittee shall not cut, prune or remove any vegetation upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(d)    Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e)    Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

20. **Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

21. **State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

22. **Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

23. **Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

24. **Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

25. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

**PACIFIC PIPELINE COMPANY**

Signature: _____

Signature: _____

Date:_____

Date:_____ July 25, 2025 _____

Name: **Dena Bellman**
Title:    District Superintendent
             Channel Coast District

Name: **J. Caldwell Flores**
Title:    President

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: _____

Date: _____

Name: **Dena Bellman**
Title:   District Superintendent
         Channel Coast District

**PACIFIC PIPELINE COMPANY**

Signature: _____

Date: _____

Name: **J. Caldwell Flores**
Title:   President



EXHIBIT F

RIGHT OF ENTRY PERMIT INSTRUCTIONS

PROPER USE OF THE RIGHT OF ENTRY (ROE) PERMIT

This form superseded the Temporary Entry Permit in 2002.  This form is intended to be used to give another party permission to temporarily cross or use State Park land for a short duration of time (a year or less).  It is intended to be a personal right, revocable by the department, and unassignable or transferable by the permittee.  It does not create an interest in the real property and may be signed by the District Superintendent.  The ROE Permit is typically used when an adjoining owner needs temporary access to his property, when an easement holder needs to cross park land to access their facilities by going outside their easement area, or if a temporary staging area is needed for construction.

There are a few guidelines that need to be adhered to in using this form:

1. Execution of a Right of Entry Permit (ROE) is a project under CEQA.  The Permittee shall provide a copy of their Environmental document for review.  The Department shall then complete the Project Evaluation Form (PEF) and make a determination of any further mitigation requirements regarding the project.
2. ROE's should be used for real property needs under one year in duration.
3. Consult the Acquisition and Real Property Services Division if a document needs to be prepared for a term longer than one year.
4. A legal description prepared by a land surveyor is not required.  An attached map or written description of the project location is adequate.
5. Do not modify the language in the paragraphs except where indicated. If additional modifications are needed, you may modify or strikethrough language as appropriate for each permit in consultation with a land agent.
6. Always run your final draft by a land agent prior to the District's execution.
7. Always send a copy of the final, executed ROE to the Acquisition and Real Property Services Division.

**Use Field Codes to Prepare This Permit**

These documents contain Field Codes for moving to specific areas of the document where additional information is to be inserted or optional language to be reviewed.  **To turn the Field Codes on, press Alt+F9.**  When the codes are showing in the document they appear as special brackets  highlighted in black.  At the beginning of the document, using the **F11** key will allow you to move throughout the document to the brackets to insert text.  Shift+F11 will move to the previous field code.  Once you start typing in highlighted brackets, the brackets will disappear.  Some of the brackets have text inside which is meant to assist in defining the information required.

Additional Comments

Field codes are used throughout this document for you to complete the sentence or to bring optional language to your attention; if the language supplied is not applicable to your permit, it should be tailored to meet your needs or struck as applicable.

When saving the document, use the File, Save As command and delete this page from the actual prepared ROE Permit.  (The page numbers will be off unless you delete this instruction page.)

If a longer term instrument is needed, such as a lease or an easement, please make a request for land agent assistance at: http://rps.team.parks.ca.gov.  Leases and easements create a 3rd party interest in the real property.  Because they are not easily terminable, they should not be entered into lightly.

Rev. 5/4/2016
128670665.4 0079299-00010

Agency:

**RIGHT OF ENTRY PERMIT**

Department of Parks and Recreation

Project:  Pacific Pipeline Anomaly Digs 2025
Sable Offshore | Gaviota State Park

---

This Right of Entry Permit (Permit) is made and entered into this 8th day of May, 2025, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and Pacific Pipeline Company, hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates and maintains the State Park known as Gaviota State Park, in the County of Santa Barbara, State of California; and

- **Whereas**, Permittee has applied to State for permission to access Gaviota State Park for purposes of carrying out Permittee's pipeline access, maintenance, inspections, tests, and repairs of existing Line 325 for the eighteen (18) sites identified and depicted on the Vicinity Map and Project Description attached as EXHIBIT "B" and EXHIBIT "C" (the Project); and

- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota State Park for purposes of the Project, as provided herein and in any related filings with the State Clearinghouse, specifically EXHIBIT "A" and as may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

**Now therefore**, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:**  By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted as shown in the document entitled Vicinity Maps, attached hereto and incorporated herein as EXHIBIT "B" (the Property), solely for the purposes of carrying out Permittee's access, maintenance, inspections, tests, and repairs of the eighteen (18) discrete anomaly repairs along Line 325, the limits of which are described in the attached Project Description, EXHIBIT "C".

