LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:   +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice*)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:   +1 202.853.3491

HOLLAND & KNIGHT LLP
  James W. Noe (*pro hac vice*)
  *jim.noe@hklaw.com*
  Ashley Akers (*pro hac vice*)
  *ashley.akers@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525
Facsimile:  +1 202.955.5564

*Attorneys for Defendants Sable Offshore Corp.
and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,<br><br>Plaintiff,<br><br>v.<br><br>SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY, and DOES 1-50 inclusive,<br><br>Defendants. | Case No. 2:26-cv-02946-WLH-MAA<br><br>**DECLARATION OF STEVE RUSCH IN SUPPORT OF DEFENDANTS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: April 24, 2026<br>Time: 1:30 p.m.<br>Hon. Wesley L. Hsu<br><br>Complaint Filed: March 17, 2026<br>Date Removed: March 19, 2026 |

1

Pursuant to 28 U.S.C. § 1746(2), I, Steve Rusch, hereby declare:

1. I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. (together with its subsidiary, Pacific Pipeline Company, "Sable"). I have over 45 years of experience in the oil and gas industry. Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting. I have a Bachelor's Degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer. I have personal knowledge of the facts set forth in this declaration, either directly or through my role at Sable, and, if called as a witness, could and would testify competently to them.

2. In February 2024, Sable acquired the entire Santa Ynez Pipeline System ("SYPS"), including its onshore pipeline segments, which are referred to as Segments CA-324 and CA-325. These pipeline segments were formerly referred to as Line 901 and the portion of Line 903 from Gaviota, CA, to the Pentland Station terminal.

3. At the time Sable acquired the SYPS, Segments CA-324 and CA-325 were subject to a Consent Decree, to which both the United States and the State of California, including its agency the California Department of Parks and Recreation ("CDPR"), were parties. The Consent Decree contemplated that oil flow through Segments CA-324 and CA-325 could be resumed if certain conditions were met. Since acquiring the SYPS, Sable has worked tirelessly with both state and federal regulators, including those at California's Office of the State Fire Marshal ("OSFM") and the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") to ensure Segments CA-324 and CA-

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

2

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

325 are repaired and maintained in a manner consistent with the Consent Decree's requirements and other requirements under applicable pipeline safety regulations.

<u>Right of Entry Permits</u>

4.     In connection with this work, Sable and its predecessors in interest obtained a series of "Right of Entry Permit[s]" from CDPR that allowed for maintenance and repairs to be completed on a portion of Segment CA-325 located within Gaviota State Park (the "Park").   Consistent with the Consent Decree's acknowledgment that oil flow through Segment CA-325 under the Park could resume if the Consent Decree's conditions were satisfied, some of these permits explicitly contemplated that oil could flow through Segment CA-325 in the future. For example, the 2019 Right of Entry Permit, attached hereto as **Exhibit A**, authorized access to the Park for both the "maintenance and operations" of Segment CA-325, incorporated the original easement conditions, referred to "pipeline production," and required the pipeline owner to "take all necessary precautions" "associated with ensuring pipeline is in safe working order."   Similarly, the 2022 Right of Entry Permit, attached as **Exhibit B**, included notification requirements "[i]n the event of an oil spill of pipeline contents onto State land."

5.     The most recent Right of Entry Permit, attached to CDPR's Declaration of Dana Bellman ("Bellman Decl."), ECF 23-4, Ex. E, lasts until July 26, 2026. *See id.* Ex. E ¶ 3.  It grants Sable "permission to enter" the  Park "for the purpose of pipeline maintenance and access for existing [Segment CA-]325" through July 26, 2026. *Id.* Ex. E ¶ 1.

