LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:   +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice*)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:   +1 202.853.3491

HOLLAND & KNIGHT LLP
  James W. Noe (*pro hac vice*)
  *jim.noe@hklaw.com*
  Ashley Akers (*pro hac vice*)
  *ashley.akers@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525
Facsimile:  +1 202.955.5564

*Attorneys for Defendants Sable Offshore Corp.
and Pacific Pipeline Company*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,<br><br>Plaintiff,<br><br>v.<br><br>SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY, and DOES 1-50 inclusive,<br><br>Defendants. | Case No. 2:26-cv-02946-WLH-MAA<br><br>**DECLARATION OF J. CALDWELL FLORES IN SUPPORT OF DEFENDANTS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: April 24, 2026<br>Time: 1:30 p.m.<br>Hon. Wesley L. Hsu<br><br>Complaint Filed: March 17, 2026<br>Date Removed: March 19, 2026 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746(2), I, J. Caldwell Flores, hereby declare:

1. I am President and Chief Operating Officer of Sable Offshore Corp. and President of Pacific Pipeline Company (collectively "Sable"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. Sable is a publicly traded oil and gas company focused on responsibly operating the Santa Ynez Unit ("SYU") and the Santa Ynez Pipeline System ("SYPS").

<u>The Santa Ynez Unit and the Santa Ynez Pipeline System</u>

3. The SYU consists of sixteen Sable-owned federal oil and gas leases covering approximately 76,000 acres in the federal waters of the Outer Continental Shelf (the "OCS"), offshore California.  The SYU is the largest known offshore oilfield in the United States.  The SYU's oil and gas is developed by three offshore platforms: the Hondo, the Harmony, and the Heritage.

4. The SYPS is a single integrated and continuous pipeline system for moving oil from the SYU onshore and then inland.  The SYPS primarily comprises offshore subsea pipelines that transport crude oil from the SYU through a wholly owned onshore processing facility in Las Flores Canyon that processes the crude oil, which is then transported through the onshore segments of the system to the Pentland Station in Kern County, California.  Two of the onshore pipeline segments are known as CA-324 and CA-325 (collectively, the "Pipeline Segments").

5. When at capacity, as it is presently, the SYPS holds approximately 532,000 barrels of oil, which at current prices is worth more than $50 million.  If a court orders the Pipeline Segments to shut down, that oil will be trapped, unable to reach refineries where it can be converted into products that are integral to supply both California consumers and the U.S. military.  Similarly, because the SYPS is the only existing means to transport oil from the SYU to market, Sable would be unable

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

2

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

to develop and transport hundreds of millions of barrels that could help offset California's dependence on oil produced abroad.

### The Pipeline Segments and Gaviota State Park

6.      Prior to construction of the Pipeline Segments, the federal Bureau of Land Management and the California State Lands Commission prepared a comprehensive Environmental Impact Report and Environmental Impact Statement, which recommended a right-of-way through Gaviota State Park (the "Park") as the environmentally superior routing for a pipeline.  This assessment analyzed the potential environmental effects of long-term operation, repairs that might become necessary, and ongoing maintenance.  The California Department of Parks and Recreation ("CDPR") was consulted as part of the environmental review process.

7.      In 1987, in response to that environmental review, CDPR granted an easement through the Park for construction of the Pipeline Segment.  The Park contains a four-mile segment of the Pipeline Segments, consisting of a thirty-inch tube buried an average of six feet underground.

### The Refugio Oil Spill and Consent Decree

8.      After almost twenty-five years of operation, in 2015, under a prior owner, a leak along Segment CA-324 resulted in the Refugio oil spill.  The Pipeline Segments were emptied of oil and filled with nitrogen gas, after which the prior owner voluntarily withdrew the then-operative Federal Energy Regulatory Commission tariffs.  The Pipeline Segments were then redesignated as an intrastate pipeline subject to regulation by the California Office of the State Fire Marshal ("OSFM").  In 2020, the United States, a range of California agencies, including CDPR, and the former owner of the Pipeline Segments entered into a Consent Decree, *see* ECF 23-2, Ex. 1, which laid out the preconditions to resuming the flow of oil.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

3

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

9. Appendix B of the Consent Decree required "State Waivers" from OSFM prior to resuming the flow of oil. These waivers were to address "the limited effectiveness of cathodic protection" before resuming petroleum transportation through the Pipeline Segments. Cathodic protection refers to one corrosion prevention method (of many) that was installed along the Pipeline Segments when they were first constructed. Industry experts have long recognized that cathodic protection systems may be weakened if insulation around a pipeline becomes compromised by water intrusion.

