ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
RILEY W. WALTERS
Email: Riley.Walters@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 514-5442

*Attorneys for Interested Party*
*the United States of America*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,<br><br>Plaintiff,<br><br>v.<br><br>SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY, and DOES 1-50 inclusive,<br><br>Defendants. | Case No. 2:26-cv-02946-SVW-SSC<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA (28 U.S.C. § 517)**<br><br>Hearing Date: April 27, 2026<br>Time: 1:30 pm<br>Judge: Honorable Stephen V. Wilson<br><br>Complaint Filed: March 17, 2026<br>Date Removed: March 19, 2026 |

# TABLE OF CONTENTS

INTERESTS OF THE UNITED STATES OF AMERICA ............................ 1

BACKGROUND .................................................................................. 3

    I.     The Defense Production Act ......................................................... 3

    II.    The Pipeline Capacity Prioritization and Allocation Order ......... 5

ARGUMENT ....................................................................................... 5

    I.     Executive Branch Orders and Regulations Preempt Conflicting State Law ..................................................................................... 6

    II.    The Defense Production Act Order Preempts the California Department of Park and Recreation's Trespass Action ............... 7

    III.   The Public Interest and Balance of Equities Do Not Support Enjoining Operation of a Pipeline Deemed Essential to the National Defense ..................................................................... 12

CONCLUSION ................................................................................. 12

i

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ...............................................................................................6

*City of New York v. FCC*,
  486 U.S. 57 (1988) .................................................................................................7

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (9th Cir. 2022)..............................................................................6, 7

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) .............................................................................................11

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) .............................................................................................11

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ..............................................................................................6, 7

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ...............................................................................................6

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ...............................................................................................7

*Haig v. Agee*,
  453 U.S. 280 (1981) .............................................................................................12

*Hercules Inc. v. United States*,
  24 F.3d 188 (Fed. Cir. 1994)..................................................................................9

*Hercules Inc. v. United States*,
  516 U.S. 417 (1996) ...............................................................................................9

*Johnson v. Tyson Foods, Inc.*,
  580 F. Supp. 3d 382 (N.D. Tex. 2022)...................................................................9

*Lichter v. United States*,
  334 U.S. 742 (1948) .............................................................................................11

ii

*Statement of Interest of the*
*United States of America*

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ..................................................................................6

*Martin v. United States*,
   605 U.S. 395 (2025) ..................................................................................7

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ................................................................................10

*Mut. Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013) ..................................................................................8

*New York v. Dep't of Justice*,
   343 F. Supp. 3d 213 (S.D.N.Y. 2018) ....................................................10

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................................10

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
   418 U.S. 264 (1974) ..................................................................................6

*Olympic Pipe Line Co. v. City of Seattle*,
   437 F.3d 872 (9th Cir. 2006) ....................................................................3

*Reed v. Tyson Foods, Inc.*,
   No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021) ............9

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ................................................................................11

*United States v. Vertac Chem. Corp.*,
   46 F.3d 803 (8th Cir. 1995) ......................................................................9

*Variscite, Inc. v. City of Los Angeles*,
   No. 2:22-cv-08685, 2023 WL 3493557 (C.D. Cal. Apr. 11, 2023) ........11

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................12

**Statutes**

28 U.S.C. § 517.............................................................................................1

50 U.S.C. § 4502(a)(1)..................................................................................3

50 U.S.C. § 4502(a)(3)..................................................................................3

iii

50 U.S.C. § 4502(a)(4)................................................................2, 3

50 U.S.C. § 4502(a)(5)................................................................2, 4

50 U.S.C. § 4511(a) ...................................................................2, 7

50 U.S.C. § 4511(c) ......................................................................2

50 U.S.C. § 4513 ...........................................................................5

50 U.S.C. § 4516 ...........................................................................4

50 U.S.C. § 4552(13) .....................................................................4

50 U.S.C. § 4552(14) .....................................................................4

50 U.S.C. § 4552(16)(A) ................................................................4

50 U.S.C. § 4552(8) .......................................................................4

50 U.S.C. § 4554(a) .......................................................................7

50 U.S.C. § 4556 ...........................................................................5

50 U.S.C. § 4557 ...........................................................................4

Pub. L. No. 95-223, 91 Stat. 1625 (1977)......................................11

**Regulations**

10 C.F.R. § 217.53(b) ...................................................................4

**Other Authorities**

77 Fed. Reg. 16651 (Mar. 16, 2012)...............................................3

85 Fed. Reg. 26313 (Apr. 28, 2020) ...............................................8

90 Fed. Reg. 8433 (Jan. 20, 2025) ...............................................2, 5

91 Fed. Reg. 13199 (Mar. 13, 2026)...............................................3

Letter from Secretary Purdue *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5, 2020) ................................................................8, 9

