ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Jessica.tuckermohl@doj.ca.gov
Supervising Deputy Attorney General
ALICE M SEGAL (SBN 288108)
alice.segal@doj.ca.gov
NICHOLAS P. TSUKAMAKI (SBN 253959)
nicholas.tsukamaki@doj.ca.gov
MATTHEW T. STRUHAR (SBN 293973)
Matthew.struhar@doj.ca.gov
Deputy Attorneys General
State Bar No. 288108
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone:  (619) 738-9640
  Fax:  (916) 732-7920
Attorneys for Plaintiff
California Department of Parks and Recreation

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **California Department of Parks and Recreation,**<br><br>Plaintiff,<br><br>**v.**<br><br>**Sable Offshore Corp. and Pacific Pipeline Company,**<br><br>Defendants. | Case No. 2:26-cv-02946-SVW-SSC<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Date:        April 27, 2026<br>Time:        1:00 p.m.<br>Courtroom:   10A<br>Judge:       Hon. Stephen V. Wilson<br>Trial Date:  Not Set<br>Action Filed: 3/17/2026<br>Date Removed: 3/19/2026 |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:**

Plaintiff California Department of Parks and Recreation respectfully submits the attached recent decision in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al. (Sable Offshore Corp, et al., Real Parties in Interest)*, Santa Barbara County Superior Court case no. 25CV02244, issued on Thursday, April 23, 2026. In the decision, the Superior Court denied Sable Offshore Corp.'s motion to dissolve or modify the preliminary

1

injunction previously issued by the Superior Court, rejecting Sable's reliance on the March 13, 2026 Order issued by Secretary of Energy Chris Wright invoking the Defense Production Act. The Superior Court also continued, to a future date, an application for issuance of an order to show cause why Sable Offshore Corp. should not be found in contempt for violating the preliminary injunction. The decision is attached to this Notice as **Exhibit A**.

Dated: April 24, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General

*/s/ Nicholas Tsukamaki*

NICHOLAS P. TSUKAMAKI
Deputy Attorney General
*Attorneys for Plaintiff*
*California Department of Parks and Recreation*

# Exhibit A

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

| | | | |
|---|---|---|---|
| Dated and Entered: | 04/17/2026 | Time: | 10:00 AM |
| Judicial Officer: | Donna D Geck | | |
| Deputy Clerk: | Preston Frye | Dept: | SB Dept 4 |
| Bailiff/Court Officer: | Eduardo Munoz | Case No: 25CV02244 | |
| Court Reporter: | Michele McNeil | | |

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:

| | |
|---|---|
| Dintzer, Jeffrey D | Attorney for Real Parties in Interest |
| Dorsi, Michael S | Attorney for Respondents |
| Krop, Linda J | Attorney for Petitioners Environmental Defense Center, Get Oil Oult!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |
| Large, Trevor | Attorney for Real Parties in Interest |
| Stanton, Garrett B | Attorney for Real Parties in Interest |
| Nimmer, Talia | Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation |
| Frankel, Jeremy | Attorney for Petitioners Environmental Defense Center, Get Oil Outt!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |
| Simmonds, Julie Teel | Attorney for Petitioner (via Zoom) |
| Roessler, Alicia | Attorney for Respondents |

**NATURE OF PROCEEDINGS***:  **Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1)    For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2)    The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.

**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.

**Analysis:**

(1)      Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).

In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.

The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2)    Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A)    Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

SC-2411 (Revised July 1, 2013)                              **MINUTE ORDER**

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405]*, the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

      (B)     Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

---

SC-2411 (Revised July 1, 2013)              **MINUTE ORDER**

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1)    Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2)    The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A)    such materials, services, and facilities are scarce, critical, and essential--

"(i)    to maintain or expand exploration, production, refining, transportation;

"(ii)    to conserve energy supplies; or

"(iii)    to construct or maintain energy facilities; and

"(B)    maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3)    During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

        (C)    Preemption

Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid.*)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

> (D)    DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules, supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id*. at p. 193.) The Claims Court held for the United States. (*Id*. at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id*. at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

"Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

"As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
" [']When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[']

"[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
"Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination 'against contracts to which priority is assigned ...,' reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]" (*Hercules*, *supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac*, *supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac*, *supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that "the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company's] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." (*Vertac*, *supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules*, *supra*, that " 'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.' [Citation.]" (*Vertac*, *supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

---

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid*.)
In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

(E)    Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

(F)    Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

(3)    Application for Order to Show Cause re Contempt

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER          Minutes Prepared by:

_____ Preston Frye _____ , Deputy

SC-2411 (Revised July 1, 2013)                **MINUTE ORDER**

# CERTIFICATE OF SERVICE

Case Name:  **California Department of Parks & Recreation v. Sable Offshore Corp. et al.**     No.     **2:26-cv-02946**

I hereby certify that on <u>April 24, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## NOTICE OF SUPPLEMENTAL AUTHORITY

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 24, 2026</u>, at Oakland, California.

|  |  |
|---|---|
| S. Wu | */s/ S. Wu* |
| Declarant | Signature |

92112903.docx