2. **Permit Subject to Laws and Regulatory Agency Permits:**  This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations.  Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, the Consent Decree (and Appendix D) entered by the State and Permittee's predecessor in interest in *United States v. Plains All American Pipeline* (Case No. 2:20-cv-02415), Permittee's original environmental document entitled Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2), and any further requirements and mitigations contained in this Permit and the Notice of Exemption, ("Environmental Document").

   Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

3. **Term of Permit:**  This Permit shall only be for the period beginning on May 8, 2025, and ending on, August 8, 2025, or upon completion of the Project, whichever occurs first. The Permit may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:**  Permittee agrees to pay State the sum of **$53,306.66** as consideration for the rights granted by this Permit.  Payment is due upon execution of this Permit.

5.    **Permit Subject to Existing Claims:**  This Permit is subject to existing contracts, permits, licenses, encumbrances and claims which may affect the Property.

6.    **Waiver of Claims and Indemnity:**  Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted.  Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or  employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State.  This indemnification includes any claims against State for the issuance of this Permit. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7.    **Contractors:**  Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder.  Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein.  Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see DEFAULT paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8.    **Insurance Requirements:**  As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**General Provisions Applying to All Policies**

A.    **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

B.    **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

C.    **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

D.    **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

E.    **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management.  If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

F.    **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

G.    **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

H.    **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR).  The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

I.    **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

    **J.**    **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insured's under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State. This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract. Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence. Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

9.    **Reservation of Rights:** State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10.    **Access Limits and Conditions:** Access to the Property shall be limited to the access defined in EXHIBIT "C".

11.    **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least forty-eight (48) non-State Holiday business hours prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact named below with written notice of Permittee's intent to enter the Property. Work on West side of property will require one week notice as described below under "Public Safety," unless otherwise agreed to in writing by State. Permittee shall also notify the State contact listed below in writing at least forty-eight (48) non-State Holiday business hours prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**
Contact: Kate Wilson
    District Planning Chief
    Katharine.wilson@parks.ca.gov

District: Channel Coast District
Address: 901 San Pedro St
    Ventura, California 93001

Telephone: 805-804-2060

**PERMITTEE'S CONTACT:**
Contact: Nathan Soderberg
    Manager, Projects and Rights of Way
    nsoderberg@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
    Houston, Texas 77002

Telephone: 805-567-9468

12.    **Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13.    **Public Safety:** Permittee shall erect temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

    (a) Anomaly digs on the West side of the park require a hard closure of public traffic. (See EXHIBIT "D") No re-routing of trails will be approved.

    i.   Permittee shall provide gate security at all potential trail intersections that could lead into project areas.

    ii.   Permittee shall provide said security with Parks language and mapping for trail alternatives.

    iii.   Permittee shall give a minimum of one week notice prior to closure of West side to State to adequately notice the public of temporary closures.

**14.** **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified herein shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

(a) Prior to commencement of work, Permittee shall schedule a pre-construction meeting with State.

(b) Prior to commencement of work on a particular site, Permittee shall submit to the State with all anticipated dates for pre-construction surveys on the provided Schedule Table, (EXHIBIT "E").

(c) All gasoline-powered equipment will be maintained according to manufacturer's specifications, and in compliance with all State and federal requirements.

(d) Prior to the start of on-site construction activities, Permittee will clean and repair (other than emergency repairs) all equipment outside State Park boundaries.

(e) Under dry conditions, a filled water truck and/or fire engine crew will be onsite during activities with the potential to start a fire.

(f) All trucks or light equipment hauling soil, sand, or other loose materials on public roads will be covered or required to maintain at least two feet of freeboard.

(g) All heavy equipment will be required to include spark arrestors or turbo chargers (which eliminate sparks in exhaust) and have fire extinguishers on-site.