6.     Sable has at all times complied with the terms of the Right of Entry Permits.  I have reviewed the Bellman Declaration, which states that Sable failed to remediate certain environmental damage caused by its pipeline repair activities in the summer of 2025. *Id.*  ¶ 11.  Sable strongly disputes this contention.  In fact, the attachments to the Bellman Declaration demonstrate the opposite: CDPR was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

supposed to—and failed to—provide Sable with a specific native seed mix. *See id.* at 87-88. CDPR's failure to timely provide that seed mix delayed Sable's remediation efforts, but they did take place. Sable was in the meantime maintaining best management practices for the land, such as covering the area to be re-seeded with straw. *Id.*

Timeline of Easement Renewal Negotiations

7. Although the Consent Decree does not require that Sable obtain a renewed easement from CDPR for the portion of Segment CA-325 located within the Park before resuming petroleum transportation through Segment CA-325, CDPR took the position with Sable that an easement renewal was required. Sable initially planned to renew the easement immediately upon purchasing the Santa Ynez Pipeline System. To that end, on April 11, 2024, Sable sent a formal letter to Kate Wilson, Senior Park and Recreation Specialist and Chief Planner for the Channel Coast District, requesting initiation of the process to renew the 1987 pipeline easement through the Park.

8. On May 2, 2024, Sable met with CDPR to discuss the process for renewing the easement and making the needed repairs to comply with the Consent Decree. Sable informed CDPR that the pipeline would be repaired, not replaced. Sable informed CDPR that, at that time, it anticipated resuming oil transportation in the repaired line by September 2024. In response, CDPR stated that the process of obtaining the easement would be extensive, likely taking a year or more. Sable's notes concerning this call reflect that both parties understood that oil would flow through Segment CA-325 during the period while the easement was being finalized.

9. In light of the need to make immediate repairs to Segment CA-325 in compliance with the Consent Decree, Sable negotiated with CDPR to obtain a Right of Entry Permit—just as Sable's predecessors in interest had done—to begin repairing the portion of Segment CA-325 in the Park immediately. Relying on

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

CDPR's representations and in good faith, Sable engaged in extensive discussions with CDPR throughout 2024 to negotiate Right of Entry Permits to complete the repairs.

10.    In August and September 2024, Sable provided detailed information, including engineering reports, to CDPR regarding planned repairs to Segment CA-325 and paid a fee of approximately $19,000.  CDPR responded that it "believe[d] the [repair work] qualified for an exemption" under CEQA, "and could be processed as such."

11.    On October 25, 2024, Sable engaged in a Zoom call with CDPR in which Sable reiterated that it was seeking both a long-term easement renewal and Right of Entry Permits to complete repairs in order to safely resume the transportation of oil.

12.    On December 20, 2024, CDPR responded with a formal letter requiring a comprehensive project description before it would evaluate Sable's easement renewal request.  CDPR stated that Sable would need to include: the scope of work permitted by the easement, access points and locations of proposed activity, frequency of access for operations, management and maintenance, conditions imposed by other agencies, details on emergency responses, and information on how monitoring and other work would occur over the life of the easement.  CDPR stated that, once it had this information, it would then "be better able to articulate the process and cost to you of obtaining an easement, including the necessary indemnifications and fees required for any transactional work and environmental review associated with a final decision."

13.    Sable's representatives had a meeting and multiple follow up calls in January 2025 to further discuss the proposed easement renewal.

14.    Meanwhile, Sable continued to move forward with pipeline repairs and negotiated an additional agreement regarding excavation in the Park needed to

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

5

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

complete repairs contemplated by the Consent Decree. On May 9, 2025, CDPR issued a Notice of Exemption from CEQA with respect to these repairs. That Notice is attached to the Bellman Declaration. *See* Bellman Decl., Ex. A. The Notice of Exemption stated, "[n]o potential for significant or cumulative impacts to the environment is anticipated in compliance with CEQA § 15301, 15302, 15304, and 15305, as the project consists of repairs to an existing facility with no expansion of use. The footprint of the pipeline remains the same." *Id.* at 9. The Notice of Exemption further stated that, under the existing permit, "project activities are undertaken within an existing right-of-way and the permit requires the right-of-way to be restored to its condition prior to the project; and the permit requires the permittee to comply with all conditions otherwise authorized by law." *Id.*

15. On May 22, 2025, Sable met with CDPR to discuss the easement renewal process and the steps required. During that meeting, representatives for the State again stated that further CEQA review would not be required.