10. Appendix D of the Consent Decree also required the owner of the Pipeline Segments to submit a "Restart Plan" before resuming petroleum transportation.

<u>Sable's Acquisition and $215 Million Investments in Pipeline Safety</u>

11. Sable acquired the SYU and the SYPS in February 2024. Unlike under the previous owner, these onshore and offshore assets are now held under the same ownership umbrella. Since then, Sable has invested over $1.4 billion, endeavoring to resume SYU production and SYPS transportation after a more than decade-long period of dormancy. This has included over $215 million in repairs and upgrades to the SYPS.

12. Sable has decades of experience safely operating in California. Sable's operational team strictly adheres to all federal, state, and local safety regulations and implements robust monitoring systems to detect potential issues. Since February 2024, Sable has worked tirelessly with both state and federal regulators, including those at OSFM and the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") to ensure the Pipeline Segments are repaired and maintained in a manner consistent with the Consent Decree's requirements.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

13. In May 2024, Sable began conducting physical repair and maintenance activities along the Pipeline Segments to remediate certain anomalous conditions detected during inspections conducted by the Pipeline Segments' prior owner. These activities, referred to as "anomaly repair work," are routine repair and maintenance activities that have been conducted on numerous occasions along the Pipeline Segments since it was first constructed. Sable performed over 200 anomaly repairs along the Pipeline Segments under direct oversight from OSFM personnel.

14. In September 2024, Sable installed twenty-seven safety valves along the Pipeline Segments in compliance with California Assembly Bill 864. These valves reduce the worst-case potential release of oil by almost 40%. Sable installed the required safety valves only after the County of Santa Barbara confirmed that it lacked permit authority or jurisdiction over the safety valve installation work.

15. On December 17, 2024, following lengthy technical discussions and inspections of Sable's pipeline facilities, OSFM issued State Waivers for the Pipeline Segments. Later, when PHMSA assumed jurisdiction, PHMSA issued a Special Permit to substitute for the State Waivers and approved Sable's "Restart Plan" for the Pipeline Segments. Both the State Waivers and the Special Permit impose over sixty conditions to address the limited effectiveness of cathodic protection along the Pipeline Segments and to provide regulatory relief from 49 C.F.R. § 195.452, subd. (h)(4)(iii)(H). These conditions included requirements to conduct water pressure tests ("hydrostatic pressure tests" or "hydrotests") along the Pipeline Segments before resuming petroleum transportation, limitations on the maximum operating temperature and maximum operating pressure for crude oil transported through the Pipeline Segments, more stringent inspection frequency requirements and thresholds for anomaly remediation, as well as detailed validation, data analysis, recordkeeping, and reporting requirements.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

16. Sable has also implemented pipeline integrity and corrosion-prevention mechanisms, including automated safety valves, in-line inspections, a new pipeline control system with real-time leak detection and automatic shutdown capability, and other ongoing maintenance. These measures exceed pipeline industry standards.

17. Contemporary analyses confirm that crude oil pipelines operated with limited cathodic protection are not more likely to result in oil spills or oil spills of increased size when other appropriate leak detection and prevention methods are implemented, such as those identified in the PHMSA Special Permit. Moreover, the heightened patrolling, monitoring, emergency shutdown, training, inspection, and corrosion prevention requirements proposed by Sable in its Restart Plans collectively will reduce the risk and magnitude of any potential oil spill.

18. Sable has updated its programs and procedures, including its Integrity Management Plan, Control Room Management Plan, Operations & Maintenance Manual, and Standard Operating Procedures, consistent with the requirements of the Consent Decree. These updates include provisions related to inspections, repair criteria, coating repair, preventative and mitigative measures, leak detection, SCADA alarms, and patrolling and surveillance of the Pipeline Segments. *See* ECF 23-2, Ex. 1, App. B, §§ 4.A, 12.A; *id.* Ex. 1, App. D §§ 1.b, 1.f. Pursuant to federal law, Sable has also maintained liability insurance and a plan for notifying authorities in the event of a spill.