*California Military Installations and Operational Areas*, Office of Governor.........5

iv

*Statement of Interest of the*
*United States of America*

## INTERESTS OF THE UNITED STATES OF AMERICA

When federal and state law conflict, the Supremacy Clause provides a clear rule of decision:  Federal law must prevail.  The California Department of Parks and Recreation (CDPR) seeks to turn this bedrock principle on its head.  If CDPR succeeds, it will not only blunt federal authority and undermine the supremacy of federal law—it will also jeopardize our national security and military readiness by effectively nullifying an order that the Secretary of Energy deemed essential to those ends.  Because the United States has a substantial interest in preventing that result, it submits this statement of interest as authorized by 28 U.S.C. § 517.[1]

The Defense Production Act (DPA) grants the President of the United States broad power to ensure that domestic industry can support national defense requirements.  Having received delegated authority from the President, the Secretary of Energy determined that the immediate flow of oil through the Santa Ynez Pipeline System (SYPS) is necessary to meet core national defense needs.  The Secretary therefore issued a DPA order (the Order) directing the pipeline's owner to immediately resume the transport of oil through the pipeline.

CDPR now contends that state tort law trumps the Order.  Specifically, CDPR asserts that it can compel a private party to violate federal law by ordering the shutdown of a pipeline that the federal government directed to operate on national security grounds under the DPA.  But settled principles of preemption confirm that a valid DPA order preempts conflicting state laws and actions.  Were it otherwise, the President's ability to promote the national defense would turn not on the full

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."  28 U.S.C. § 517.  The United States is actively considering whether to move to intervene and expects to make a decision imminently.  It submits this statement now given the upcoming hearing on CDPR's motion for a preliminary injunction.

*Statement of Interest of the*
*United States of America*

authority Congress gave him, but on whatever residual authority remains after deferring to each of the thousands of state laws and local ordinances that may act as a veto of Presidential action.  That is not how our federal system works.

And that is especially true when, as here, our national security is at stake.  As the President has recognized, an "affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025).  In the DPA, Congress likewise acknowledged the tight nexus between the domestic energy supply and our national security, finding that "in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs."  50 U.S.C. § 4502(a)(5).  Congress, through the DPA, accordingly vested the President "with an array of authorities" to achieve this goal, *id.* § 4502(a)(4), including authority to require the prioritized performance of certain contracts and to allocate materials, services, and facilities as the President deems necessary or appropriate to promote the national defense and maximize domestic energy supplies, *see id.* § 4511(a), (c). Having been delegated that authority by the President, the Secretary of Energy determined that the Order is necessary to remedy energy shortages—particularly on the Nation's West Coast, where essential defense-related activities require rapid and reliable fuel supplies—and to reduce supply chain and national security risks posed by dependence on energy imported from foreign adversaries.  CDPR's requested relief would thwart those efforts, to the detriment of the entire Nation.

Because CDPR fails to show that it is likely to prevail on the DPA-preemption question, and because the public interest and balance of equities cut strongly against its requested relief, CDPR is not entitled to the extraordinary remedy of a preliminary injunction.[2]  The Court can deny its motion on these grounds alone.

---

[2] Insofar as CDPR is attempting to regulate pipeline safety, as it suggests in its

2

<em>Statement of Interest of the<br>United States of America</em>

## BACKGROUND

### I.    The Defense Production Act

The DPA grants the President—and any department head to which he delegates authority—extensive power to ensure that domestic industry can support national defense requirements.  Congress enacted the DPA because "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States."  *Id.* § 4502(a)(1); *see also id.* § 4502(a)(3) (finding that "the development of domestic productive capacity" is necessary "to provide for the national security" of the United States and "national defense preparedness").  Consistent with this prophylactic focus, the DPA grants the President "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base."  *Id.* § 4502(a)(4).