(h) All heavy equipment off of a roadway moving up a slope of 10% grade or more must be rubber tire only unless otherwise approved in writing by State.

(i) All entry and exit points from offroad surfaces will be equipped with Rumble Strips to limit transfer of soil onto roadways.

(j) The project will comply with all applicable water quality standards as specified in the Central Coast Region RWQCB Basin Plan. (EXHIBIT "F")

(k) Straw wattles, and mats if needed, will be the primary method for erosion control using only weed free biodegradable materials such as jute/coir open weave mats, coir rolls, rice straw or other weed free wattles in jute netting, etc. (no nylon mesh or nylon mesh covered materials).

(l) Straw wattles will be installed with the following guidelines from the California Stormwater BMP Handbook (Section SE-5).

(m) Permittee will deploy qualified biologists to conduct nesting bird surveys no more than seven (7) days before the start of work as specified in provided Nesting Bird Protocol (EXHIBIT "G").

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

(a) Prior to commencement of anomaly repair work on a particular site, Permittee shall ensure that surveys and reports to the State are provided of any overland access routes and staging areas. Further, Permittee, during anomaly repair work, shall conduct an updated records search of all dig sites, access routes, and staging areas within a .25-mile buffer. Study reports shall be accompanied by maps and figures. Permittee, for anomaly repair work, shall also provide a copy of the results and any reports of the monitoring, Phase 1 and extended Phase 1 studies conducted from 2016 – Completion of this project.

(b) Surveys and reports shall be consistent with the standards provided in the *Fieldwork and Reporting Guidelines for Cultural Resources- Archaeological, Historic, and Tribal Cultural Resources* (April 28, 2020), developed by the Society of California Archaeology.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work.  State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols,

or other resource issues are identified within the Project site.  Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring.  During excavation, the State archaeological monitor may observe and report to the State on all excavation activities.  State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee.  The specific protocol, guidelines and channels of communication outlined by the California Native American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed.  Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days.  Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15.  **Restoration of Property:**  Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first.  This obligation shall survive the expiration or termination of this Permit.

16.  **Performance Bond:**  To ensure that Permittee performs and completes its obligations in accordance with the terms of the Permit, Permittee shall obtain a Performance Bond in the amount of $500,000 from a surety duly licensed in the State of California.  Permittee shall provide State with a copy of such performance bond prior to commencement of work.

17.  **Right to Halt Work:**  The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

18.  **Use Restrictions:**  The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State.  No person shall use or occupy the Property overnight.

   (a) Excavation and grading activities will be suspended when sustained winds exceed 15 miles per hour (mph), instantaneous gusts exceed 25 mph, or when dust occurs from remediation related activities where visible emissions (dust) cannot be controlled by watering or conventional dust abatement controls.

   (b) Track-mounted vehicles must enter and exit areas via the same route of travel (by backing up only).

   (c) All construction activities will be suspended during heavy precipitation events (i.e., at least 1/2-inch of precipitation in a 24-hour period) or when heavy precipitation events are forecast.

   (d) No track-mounted or heavy-wheeled vehicles will be driven within Gaviota State Park backcountry areas during the rain or when soils are saturated to avoid compaction and/or damage to soil structure.

   (e) During dry, dusty conditions, all active construction areas will be lightly sprayed with water to reduce dust without causing runoff.

(f)  Prior to delivery and/or removal of project-related equipment or materials that could impede or block access to driveways, cross streets, or street parking, Permittee will coordinate with State to develop and implement traffic control measures.

Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park.  Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified in writing by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

19.  **State's Right to Enter:**  At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

Permittee shall not interfere with State's right to enter.

20.  **Protection of Property:**  Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

(a)  Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

(b)  Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

(c)  Permittee shall not cut, prune or remove any vegetation upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(d)  Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e)  Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as herein permitted, or subsequently approved in writing by the District Superintendent.

   i.  Stockpiles will be contained as specified in WM-3. Silt fence or straw wattles will be secured around the stockpile, and plastic liner will cover the spoil pile to prevent any pollution to air or stormwater.

   ii.  Each of the repair sites will have the following BMPs before and during the excavation:
      • Orange fence surrounding the perimeter of the work site.
      • Silt fence on the outer edges of sloped areas to prevent loose material from leaving the work area.
      • The top six inches of topsoil will be stored separately.

   iii.  The restoration following return of the stockpiled surface material will be by application of a native herbaceous seed mix of grasses and broadleaf plant species to be specified by State Parks. The seed mix will be applied by hand and raked in at manufacturer recommended quantities.