16. On June 27, 2025, CDPR sent Sable a letter laying out its easement application requirements.

17. On July 3, 2025, CDPR's Chief Counsel informed Sable's representatives that it was likely that easement renewal was exempt from the California Environmental Quality Act ("CEQA") and that no further environmental review would be needed, because environmental review had already been completed at the time Segment CA-325 was initially constructed. This was consistent with the position that CDPR had taken with respect to the repairs in the May 9, 2025 Notice of Exemption, and with CDPR's prior statements to Sable.

<u>Sable's Repeated Unsuccessful Attempts to Meet with CDPR</u>

18. Meanwhile, throughout 2025, the California Legislature—supported by Governor Newsom—negotiated, drafted, and passed Senate Bill 237 ("SB 237"). In return for allowing oil production in Kern County, SB 237 expressly aimed to make

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

6

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

it substantially harder for Sable to resume petroleum transportation by imposing new regulatory requirements—as evidenced by its legislative history directly naming Sable and referring to the Santa Ynez Pipeline System. SB 237 was signed into law on September 19, 2025, with an effective date of January 1, 2026.

19. As SB 237 moved towards passage, CDPR and other state agencies abruptly stopped cooperating with Sable's efforts to safely resume petroleum transportation through the SYPS, including Segment CA-325.

20. On July 11, 2025, Sable submitted a formal application for an easement. Despite CDPR's prior representations that it would not likely consider further environmental review to be necessary, State Parks Senior Staff Counsel Emma Siverson responded that it was "much too early in the process" for a new easement and that the easement process would "require[] an appraisal and compensation" and, "[d]epending on what your project entails, it may also include mitigation." CDPR offered only to renew the annual Right of Entry Permit for maintenance access and recommended a meeting to discuss the easement process. CDPR also suggested Sable's operations "could require CEQA and cultural monitoring."

21. Notwithstanding CDPR's change of position, Sable continued to cooperate with CDPR in this process. On July 4, 2025, Sable submitted a real estate appraisal to the Department of General Services.

22. On July 17, 2025, Sable submitted additional Paragon title reports.

23. On August 7, 2025, Sable submitted a Biological Resources Assessment.

24. On August 11, 2025, Sable submitted a Cultural Resources Assessment.

25. On August 24, 2025, Sable submitted updated preliminary title reports.

26. On September 9, 2025, CDPR abruptly canceled an easement process meeting it had requested. However, I understand that CDPR wrote that the meeting could be rescheduled to early the following week.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

27.     I understand that Sable's representative responded immediately to Ms. Siverson, asking about the new meeting date.  He received no response.

28.     I understand that Sable's representative followed up on September 11, 2025, to Ms. Siverson and her colleague, Chief Counsel Tara Lynch, but received no reply.

29.     I understand that Sable's representative followed up again on September 14, 2025, and on September 15, 2025, with both Ms. Siverson and Ms. Lynch, but received no reply.

30.     On September 17, 2025, CDPR stated that it would "reach out as soon as we can to schedule a meeting with Sable."

31.     I understand that Sable's representative followed up again with a phone call to Ms. Siverson on September 22, 2025, but received no response.

32.     I understand that Sable's representative followed up again with a call to Ms. Siverson on September 24, 2025.  Ms. Siverson responded by email, stating only that "State Parks is reviewing internally.  I will let you know as soon as we are ready to meet."

33.     I understand that Sable's representative followed up again on September 25, 2025, with a message to Ms. Lynch, but received no response.

34.     I understand that Sable's representative followed up again on September 30, 2025, with a call to Ms. Lynch, but received no response.

35.     I understand that Sable's representative followed up again on October 7, 2025, with a call to Ms. Lynch, but received no response.

36.     I understand that Sable's representative followed up again on October 28, 2025, with a call to Ms. Lynch, but received no response.