19. OSFM has reviewed Sable's updated Integrity Management Plan, a document outlining Sable's processes and procedures intended to provide for active reduction in operating risk through the ongoing evaluation of risk, implementation of integrity assessments, evaluation and implementation of risk-reducing actions, and the evaluation of program effectiveness, in conjunction with inspections and meetings in 2024 and 2025.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

6

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

20. In May 2025, Sable completed all anomaly repairs along the Pipeline Segments falling within the heightened repair criteria established by the Consent Decree.

21. After completing all anomaly repair work, Sable conducted successful hydrotests along the Pipeline Segments between March and May 2025. These occurred under OSFM's supervision and as required by the then-effective State Waivers. Sable's hydrotests confirmed that the Pipeline Segments could be operated at pressures in exceedance of the Pipeline Segments' defined maximum operating pressures for both short periods ("spike" hydrotests) and longer durations.

22. On July 25, 2024, and again on July 17, 2025, Sable held oil spill response preparedness drills which included approximately 35 representatives from the U.S. Environmental Protection Agency, PHMSA, U.S. Coast Guard, National Oceanic and Atmospheric Administration's Office of National Marine Sanctuaries, California Department of Fish and Wildlife's Office of Spill Prevention and Response, Santa Barbara County Air Pollution Control Department, Santa Barbara County Office of Emergency Management, Santa Barbara County Fire Department, and Santa Barbara County Certified Unified Program Agency.

23. From August 6 to 8, 2025, OSFM met with Sable to review Sable's Operations and Maintenance Manual. OSFM confirmed that Sable's Operations and Maintenance Manual incorporated all procedural modifications contemplated by the Consent Decree. OSFM also confirmed that Sable has instituted a management of change plan to ensure any future procedural changes are similarly incorporated into the Operations and Maintenance Manual.

24. From August 12 to 14, and again on August 20, 2025, OSFM met with Sable to discuss the process of resuming petroleum transportation through the Pipeline Segments. OSFM also conducted inspections of Sable's control room and site visits to the Pipeline Segments' pump stations and valve sites.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

25.     From August 12 to 14, 2025, Sable met with OSFM to discuss its Fill Plan and Start Up Procedures.  The Fill and Start Up Procedures were submitted to OSFM on September 11, 2025.

26.     From September 2 to 5, 2025, OSFM met with Sable to inspect Sable's Control Room Management plan.  OSFM tested and reviewed all alarms and systems, including the Master Control Room enhancements, during these inspections and confirmed the enhancements satisfied all applicable Consent Decree requirements.

PHMSA's Assumption of Jurisdiction

27.     On November 26, 2025, Sable submitted a letter to PHMSA seeking confirmation of Sable's determination that the Pipeline Segments are part of an interstate pipeline facility under the Pipeline Safety Act and requesting PHMSA's assessment of that determination.  Sable's assessment relied on the unified ownership of the offshore and onshore pipeline segments as part of a single SYPS.

28.     PHMSA then conducted on-site facilities inspections of the Pipeline Segments, pump stations, and control room from December 9 to 11, 2025. PHMSA also reviewed Sable's written procedures and records and program inspections previously completed by OSFM.

29.     Based on its review and on-site facilities inspections, on December 17, 2025, PHMSA issued a letter to Sable concurring with Sable's determination that the Pipeline Segments are part of an "interstate" pipeline facility subject to PHMSA's jurisdiction.

30.     On December 22, 2025, after reviewing documents submitted by Sable and in light of PHMSA's field inspections of the facilities, PHMSA approved Sable's Restart Plans for the Pipeline Segments, including Sable's Fill Plan and Start Up Procedures, Linefill Positioning Plan Assignments, and Linefill Contact List.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

31.     On December 23, 2025, PHMSA granted Sable an emergency "Special Permit" for the Pipeline Segments.  On January 22, 2026, Sable submitted a request for a non-emergency Special Permit.  On February 23, 2026, PHMSA "preliminarily determined that the issuance of the special permit would not be inconsistent with pipeline safety" and noticed the Special Permit application for public comment.  *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026).