Three of those authorities are relevant here: the President's prioritization authority under section 4511(a)(1); the President's allocation authority under section 4511(a)(2); and the President's energy-production authority under section 4511(c). The President has delegated these authorities to the Secretary of Energy and other executive department and agency heads.  *See National Defense Resources Preparedness*, Exec. Order. No. 13603, 77 Fed. Reg. 16651 (Mar. 16, 2012); *Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026).

Starting with his prioritization authority, section 4511(a)(1) allows the President "to require acceptance and performance" of "contracts or orders" that "he deems necessary or appropriate to promote the national defense … in preference to

motion, that effort is also preempted by the Pipeline Safety Act.  *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878, 881-82 (9th Cir. 2006).

3

other contracts or orders." Nothing in this provision limits its scope to contracts with the federal government.

Next, the President's allocation authority under section 4511(a)(2) allows him "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." The term "materials" includes "any raw materials" and "services ancillary to the use of any such materials," 50 U.S.C. § 4552(13); the term "services" includes "any effort that is needed for or incidental to" the "development" or "production" or "distribution" of "an industrial resource," *id.* § 4552(16)(A); and the term "facilities" includes "all types of buildings, structures, or other improvements to real property …, and services relating to the use of any such building, structure, or other improvement," *id.* § 4552(8). An allocation order may "require[] a person to take or refrain from taking certain actions," including with respect to the production of a resource. 10 C.F.R. § 217.53(b).

Finally, section 4511(c) authorizes the President to use these prioritization and allocation powers "to maximize domestic energy supplies," even absent a national-defense finding. This added authority reflects the DPA's broader focus on the link between domestic energy supplies and the national defense. *See, e.g.*, 50 U.S.C. § 4502(a)(5) (recognizing that "national defense preparedness" depends on "the availability of domestic energy supplies for national defense needs"); *id.* § 4552(14) (defining "national defense" broadly to include "energy production or construction"). Indeed, the DPA specifically designates energy as a "strategic and critical material." *Id.* § 4516.

The DPA supplements these broad powers by granting immunity from liability "for damages or penalties" arising from "any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued" under the statute. *Id.* § 4557. At the same time, failure to comply with a DPA order

4

*Statement of Interest of the*
*United States of America*

subjects a person to civil liability, *id.* § 4556—and, if that failure is willful, even criminal liability, *id.* § 4513.

## II.    The Pipeline Capacity Prioritization and Allocation Order

With 32 military bases, California has the highest concentration of defense-related activities in the United States.[3]  A rapid and reliable regional fuel supply for these forces is critical to our national security and military readiness.  But "dangerous State and local policies" have led to domestic energy shortages, especially on the West Coast, which in turn have led to increased reliance on energy imported from abroad.  Exec. Order No. 14156, § 1.

In March 2026, the Secretary of Energy determined that the restart of a pipeline owned and operated by Sable Offshore Corp. and Pacific Pipeline Company ("Sable") is essential to core national defense and security needs, which are threatened by energy shortages and reliance on foreign oil.  The Secretary therefore issued an order under the DPA directing Sable to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the Santa Ynez Unit—a critical offshore oil and gas unit in federal waters off the coast of California— through the SYPS; to commence performance under contracts or orders for services for hydrocarbon transportation capacity in the SYPS from the point of production in the Santa Ynez Unit through the SYPS; and to prioritize these contracts and orders over non-SYPS hydrocarbon transportation contracts or orders.  *See* Ex. A.

## ARGUMENT

There is an irreconcilable conflict between the Secretary's Order directing Sable to restart operations and CDPR's effort under state tort law to shutter those operations.  Under the Supremacy Clause, CDPR's use of state law is therefore preempted.  CDPR has not established, at this early stage, that it is likely to succeed

---

[3] *California Military Installations and Operational Areas*, Office of Governor, https://tinyurl.com/4bdzzwka, accessed Apr. 16, 2026.

*Statement of Interest of the*
*United States of America*

on the merits of the DPA-preemption question—as CDPR must do to secure a preliminary injunction—or that the public interest and equitable factors favor preliminary relief.  The Court should accordingly deny the motion.

## I.   Executive Branch Orders and Regulations Preempt Conflicting State Law.

When federal law confers a right or restricts regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Such conflict may exist when "it is impossible for a private party to comply with both state and federal requirements," or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

Because the full "force and effect of law" attaches to Executive Branch orders and regulations that carry out constitutional or congressionally delegated authority, such orders and regulations have long "been held to pre-empt state law under the Supremacy Clause." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986) ("Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."). An order issued under authority that Congress delegated to the President thus preempts conflicting state law. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974).