(f)  Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as identified

in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as herein permitted, or subsequently approved in writing by the District Superintendent.

    i. Refueling will be done in accordance with SC-8 and NS-9 in the CalTrans Construction Site Best Management Practices Manual.

    ii. The refueling areas identified in EXHIBIT "C" will have a plastic liner with elevated sandbags surrounding the perimeter of the liner (any hazardous materials such as grease and lubricants will be labeled appropriately and stored in this location as well).

    iii. Containment basins under each portable restroom.

    iv. Restrooms will be stored at the eleven sites shown in EXHIBIT "C".

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

21. **Notice Requirements:** Prior to beginning work under this Permit, Permittee shall provide State with sufficient proof that it has complied with the notice requirements in Public Resources Code section 21080.23.

22. **Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property.  In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

    i. any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default, and all the detriment proximately caused by Permittee's unauthorized access to the Property in February 2025; plus

    ii. at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

23. **State's Right to Cure Permittee's Default:**  At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost.  If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid.  The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

24. **Revocation of Permit:**  The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee.  Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery.  If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed.  Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

25. **Recovery of Legal Fees:**  In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said

action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

26. **Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

27. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit.  Permittee acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

28. **Entire Agreement:**  The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

29. **Warranty of Authority:**  The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

30. **Assignment:**  This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

31. **Choice of Law:**  This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

By: _____
Name:  Dena Bellman
Title:    District Superintendent
          Channel Coast District

**PACIFIC PIPELINE COMPANY**

By: _____
Name:  J. Caldwell Flores
Title:    President
Pacific Pipeline Company

# EXHIBIT G

**From:** Soderberg, Nathan <nsoderberg@sableoffshore.com>
**Sent:** Wednesday, August 6, 2025 11:46 AM
**To:** Wilson, Katharine@Parks <Katharine.Wilson@parks.ca.gov>
**Subject:** Re: Condition 15 – Restoration of Property (ROE Issued May 8, 2025)

Kate,

I can confirm that Sable will maintain BMPs until seeding occurs in October. State Parks was to provide the seed mix July 1st. Once the seed mix is delivered, we will order the seed accordingly and plan to seed on October 15th. We have a drone operator heading up today to capture the sites that were not covered during the July 14th site visit. Sable is also committed to repaving San Julian Road and will coordinate with Parks and Vista De

Las Cruces School.

Thank you,
Nathan


**Nathan Soderberg**

Manager – Facilities, Right of Way, & Projects

Sable Offshore Corp

(C): 805-264-6318

nsoderberg@sableoffshore.com



---

**From:** Wilson, Katharine@Parks <Katharine.Wilson@parks.ca.gov>
**Sent:** Tuesday, July 15, 2025 2:41 PM
**To:** Soderberg, Nathan <nsoderberg@sableoffshore.com>
**Subject:** Condition 15 – Restoration of Property (ROE Issued May 8, 2025)


**CAUTION:** External Sender


Condition 15 of the Right of Entry (ROE) permit issued on May 8, 2025, regarding *Restoration of Property* reads:

"Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit."


As discussed during the site visit on May 20, 2025, each dig site must be inspected by State Parks for compliance with restoration standards prior to final project approval. At a minimum, all sites must be:

- Cleared of project-related fencing, signage, plant debris, and refuse.
- Contained by a temporary perimeter of certified, weed-free, non-biodegradable straw wattles.
- Covered by weed-free mulch.

Additional restoration treatments may be required based on site-specific conditions, particularly in sloped areas.