37.     I understand that Sable's representative followed up again on November 6, 2025, with a message to Ms. Siverson asking for a call, but received no response.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

38.   On November 13, 2025, CDPR finally responded, stating that, at this time, "we will not be preparing an exemption for the project," but rather was preparing an "Initial Study." A true and correct copy of CDPR's email and the reply of Sable's counsel is attached hereto as **Exhibit C**. CDPR stated that they would send a map showing the footprint of the proposed easement, covering not just Segment CA-325 but any area that Sable needed to service the pipeline. (Of note, CDPR did not actually send the map until January 2026.) CDPR noted that the easement footprint diagram could impact the scope of the appraisal and that a survey would likely be required. CDPR also requested additional data not included in Sable's project description, including data on how often repairs were expected to occur based on Segment CA-325's age and construction.

39.   CDPR's proposal completely disregarded the original Environmental Impact Report/Environmental Impact Statement prepared for Segment CA-325 and other onshore pipeline segments, which minimized Segment CA-325's pipeline operational right-of-way, reduced the right-of-way to a maximum of 50 feet in certain sensitive areas, and required the route to avoid other sensitive areas.

40.   CDPR's proposal was also not reasonable because the scope of a repair depends on the type of repair required. For this reason, Sable's practice is to send CDPR a plan for each repair to confirm compliance with the applicable Right of Entry Permit before performing the repair.

41.   I understand that, on November 13, 2025, Sable's representative wrote to Ms. Siverson, asking for a "particular reason or basis" for CDPR's change in view on the application of CEQA exemption, but received no response. *See* Ex. C.

42.   While I understand that CDPR is now claiming in this lawsuit that easement renewal is not exempt from CEQA, that is a change from prior positions CDPR has taken over time. Nothing under Sable's proposed easement with CDPR would authorize Sable to conduct any activities in the Park that were not already

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

evaluated under CEQA in the original EIR/EIS, or which CDPR has not already found to be exempt from further CEQA review. When a third-party environmental organization had asked CDPR to find that the easement renewal required new CEQA review, Sable rebutted those arguments on the record in a letter on September 14, 2025. A true and correct copy of Sable's letter is attached hereto as **Exhibit D**. Sable explained and demonstrated that "renewal of the Easement falls squarely within the prior Environmental Impact Report." *See* Ex. D.

43. I understand that Sable's representative followed up on December 22, 2025, to Ms. Siverson and Ms. Lynch.

44. On December 26, 2025, Ms. Siverson requested a meeting with Sable, promising to send "a list of available times" within the "next couple days."

45. I understand that, on December 30, 2025, Sable's representative followed up, but Ms. Siverson still had no meeting times to propose.

46. On December 31, 2025, Ms. Siverson sent a corrected Right of Entry Permit, but still no meeting times.

47. I understand that, on January 2, 2026, Sable's representative asked for an immediate meeting.

48. A meeting finally took place on January 5, 2026. I understand that, at that meeting, CDPR reported that it had not commenced the "Initial Study" it had claimed on November 13, 2025, was necessary for environmental review.

49. Another meeting was set for January 26, 2026. Sable continued to try to meet CDPR's ever-changing demands, but CDPR continued to stonewall. Further, I understand that Sable's counsel sought clarification as to the scope of biological and cultural survey information CDPR wanted for its review. In a response email that was accidentally sent to Sable's counsel, CDPR wrote back, "I would tell him that it is not our job to tell them what we need; it is their job to submit any and all information thet [*sic*] they want included in our evaluation."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION

50.     On February 11, 2026, Sable's representatives met again with Ms. Siverson and her colleague Kathryn Tobias.  CDPR stated at the meeting that it would take them until at least August 2026 to complete the "Initial Study" it claimed was necessary.  Sable's representatives explained that the law was clear that the original Environmental Impact Report/Environmental Impact Statement was still in effect, and that no new review was necessary, but continued to cooperate and provide CDPR with the materials it claimed to need.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on April 3, 2026, in Thousand Oaks, California.

_____
Steve Rusch

ATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

12

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF STEVE RUSCH ISO OPP. TO MOTION
FOR PRELIMINARY INJUNCTION