32.     The Special Permit waives compliance with a single regulatory requirement, 49 C.F.R. § 195.452, subd. (h)(4)(iii)(H), and imposes additional safety measures to ensure pipeline integrity.  The Special Permit includes substantially the same conditions as those found in the OSFM State Waiver, to provide continuity based on the Pipeline Segments' change to interstate status.

33.     Sable has committed to implementing the conditions of the Emergency Special Permit in the interim while PHMSA's review of the non-emergency special permit is pending, and PHMSA technical staff have been onsite during the process of resuming flow.

<u>Sable's Resumption of Oil Transportation Pursuant to the Defense Production Act Order</u>

34.     In late February 2026, the United States became involved in the ongoing Iran conflict, which has resulted in serious disruptions to oil supplies and significant increases in the cost of oil.  These developments exacerbated an already-acute oil shortage on the West Coast as recognized in Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025), creating threats to national security and domestic energy supplies.

35.     On March 16, 2026, the United States, through the U.S. Secretary of Energy, issued an order commanding Sable to immediately provide services requiring the flow of crude oil through the Santa Ynez Pipeline System, pursuant to the Defense Production Act, 50 U.S.C §§ 4501 *et seq*.  As recognized by the DPA

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

9

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

Order, ECF 23-2, Ex. 3, "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" *Id.* at 114. The Santa Ynez Unit is a critical resource on the West Coast.

36.    Pursuant to the DPA Order, Sable resumed the transportation of hydrocarbons through the Pipeline Segments according to the Restart Plan beginning on March 13, 2026. On the morning of March 14, 2026, the Director of the Western Region for the Office of Pipeline Safety and two other qualified PHMSA safety inspectors arrived onsite to observe the resumption of oil flow. Two PHMSA safety inspectors were on site at the Las Flores facility, where Sable was bringing online one of the two mainline pumps. One PHMSA inspector was in the control room.

37.    Consistent with the Consent Decree, the Restart Plan provides for a staged process where each segment of the system is brought up to pressure that is held for two hours before moving to a higher pressure for another two hours. This operational procedure is called a stand-up pressure test. During the procedure, the line pressures are checked for any change in pressure that could indicate an issue. The Pipeline Segments also are monitored by aircraft for any signs of releases. There have been no releases or other problems during the resumption of oil flow.

38.    Sable began by filling CA-324 with hydrocarbons that had been stored in tanks. Sable put a device inside CA-324 to expel nitrogen and turned on its shipping pump to pump the oil through the Pipeline Segments. Once the stand-up pressure tests in one segment of the Pipeline Segments were complete, Sable started the next segment. If there had been issues maintaining pressure, Sable would have shut down the segments at issue. There have been no issues maintaining pressure.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

10

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

39.    Sable started the process during daylight hours, as laid out in the Restart Plan, and notified local emergency response personnel.

40.    Three PHMSA inspectors were onsite monitoring the process again on March 15, 2026.  That morning, Sable and a PHMSA inspector visited the control room to make sure the resumption of oil flow was proceeding according to plan. Sable monitored pressure, conducted safety checks on the Pipeline Segments, and made sure aircraft were conducting the required flyovers.  Sable detected no safety concerns.

41.    Sable completed filling CA-324 with hydrocarbons on the morning of March 15, 2026.  Sable conducted two stand-up pressure tests that passed the Restart Plan's conditions.

42.    By late afternoon on March 15, 2026, Sable began filling CA-325 with product from Gaviota to Valve Site 13.  On March 19, 2026, Sable completed filling a segment called CA-325A with hydrocarbons from Gaviota to Sisquoc Pump Station.  On that date, Sable successfully conducted two stand-up pressure tests of CA-325A that passed the Restart Plan's conditions.

43.    On March 20, 2026, Sable flooded Sisquoc Station and successfully tested station piping in accordance with the Restart Plan.