That preemptive effect "does not depend on express congressional authorization to displace state law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982); *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022) (holding that "Congress need not expressly delegate preemptive authority to [an agency] for its regulations to preempt state law").  When considering the preemptive force of Executive action, courts "do not focus on Congress's intent to supersede state law," but on (1) whether the action falls "within the scope of the [Executive's]

6

delegated authority," and (2) whether the Executive "meant to pre-empt the state law." *Cohen*, 46 F.4th at 1028 (cleaned up). As with federal statutes, the intent to preempt need not be express. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884-85 (2000). Instead, "[t]he statutorily authorized regulations of [the Executive] will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988).

## II.   The Defense Production Act Order Preempts the California Department of Park and Recreation's Trespass Action.

Applying those principles here, the preemption analysis is straightforward. The Order falls squarely within the scope of the President's delegated authority, as the DPA explicitly "authorize[s]" the President (and his delegees) to issue prioritization, allocation, and energy-production orders. *See* 50 U.S.C. § 4511(a), (c); *id.* § 4554(a) ("the President may prescribe such regulations and issue such orders as the President may determine to be appropriate to carry out this chapter"). Indeed, in its motion, CDPR does not appear to dispute that the Order is "a lawful exercise of delegated power"; it instead notes that it is challenging the validity of the Order in a separate case. Mem. In Support of Mot. for Preliminary Injunction ("Mem."), Dkt. No. 23-1, at 10 n.1 (March 27, 2026); *see State of California v. Wright, et al.*, No. 2:26-cv-03396 (C.D. Cal.). So for purposes of *this* motion for a preliminary injunction, CDPR has not established *any* likelihood of success on the argument that the Order is not "statutorily authorized." *Cohen*, 46 F.4th at 1028.

Nor is there merit to CDPR's suggestion that the Order does not intend to preempt state law. *See* Mem. at 9. An intent to preempt is "implied" if there is a "conflict" between "state and federal requirements," such as when it is "impossible" to comply with both. *Cohen*, 46 F.4th at 1028; *English*, 496 U.S. at 79. Simply put, "when a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 605 U.S. 395, 409 (2025).

7

And that is the case here:  Sable faces a federal directive to immediately operate its pipeline, and a state directive to immediately shut it down.  Because it is impossible for Sable to comply with both directives, the federal directive controls. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (holding that state law was conflict preempted because it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for a drug "and its federal-law duty not to alter" the label for the same drug).  CDPR all but concedes this point when it claims that an injunction would not require Sable to violate federal law because the Order does not "authorize or command Sable to commit trespass in violation of State law."  *See* Reply to Opp. to Mot. for Preliminary Injunction ("Reply"), Dkt. No. 30, at 8 (Apr. 10, 2026).  This proves conflict preemption:  Sable cannot, in CDPR's view, operate the pipeline while also complying with state tort law.  State tort law is thus preempted.

This is not the first time a DPA order has preempted conflicting state law.  In 2020, the President issued an executive order invoking his authority under the DPA to ensure the national supply of meat and poultry.  *See Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19*, Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020).  The executive order delegated DPA prioritization and allocation authority to the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA."  Exec. Order. No. 13917, §§ 1-2.  The Secretary of Agriculture then ordered meat and poultry processing plants to remain in operation—or, for plants that had closed due to COVID-19, to promptly resume operations—under that specialized federal guidance.[4]

---

[4] *See* Letter from Secretary Purdue *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5,

8

When former employees sued the owner of one such plant under state tort law alleging that unsafe working conditions caused them to contract COVID-19, the district court held that the DPA directive preempted state tort law. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388-89 (N.D. Tex. 2022). As the court explained, the plaintiffs sought "to impose liability … for failure to operate consistent with state-law standards," but those standards conflicted with standards imposed "pursuant to [the President's] delegated DPA authority." *Id.* at 389. Because the "application of those state-law standards would undermine the President's statutory authority" under the DPA, the court held that the plaintiffs' claims were preempted. *Id.*; *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions …, the state law must yield." (cleaned up)). So too here.