**Erosion and Sediment Control Standards**

Before any seed is applied, all erosion and sediment control Best Management Practices (BMPs) must be:

- Fully installed and functioning
- In compliance with the *Caltrans Construction Site BMP Manual (CTSW-RT-19-314.18.1)* and approved project plans
- Inspected and approved in the field these BMPs are particularly critical in coastal, sloped, and mountainous areas, and include:
- **SS-6**: Straw Mulch – Certified weed-free straw applied to disturbed areas for temporary protection
- **SS-7**: Rolled Erosion Control Products (RECPs) – Natural or synthetic mats used to stabilize slopes and assist vegetation
- **SC-5**: Fiber Rolls – Certified weed-free, biodegradable straw or coir rolls placed along slope contours to reduce water velocity and trap sediment

*Note*: While ROE Condition 14(k) requires biodegradable wattles, this memorandum authorizes **temporary use of non-biodegradable wattles** around each dig site perimeter to allow easy removal and re-entry in October 2025. All non-biodegradable wattles must be removed from the site and properly disposed of by the permittee following seed application.

*Important*: *Silt fences (SC-1) have been removed from the approved BMP list due to rapid deterioration in windy conditions and their potential to generate plastic waste.*

**Seed Mix Application Schedule**

Per the current project description submitted by Pacific Pipeline, seed mix application was initially scheduled to occur immediately following physical restoration. However, to maximize viability and ecological success, State Parks has revised this timeline:

**Seed mix application is now scheduled for October 15, 2025.**

While other restoration and construction work may be completed prior to this date, final project approval is contingent upon seed mix application in accordance with the revised schedule.

**Seed Mix Composition**

State Parks will conduct a post-construction vegetation survey to determine appropriate seed mix composition. Based on the findings, **State Parks will provide the final seed blend, including species selection and percentage composition by July 1, 2025.**

Do not purchase or apply seed until written approval of the final seed mix is received.

**Seed Application Requirements**

- Target date for seed application: *October 15, 2025*.
- Seeding must occur on or within 2 days of this date.
- Submit written notice to State Parks two weeks in advance of the seed application.
- Provide written and photographic confirmation of completed seeding, including field logs.

**Next Steps**

- Complete and document all erosion control installations and submit labelled photo evidence.
- Maintain all BMPs until seed mix application. Pacific Pipeline shall inspect site integrity bimonthly until seed-mix is applied and report compliance to State Parks. Results of these inspections shall be submitted by email.
- Increased traffic and use by heavy equipment has significantly deteriorated the pavement on San Julian road. Permittee shall contract service to repave the road, in coordination with State Parks and the Vista de las Cruces School.

Sincerely,

**Kate Wilson** (She/Her)

Chief Planner | Senior Park & Rec. Spc.

CA State Parks – Channel Coast

**Phone**: 805-804-2060

**Email**: katharine.wilson@parks.ca.gov

911 San Pedro Street

Ventura, CA 93001

# EXHIBIT H

| | |
|---|---|
| State of California • Natural Resources Agency | Gavin Newsom, *Governor* |

**DEPARTMENT OF PARKS AND RECREATION**                                                   Armando M. Quintero, *Director*
**Legal Office • Post Office Box 924896 • Sacramento, CA 94296-000**


March 14, 2026                                                    *Sent via Electronic Mail Only*
                                                                 *slaperouse@sableoffshore.com*


Stephen T. Laperouse
Vice President Land
Sable Offshore
845 Texas Avenue, Suite 2920
Houston, TX 77002


Dear Mr. Laperouse:

This letter is to notify Sable Offshore and Pacific Pipeline Company ("Sable") that
California Department of Parks and Recreation ("State Parks") is denying Sable's
easement request, and demanding Sable immediately remove the pipeline according to
section 8 of the Expired Easement.

Section 8 of the temporary pipeline easement granted to Sable's predecessor, Celeron
Pipeline Company, which expired in 2016 ("Expired Easement"), attached hereto,
authorizes State Parks to demand Sable to remove the pipeline and restore the property
to its original condition after the end of the term. This letter demands immediate removal
of the pipeline on State Parks' property pursuant to section 8 of the Expired Easement.
State Parks has determined that due to Sable's excessive drain on state resources and
incompatibility of their project with the park unit, State Parks will not be granting Sable
an easement to continue to use Gaviota State Park for its oil pipeline operations.
Additionally, although, State Parks has discussed the possibility of an easement with
Sable, all prior permissions and discussions have been premised on the requirement
that Sable comply with all applicable state laws and obtain all applicable state
approvals, and Sable has now indicated that it has begun or imminently intends to begin
restarting operations without adhering to those requirements or obtaining permission to
use the State of California's land.