44.    On that same date, Sable began filling CA-325B with product.  On March 29, 2026, Sable completed filling CA-325B from Sisquoc Pump Station to Pentland Station.  On that same date, Sable successfully conducted a stand-up pressure test of CA-325B. Sable then flooded and successfully tested its Pentland Station facility piping in accordance with the Restart Plan's conditions.

45.    Once these operations were completed, on March 29, 2026, Sable commenced deliveries of hydrocarbons through a custody transfer meter owned by the Pentland Station operator and into the operator's own Pentland Station piping.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

11

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

46. The process has gone smoothly, consistent with the Consent Decree and the Restart Plan, with no safety concerns.

### Sable's Plans for Continued Operation

47. After the Consent Decree is terminated, Sable will continue to be regulated by PHMSA and will continue to comply with the conditions in Sable's Special Permit, which embody all forward-looking Consent Decree safety provisions, in addition to all applicable requirements under 49 C.F.R. Part 195.

### Consequences to Sable from A Court-Ordered Shutdown

48. A court-ordered pipeline shutdown would be a difficult, complex, time-consuming process which carries additional safety risks.

49. If operation of the Pipeline Segments is enjoined, the production and transportation of oil will halt, precluding Sable from supplying California refineries. Sable will lose substantially all its revenue, totaling approximately $5.14 million per day (or $156.15 million per month).

50. Sable Offshore Corp. is publicly traded on the New York Stock Exchange. A business disruption of this magnitude could dramatically lower the company's share price, destroying value for shareholders, including not just institutional investors but also workers across the country whose pensions and retirement plans hold equity in Sable.

51. Sable employs approximately 200 full-time employees across its operations in California. These jobs are good-paying, not easily replicated, and offer substantial benefits and room for upward mobility. If SYU or SYPS operations are enjoined, Sable may be forced to suspend or lay off some of its employees.

52. Continued operation of the SYU and the SYPS is also indispensable to the livelihoods of approximately 300 well-paid contractors, including laborers, operators, welders, mechanics, electricians, engineers, longshoremen, and construction workers, many of whom are unionized. Because of the dearth of oil

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

12

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

production in California, these jobs will also be difficult to replace if lost. Moreover, informing contractors that there is no longer work for them would compromise goodwill and jeopardize longstanding relationships between those individuals and Sable.

53.    Collectively, the combined annual direct employee and indirect contractor payroll is estimated to range between $100 and $200 million.

54.    Loss of these jobs would not only hurt the employees, contractors, and their families: local governments, principally Santa Barbara County, but also San Luis Obispo County and Kern County, would be negatively affected by the loss of revenue from income, sales, and property taxes, as detailed below.

<u>Consequences for California's Energy Supply from A Court-Ordered Shutdown</u>

55.    California is currently facing an energy crisis. It has the highest retail gasoline and aviation fuel costs in the United States, and the state must import most of its oil from foreign countries to satisfy its residents' growing energy demands. According to the California Energy Commission, over 61% of the crude oil feeding California refineries was imported from foreign countries, many in the turbulent Middle East. *See* Cal. Energy Comm'n, *Annual Oil Supply Sources to California Refineries*, https://tinyurl.com/4hkecyjn (last visited Apr. 1, 2026). Whereas thirty years ago in-state production constituted 50% of oil supply (and Alaskan production represented another 38%, for a domestic total of 88%), foreign imports have risen from 12% in 1997 to 61% last year. Iraq alone is responsible for 17% of California's foreign crude oil imports, and Middle Eastern imports collectively represent over a quarter of California's oil imports. *See* Cal. Energy Comm'n, *Foreign Sources of Crude Oil Imports to California*, https://tinyurl.com/yjtu77rx (last visited Apr. 1, 2026). Many of these tankers must traverse the Strait of Hormuz, which is currently

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

the site of intense military activity, and then travel thousands of nautical miles before offloading their cargos into the California market.