CDPR contends that two courts of appeals have come out the other way on DPA preemption. *See* Reply at 6-7. Not so. Those cases addressed a different question: whether section 4557—the DPA's liability shield—confers immunity and a right to indemnification to manufacturers for downstream liability and expenses related to the performance of DPA contracts. *Hercules Inc. v. United States*, 24 F.3d 188, 202-04 (Fed. Cir. 1994); *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 811-13 (8th Cir. 1995). When *Hercules* reached the Supreme Court, the Court explicitly declined to decide the scope of section 4557's liability shield "because it clearly functions only as an immunity," not—as the manufacturers had argued—as "a further agreement to indemnify" costs incurred litigating and settling third-party tort claims. *Hercules Inc. v. United States*, 516 U.S. 417, 429-30 & n.14 (1996). Besides, no matter the scope of its immunity provision, the DPA does not allow a

2020), https://tinyurl.com/3tb3zfb5.

9

conflicting state law to thwart the *specific conduct* commanded by a DPA order. For the reasons given above, any such state requirement would be conflict preempted even if there were no immunity provision in the DPA.

CDPR's invocation of the anticommandeering doctrine is even further afield. The anticommandeering doctrine prohibits the federal government from "issu[ing] orders *directly* to the States." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (emphasis added). It reflects the basic principle that the "Constitution … confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). Or put differently, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178.

"[C]ommandeering does not occur when Congress validly preempts state law through the Supremacy Clause." *New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 232 (S.D.N.Y. 2018). All preemption cases follow the same pattern: Federal law "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. In other words, when federal law preempts state law, it does not "operate directly on the States." *Id.* at 478; *see also id.* at 479 ("every form of preemption is based on a federal law that regulates the conduct of private actors, not the States"). So the Order does not conscript California into doing anything; it simply imposes an obligation on Sable that conflicts with obligations allegedly imposed by state law. True, this may affect California "indirectly," but indirect effects do not implicate the anticommandeering doctrine. *Id.* at 470-71.

Finally, CDPR's claimed property rights do not change the analysis. To provide for the national defense, the federal government has often displaced traditional property rights. Following World War II, for example, the Supreme Court upheld the federal government's ability under the Renegotiation Act "to

10

recover excess profits" on wartime contracts—even as to contracts between private parties. *Lichter v. United States*, 334 U.S. 742, 788-89 (1948). And if anything, states are in an even weaker position than private parties because they lack due process rights. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). The Supreme Court also upheld President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to transfer those assets to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In so doing, the Court emphasized that the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, notwithstanding traditional property rules. *Id.* at 674.

*       *       *

In short, CDPR claims a right to veto the exercise of discretionary authority delegated by Congress to the President in the DPA, and the relief CDPR seeks—enjoining Sable from transporting oil through its pipeline—would force a private party to violate federal law. But "[i]t is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000). And it is beyond cavil that a federal court "may not grant relief that would compel a party to violate federal law." *Variscite, Inc. v. City of Los Angeles*, No. 2:22-cv-08685, 2023 WL 3493557, at *9 (C.D. Cal. Apr. 11, 2023). The Court should deny CDPR's motion.

11

*Statement of Interest of the*
*United States of America*

**III.    The Public Interest and Balance of Equities Do Not Support Enjoining Operation of a Pipeline Deemed Essential to the National Defense.**

"It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (cleaned up).  The Secretary issued the Order based on his determination that the immediate operation of Sable's pipeline is necessary to ensure the national defense in light of energy shortages and supply chain risks, especially on the West Coast.  It would therefore be manifestly contrary to the public interest for the Court to grant CDPR's motion and enjoin operation of the pipeline.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (finding that the public interest and balance of equities tipped "strongly in favor" of the government based on the President's determination that the challenged activity was "essential to national security").

## CONCLUSION

CDPR has not shown that it is likely to succeed on the merits or that the equitable factors favor preliminary relief.  The Court should deny its motion.

DATED:  April 23, 2026            Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General

*/s/ Riley W. Walters*
Riley W. Walters
Email:  Riley.Walters@usdoj.gov
Counsel (DC Bar No. 90008638)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  (202) 514-5442

*Attorneys for Interested Party*
*the United States of America*

12

*Statement of Interest of the*
*United States of America*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Interested Party the United States of America, hereby certifies that this Statement of Interest contains 3,827 words, which complies with the word limit for L.R. 11-6.1.


DATED:  April 23, 2026                    /s/ *Riley W. Walters*

                                                            Riley W. Walters

*Statement of Interest of the*
*United States of America*