Consequently, State Parks is immediately ceasing any easement negotiations and
related CEQA process.

If Sable does not formally respond within 10 days with plans for removal of the pipeline
segment within Gaviota State Park, State Parks will pursue legal action to defend the
State's property rights, and State Parks reserves the right to take all appropriate legal
action in the interim.  State Parks is prepared to withdraw this letter, however, if Sable
confirms in writing to State Parks no later than 12 PM Pacific Time on Monday, March

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 2

16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed.

*Background*

State Parks stewards Gaviota State Park, which consists of 2,712 acres of oak woodland and chaparral backcountry, beach and campground property, and natural sulfur hot springs in varied ecologically diverse habitats. It also contains significant known archeological, tribal, and historic resources, including the Las Cruces Adobe.

In 1986, Sable's predecessor received a 30-year pipeline easement from State Parks. Sable's pipeline runs four miles through Gaviota State Park, but has been offline since the May 2015 Refugio oil spill. The federal pipeline safety oversight agency determined the cause of the spill was in part the result of "ineffective protection against external corrosion of the pipeline." (Plains Pipeline, LP – Failure Investigation Report, Santa Barbara County, California Crude Oil Release – May 19, 2015, PHMSA (May 2016).) As a result of the spill, various state and federal agencies entered into a Consent Decree with Sable's predecessor as a settlement to a lawsuit containing a variety of claims. State Parks, as a resource trustee, is party to that Consent Decree which requires, among other things, that Sable comply with existing laws in its effort to restart its pipeline.[1]

Sable's 30-year easement for its pipeline expired in 2016, after the Refugio spill. Section 5 of the Expired Easement required Sable, "in the exercise of the privileges [therein] granted, [to] at all times be in compliance with all applicable laws, rules, and regulations." Section 8 of the Expired Easement stated that "[u]pon termination of this easement, COMPANY shall remove at option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration."

---

[1] Section 78 of the Consent Decree states: "This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, and permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or any other provisions of federal, state, or local laws, regulations, or permits."

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3G-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 3

Since 2016, State Parks has issued successive year-long right of entry permits in order to permit Sable (or its predecessors) access to the offline pipeline for general maintenance and monitoring. These permits have always been "expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations." (Annual ROE, § 2.)

For years, State Parks understood Sable would ultimately abandon the current pipeline and replace and potentially realign the pipeline if it were to resume operations, and thus limited the ROE to those actions and access needs necessary for closure of the pipeline. Thus, the Annual ROE does not and cannot authorize operations. The second recital of the current Annual ROE states (omitting emphasis):

> Whereas, Permittee [Sable] has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart."

*Sable's Lack of Cooperation with State Parks, Violations of Past Permits, and Illegal Acts Damaging State Land*

Over the course of Sable and State Parks' negotiations, Sable has resisted every step of the process rather than working with State Parks. In July 2024, State Parks explained that Sable needed an easement in order to restart, and that a Right of Entry Permit for the anomaly digs would only be appropriate if the easement was near execution.

Instead of working with State Parks, Sable pushed for an immediate Right of Entry Permit, arguing there was no time for easement negotiations, despite the fact that State Parks had initiated the discussion about easement negotiations in July 2024. No law or contract required State Parks to continue working with Sable, or affiliated entities Exxon or Plains Pipeline, yet in order to provide physical access to the existing offline pipeline on public property, State Parks continued to offer a Right of Entry Permit so that Sable could have physical access to the property. State Parks did this with the

Page **3** of **6**

Stephen Laperouse
March 14, 2026
Page 4

understanding that if the pipeline company ever continued operations, it would need to construct a new pipeline.  The Consent Decree is clear that it does not waive any other requirements (see footnote 1), including legal authorization from State Parks to use and access the pipeline.