56.    The current state of affairs is exemplified by the recent ordeal involving the San Pablo Bay Pipeline used to transport crude oil from Kern County to Bay Area refineries.  In September 2025, the pipeline's owner sent a letter to California Governor Gavin Newsom, noting that the operator was in severe financial distress because of the pipeline's sudden underutilization.  Without relief, the letter warned, the pipeline would have to be shut down, which would have severely negative consequences.  The CEO added that California crude oil production was meeting only 25% of refinery demand and encouraged Governor Newsom to allow the SYU to reopen, which would reinfuse the pipeline system and allow more crude oil to flow north from Kern County.  But without additional production coming online, by the end of 2025, the pipeline was essentially empty, and as of now, it is shut down.  Prospects for restart are dim, as the economics of the pipeline remain highly challenged due to declining regional production and strict environmental regulations.  Now that the San Pablo Bay Pipeline is shut down, oil producers in Kern County have shifted transportation to the road, deploying upward of 100 trucks each day to move crude oil, which is more polluting, more expensive, and more hazardous.

57.    California refineries have faced similar dire challenges.  Over the past several years, numerous California refineries have been converted to alternative feedstock sources, idled, or shuttered.  These include Marathon's Martinez refinery and Phillips 66's Rodeo refineries, which were converted to sources other than the crude oil for feedstock, and Phillips 66's Los Angeles refinery and Valero's Benicia refinery, which were shuttered. And these refineries are needed to supply needed fuel, including gasoline, not just to California but also the rest of the West Coast, including inland states like Nevada and Arizona that are dependent on California.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

14

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION

58.     Flowing oil through the SYPS from the SYU to refineries helps to alleviate California's energy crisis.  Indeed, Sable is immediately increasing in-state oil production by approximately 17%.

59.     If a court prevents Sable from producing oil and gas from the SYU and transporting oil through the SYPS to market, it is highly unlikely that the SYU will ever be produced, stranding billions of dollars of valuable natural resources owned by the public and destroying significant economic activity.

60.     Without the continued supply of oil from the SYU through the SYPS, the remaining refineries would be forced to obtain feedstock oil from other sources, including oil imported from foreign countries or from the Gulf Coast, which requires a lengthy and costly ocean voyage (and in many cases, through the Panama Canal) for delivery to California.

Consequences for the Federal, State, and Local Fiscs from A Court-Ordered Shutdown

61.     Oil producers like Sable are required to pay royalties—a percentage of the value of the oil produced from leased land—to the State of California and the federal government.  Sable pays a royalty of 16.39% of gross revenue to the federal government, worth approximately $368 million annually at current crude oil market prices and Sable's current production rate.  An injunction would eliminate this significant contribution to the U.S. Treasury, which is a primary source of funding for the Land and Water Conservation Fund (the "LWCF").  The LWCF funds federal land acquisition and provides grants to state and local governments for park development, including numerous projects in Santa Barbara County.

62.     Sable's real estate and infrastructure are also subject to local property taxes paid into county-level general funds, where the money can be used to fund essential public services.  These tax contributions, as a percentage of Sable's net revenue, are substantial.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

63. In fact, Sable is one of Santa Barbara County's highest taxpayers. In 2014, the final full year of operation for the SYPS, the county received approximately $5 million in tax revenue from Sable's predecessor-in-interest.

64. Sable's operations also generate significant tax proceeds for the State of California and the United States Government as well in the form of sales, corporate, and income taxes paid by Sable, its employees, and its contractors.

<u>Consequences for the U.S. Military from A Court-Ordered Shutdown</u>

65. Flow of oil through the Pipeline Segments helps meet the urgent needs of the U.S. military to supply West Coast military installations and serve U.S. Indo-Pacific Command.

66. California is home to more than 40 major military installations, the highest concentration of any U.S. state. These bases serve as critical hubs for training, logistics, and research across every branch of the Armed Forces.

67. Among these installations are Naval Base San Diego, the largest naval base on the West Coast and home to the U.S. Pacific Fleet; Camp Pendleton, the Marine Corps' premier West Coast expeditionary training facility; Edwards Air Force Base, where the world's most extensive aircraft testing takes place; and Vandenberg Space Force Base, the country's primary West Coast space launch and missile testing facility.

68. A reliable domestic supply of crude oil to the West Coast is essential to military readiness and homeland security.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on April 3, 2026, in Houston, Texas.

_____
J. Caldwell Flores

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

CASE NO. 2:26-cv-02946-WLH-MAA
DECL. OF J. CALDWELL FLORES ISO OPP. TO
MOTION FOR PRELIMINARY INJUNCTION