State Parks retains its usual discretion whether to grant an easement. Under Public Resources Code section 5012, State Parks may, but is not required to, grant an easement for pipeline purposes. Under State Parks' policy, encumbrances that do little or nothing to contribute toward State Parks' mission are presumed to be inappropriate, and State Parks is required to carefully analyze impacts before the encumbrance is approved by the State Parks Director. (State Parks' Department Operations Manual ("DOM"), § 2103.2.) Those requests that do little or nothing to contribute toward State Parks' mission must have no feasible offsite alternatives. Sable has stated that it has an offsite alternative. (https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Announces-Alternative-Offtake-Strategy/default.aspx.)

Additionally, because Sable has requested a 30-year easement, State Parks has to be particularly careful in its analysis of whether and how to grant an easement that will impact this environmentally and culturally sensitive public land for decades. State Parks has informed Sable that under its policy "careful consideration must be given to impacts that may occur over the life of the encumbrance, including the burden and effect of ongoing maintenance or other intrusions." (DOM, § 2103.2.) In response, Sable has not provided sufficient information and follow State Parks' process and has shown time and again that it is not interested in complying with State Parks' process and will only be a burden and a liability to State Parks for the next three decades if it receives the right to operate within Gaviota State Park.

State Parks has always been clear that the annual Right of Entry Permit described above did not cover the extensive work involved with the anomaly digs. However, in February 2025, Sable elected to re-interpret the then-existing annual Right of Entry Permit and trespassed on State Parks' property, resulting in damage to natural resources. While Sable ceased work upon State Parks' demands, it showed that it is not a partner of the State and that obtaining full compensation and mitigation from Sable without litigation or other expensive, time consuming negotiations, is highly unlikely. Yet, State Parks cooperated with Sable's request and on May 8, 2025, State Parks issued a Right of Entry Permit for Sable's 18 anomaly digs ("Anomaly Dig ROE").

The Anomaly Dig ROE included restoration requirements which Sable has yet to perform, including restoration of a road that they demolished that provides access to an elementary school. Once the anomaly digs were complete[2], it became clear that Sable

---

[2] While the anomaly digs themselves were complete, Sable still has not finished completing the work required under the Anomaly Dig Right of Entry Permit, as noted above, including reconstruction of the

Stephen Laperouse
March 14, 2026
Page 5

needed a much wider footprint for its easement area than they had proposed in their easement request.

On May 22, 2025, State Parks and Sable met to discuss the requirements for the easement request. State Parks informed Sable that restart is not authorized without an easement in place. While the basis for this is basic real property law rather than laws specific to state property, State Parks has had to continually explain to Sable why Sable needs a land right in order to operate on property it does not own, and that a license or permit to access property is not a land right and does not govern continuing operations. State Parks has been clear and consistent on this basic real property principle since the beginning of negotiations.

As a result of (1) Sable's consistent reluctance to work with State Parks' process, (2) Sable's illegal destruction of public property, (3) State Parks' statutory obligation to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public," (Public Resources Code § 5003), (4) State Parks' general policy against granting encumbrances that do not directly serve that mission, and (5) Sable's indications that it has begun or imminently intends to begin restarting operations without securing all required state approvals or a new easement, State Parks is denying Sable's easement request.

As stated above, if State Parks does not receive a plan for removal of the pipeline within 10 days of the date of this letter, or if Sable does not confirm in writing to State Parks no later than 12 PM Pacific Time on Monday, March 16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.

Sincerely,

DocuSigned by:

*Tara E. Lynch*
F610A257FA1247D...

Tara E. Lynch
Chief Counsel

---

damaged road that provides access to a local elementary school, and revegetation of the anomaly dig area. Sable has claimed that the anomaly dig footprint is revegetated, but in fact it came back with invasives, which can be expected where the footprint was not reseeded with State Parks-approved native mix as required by the Right of Entry Permit.

Docusign Envelope ID: 9F8AF68A-9C3E-498A-BC3C-5495CBB5978C

Stephen Laperouse
March 14, 2026
Page 6

Enclosures
1. Annual ROE
2. Expired Easement

Cc:

      Anthony Duenner, Sable Offshore General Counsel
      Lee Alcock, Sable Offshore Assistant General Counsel
      Dena Bellman, Channel Coast District Superintendent, State Parks
      Katharine Wilson, Channel Coast District Planning Chief, State Parks
      Emma Siverson, Senior Staff Counsel, State Parks